**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

FILED
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

303 CREATIVE LLC, a limited liability
company; LORIE SMITH,

     Plaintiffs - Appellants,

v.

AUBREY ELENIS; CHARLES GARCIA;
AJAY MENON; MIGUEL RENE ELIAS;
RICHARD LEWIS; KENDRA
ANDERSON; SERGIO CORDOVA;
JESSICA POCOCK; PHIL WEISER,

     Defendants - Appellees.

------------------------------

FOUNDATION FOR MORAL LAW;
CATO INSTITUTE; CENTER FOR
RELIGIOUS EXPRESSION;
CATHOLICVOTE.ORG EDUCATION
FUND; LAW AND ECONOMIC
SCHOLARS; TYNDALE HOUSE
PUBLISHERS; CROSSROADS
PRODUCTIONS, INC., d/b/a Catholic
Creatives; WHITAKER PORTRAIT
DESIGN, INC., d/b/a Christian
Professional Photographers; THE BRINER
INSTITUTE, INC.; STATE OF
ARIZONA; STATE OF ALABAMA;
STATE OF ALASKA; STATE OF
ARKANSAS; STATE OF KENTUCKY;
STATE OF LOUISIANA; STATE OF
MISSOURI; STATE OF MONTANA;
STATE OF NEBRASKA; STATE OF
OKLAHOMA; STATE OF SOUTH

No. 19-1413

CAROLINA; STATE OF TENNESSEE;
STATE OF TEXAS; STATE OF WEST
VIRGINIA; ROBERT P. GEORGE,
Professor; AMERICAN CIVIL
LIBERTIES UNION OF COLORADO;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; AMERICANS UNITED
FOR SEPARATION OF CHURCH AND
STATE; ANTI-DEFAMATION LEAGUE;
BEND THE ARC: A JEWISH
PARTNERSHIP FOR JUSTICE;
CENTRAL CONFERENCE OF
AMERICAN RABBIS; GLOBAL
JUSTICE INSTITUTE, METROPOLITAN
COMMUNITY CHURCHES;
HADASSAH, THE WOMEN'S ZIONIST
ORGANIZATION OF AMERICA, INC.;
HINDU AMERICAN FOUNDATION;
INTERFAITH ALLIANCE
FOUNDATION; INTERFAITH
ALLIANCE OF COLORADO; MEN OF
REFORM JUDAISM; PEOPLE FOR THE
AMERICAN WAY FOUNDATION;
RECONSTRUCTIONIST RABBINICAL
ASSOCIATION; SIKH COALITION;
WOMEN OF REFORM JUDAISM;
UNION FOR REFORM JUDAISM;
STATE OF MASSACHUSETTS; STATE
OF CALIFORNIA; STATE OF
CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY;
STATE OF NEW MEXICO; STATE OF
NEW YORK; STATE OF NORTH
CAROLINA; STATE OF OREGON;
STATE OF PENNSYLVANIA; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF VIRGINIA;
STATE OF WASHINGTON; LAW

PROFESSORS OF THE STATE OF
COLORADO; LAW PROFESSORS
FROM THE STATE OF KANSAS; LAW
PROFESSORS FROM THE STATE OF
NEW MEXICO; LAW PROFESSORS
FROM THE STATE OF OKLAHOMA;
LAW PROFESSORS FROM THE STATE
OF UTAH; LAW PROFESSORS FROM
THE STATE OF WYOMING;
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW; SOUTHERN
POVERTY LAW CENTER; ASIAN
AMERICAN LEGAL DEFENSE &
EDUCATION FUND; LATINOJUSTICE
PRLDEF; LEADERSHIP CONFERENCE
ON CIVIL AND HUMAN RIGHTS;
NATIONAL ACTION NETWORK; THE
CENTER FOR CONSTITUTIONAL
RIGHTS; CENTER FOR
CONSITUTIONAL RIGHTS; FLOYD
ABRAMS; ERWIN CHEMERINSKY;
WALTER DELLINGER; KERMIT
ROOSEVELT; AMANDA SHANOR;
REBECCA TUSHNET; MAX H.
BAZERMAN; MONICA C. BELL; ISSA
KOHLER-HAUSMANN; DAVID
LAIBSON; ADAM J. LEVITIN; MARY-
HUNTER MCDONNELL; NEERU
PAHARIA; NINA STROHMINGER;
TOM R. TYLER; LAUREN E. WILLIS;
LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.,

   Amici Curiae.

―――――――――――――――――――

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-02372-MSK-CBS)**

―――――――――――――――――――

Kristin K. Waggoner (Jonathan A. Scruggs and Katherine L. Anderson, Alliance
Defending Freedom, Scottsdale, Arizona; David A. Cortman and John J. Bursch, Alliance

Defending Freedom, Washington, DC, with her on the briefs), Alliance Defending Freedom, Scottsdale, Arizona, appearing for Plaintiffs-Appellants.

Eric R. Olson, Solicitor General (Phillip J. Weiser, Colorado Attorney General; Billy Lee Seiber, First Assistant Attorney General; Jack D. Patten, III, Senior Assistant Attorney General; Vincent E. Morscher and Skippere S. Spear, with him on the brief), Colorado Department of Law, Denver, Colorado, appearing for Defendants-Appellees.

———————————————————

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

———————————————————

**BRISCOE**, Circuit Judge.

———————————————————

## I.  Introduction

Appellants Lorie Smith and her website design company 303 Creative, LLC (collectively, "Appellants") appeal the district court's grant of summary judgment in favor of Appellees Aubrey Elenis, Director of the Colorado Civil Rights Division (the "Director"), Anthony Aragon, Ulysses J. Chaney, Miguel Rene Elias, Carol Fabrizio, Heidi Hess, Rita Lewis, and Jessica Pocock, members of the Colorado Civil Rights Commission (the "Commission"), and Phil Weiser, Colorado Attorney General (collectively, "Colorado").  Appellants challenge Colorado's Anti-Discrimination Act ("CADA") on free speech, free exercise, and vagueness and overbreadth grounds.

As to our jurisdiction, we hold that Appellants have standing to challenge CADA.  As to the merits, we hold that CADA satisfies strict scrutiny, and thus permissibly compels Appellants' speech.  We also hold that CADA is a neutral law of general applicability, and that it is not unconstitutionally vague or overbroad.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's grant of summary judgment in favor of Colorado.

## II.    Background

### A. Factual Background

#### 1.  CADA

CADA restricts a public accommodation's ability to refuse to provide services based on a customer's identity.  Specifically, CADA defines a public accommodation as "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public."  Colo. Rev. Stat. § 24-34-601(1).  Exempted from CADA's definition of public accommodations are places that are "principally used for religious purposes."  *Id.*

Under CADA's "Accommodation Clause," a public accommodation may not:

> directly or indirectly . . . refuse . . . to an individual or a group, because of . . .  sexual orientation . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation . . . .

Colo. Rev. Stat. § 24-34-601(2)(a).

Under CADA's "Communication Clause," a public accommodation also may not:

> directly or indirectly . . . publish . . . any . . . communication . . . that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused . . . or that an individual's patronage . . . is unwelcome, objectionable, unacceptable, or undesirable because of . . . sexual orientation . . . .

*Id.*

CADA exempts certain sex-based restrictions from the Accommodation Clause and Communication Clause. Specifically, under CADA, "it is not a discriminatory practice for a person to restrict admission to a place of public accommodation to individuals of one sex if such restriction has a bona fide relationship to the goods, services, facilities, privileges, advantages, or accommodations of such place of public accommodation." Colo. Rev. Stat. § 24-34-601(3).

CADA provides several different means of enforcement. A person alleging a violation of CADA can bring a civil action in state court. The state court may levy a fine of "not less than fifty dollars nor more than five hundred dollars for each violation." Colo. Rev. Stat. § 24-34-602(1)(a). A complainant can also file charges alleging discrimination with the Colorado Civil Rights Division. The Commission, individual Commissioners, or the Colorado Attorney General may also independently file charges alleging discrimination "when they determine that the alleged discriminatory or unfair practice imposes a significant societal or community impact." Aplts.' App. at 2-315, ¶ 7. The Director of the Civil Rights Division then investigates the allegations and determines whether the charge is supported by probable cause. If probable cause is found, the Director provides the parties with written notice and commences a compulsory mediation. If mediation fails, a hearing may be held before the Colorado Civil Rights Commission, a single Commissioner, or an administrative law judge. If a violation is found after a hearing, the

Commission may issue a cease and desist order against the offending public accommodation.

In a different case, Colorado enforced CADA against a bakery that, because of its owner's religious beliefs, refused to provide custom cakes that celebrated same-sex marriages. That case eventually made its way up to the United States Supreme Court, where the Court ruled in favor of the baker. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018). There, the Court held that Colorado violated the Free Exercise Clause by enforcing CADA in a manner "inconsistent with the State's obligation of religious neutrality." *Id.* at 1723. The Court relied, in part, on statements made by a Commissioner who disparaged the baker's religious beliefs when the Commission adjudicated that case. *Id.* at 1729. The Court also noted that, on at least three other occasions, Colorado declined to enforce CADA against other bakers who refused to create custom cakes that disparaged same-sex marriages. *Id.* at 1730.

At a public meeting held a few days after the Court's ruling in *Masterpiece Cakeshop*, a single Commissioner opined that, despite the Court's ruling, the Commissioner who was referenced in *Masterpiece Cakeshop* did not say "anything wrong." Aplts.' App. at 3-609. Others at that hearing, however, including Director Elenis, voiced agreement with the Court's ruling and their commitment to follow that ruling. *See, e.g.*, *id.* at 3-606 (Director Elenis: "So in these cases going forward, Commissioners and ALJs and others, including the Staff at the Division, have to be

careful how these issues are framed so that it's clear that full consideration was given to sincerely—what is termed as sincerely-held religious objections.").

## 2. Appellants

303 Creative is a for-profit, graphic and website design company; Ms. Smith is its founder and sole member-owner. Appellants are willing to work with all people regardless of sexual orientation. Appellants are also generally willing to create graphics or websites for lesbian, gay, bisexual, or transgender ("LGBT") customers. Ms. Smith sincerely believes, however, that same-sex marriage conflicts with God's will. Appellants do not yet offer wedding-related services but intend to do so in the future. Consistent with Ms. Smith's religious beliefs, Appellants intend to offer wedding websites that celebrate opposite-sex marriages but intend to refuse to create similar websites that celebrate same-sex marriages. Appellants' objection is based on the message of the specific website; Appellants will not create a website celebrating same-sex marriage regardless of whether the customer is the same-sex couple themselves, a heterosexual friend of the couple, or even a disinterested wedding planner requesting a mock-up. As part of the expansion, Appellants also intend to publish a statement explaining Ms. Smith's religious objections (the "Proposed Statement"):

> These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs. So I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman. Doing that would compromise my Christian witness and tell a story

8

> about marriage that contradicts God's true story of marriage –
> the very story He is calling me to promote.

Aplts.' App. at 2-326 (¶ 91).

Appellants have not yet offered wedding-related services, or published the

Proposed Statement, because Appellants are unwilling to violate CADA.

## B. Procedural Background

Appellants brought a pre-enforcement challenge to CADA in the United States

District Court for the District of Colorado.  Appellants alleged a variety of

constitutional violations, including that CADA's Accommodation Clause and

Communication Clause violated the Free Speech and Free Exercise Clauses of the

First Amendment, and that CADA's Communication Clause violated the Due Process

Clause of the Fourteenth Amendment because it was facially overbroad and vague.

Colorado moved to dismiss.  At a motions hearing, both parties agreed there were no

disputed material facts and that the matter should be resolved through summary

judgment.

After summary judgment briefing had concluded, the district court found that

Appellants only established standing to challenge the Communication Clause, and

not the Accommodation Clause.  The district court initially declined to rule on the

merits of Appellants' Communication Clause challenges, however, because

*Masterpiece Cakeshop* was then pending before the United States Supreme Court.

After the Supreme Court's ruling in *Masterpiece Cakeshop*, the district court denied

Appellants' summary judgment motion on its Communication Clause challenges.  In

doing so, the district court "assume[d] the constitutionality of the Accommodation

Clause . . . ." *Id.* at 3-568. The district court also ordered Appellants to show cause

why final judgment should not be granted in favor of Colorado. *Id.* at 3-588. After

additional briefing, the district court granted summary judgment in favor of

Colorado.

Appellants timely appealed the district court's final judgment. They assert that

the district court erred (1) in determining that Appellants lack standing to challenge

the Accommodation Clause; (2) in assuming the Accommodation Clause does not

compel speech and in ruling that the Communication Clause does not compel speech;

(3) in rejecting Appellants' Free Exercise challenges to both Clauses; and (4) in

rejecting Appellants' overbreadth and vagueness challenges to the Communication

Clause.

### III.    Analysis

### A. Standard of Review

Summary judgment is warranted when the movant is entitled to "judgment as a

matter of law" in the absence of a "genuine dispute as to any material fact." Fed. R.

Civ. P. 56(a). We review the entry of summary judgment de novo, "applying the

same standard for summary judgment that applied in the district court." *Sandoval v.

Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020); *see also Lincoln v.

BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (stating that when reviewing

summary judgment "we need not defer to factual findings rendered by the district

court") (citation and internal quotation marks omitted). We view the evidence and

draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where the activity in question is arguably protected by the First Amendment, the court has "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).

## B. Standing

"Standing is a jurisdictional issue that may be raised by the court at any time." *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 492 (10th Cir. 1998). Whether a party has standing is a question of law reviewed de novo. *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996).

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const. art. III, § 2). The doctrine of standing serves as "[o]ne of those landmarks" in identifying "the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Under Article III, standing requires at least three elements: injury in fact, causation, and redressability. *Id*. at 560–61.

11

### 1. Injury in Fact

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc) (quoting *Lujan*, 504 U.S. at 560). In the context of a pre-enforcement challenge, to show an injury in fact, a party must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 545 (10th Cir. 2016. Article III does not require the plaintiff to risk "an actual arrest, prosecution, or other enforcement action." *SBA List,* 573 U.S. at 158 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Reviewing the issue de novo, we conclude that Appellants have shown an injury in fact. Appellants have sufficiently demonstrated both an intent to provide graphic and web design services to the public in a manner that exposes them to CADA liability, and a credible threat that Colorado will prosecute them under that statute.

Although not challenged by Colorado, *see* Colorado's Br. at 26, we are satisfied that Appellants have shown an "intention to engage in a course of conduct arguably affected with a constitutional interest." *SBA List*, 573 U.S. at 159. Although Appellants have not yet offered wedding website services, Ms. Smith has

been employed as a graphic and web designer in the past.  Appellants have also provided clear examples of the types of websites they intend to provide, as well as the intended changes to 303 Creative's webpage.  And Ms. Smith holds a sincere religious belief that prevents her from creating websites that celebrate same-sex marriages.

We are also satisfied that Appellants' intended "course of conduct"[1] is at least "arguably . . . proscribed by [the] statute," i.e., CADA.  *SBA List*, 573 U.S. at 162 (alterations in original).  In briefing the merits of its claims, Appellants, somewhat contradictorily, assert that "Colorado concedes that [Appellants] serve[] regardless of status, do[] not discriminate against LGBT persons, and make[] only message-based referrals."  Aplts.' Br. at 31–32.  True enough, the parties stipulated to the district court that Appellants are "willing to work with all people regardless of classifications such as race, creed, sexual orientation, and gender."  Aplts.' App. at 2-322 (¶ 64).  Thus, it might appear that Appellants have no exposure to liability under CADA.  Although neither party presses this argument on appeal, we address it to assure ourselves of jurisdiction.  *Buchwald*, 159 F.3d at 492.

To be sure, some of Appellants' intended course of conduct would not violate CADA, and thus would not give rise to standing.  For example, Appellants are willing to "create custom graphics and websites for gay, lesbian, or bisexual clients

---

[1] We refer to Appellants' "course of conduct" in applying the standard under *SBA List* for determining Article III standing; our discussion as to standing does not indicate whether Appellants' "course of conduct" is speech or commercial conduct.

. . . so long as the custom graphics and websites do not violate [Appellants'] religious beliefs, as is true for all customers." Aplts.' App. 2-322 (¶ 65). Thus, Appellants are not injured because CADA might "compel" them to create a website announcing a birthday party for a gay man; that is something Appellants would do willingly. Nor are Appellants injured because CADA might "compel" them to create a website announcing "God is Dead"; Colorado concedes CADA would not apply if Appellants would not produce such a website for any customers. *See* Colorado's Br. at 42. But, of course, neither birthday parties nor Nietzschean pronouncements are the focus of Appellants' challenge.

Setting aside other hypotheticals, we focus on what is to us the most obvious scenario: Appellants refuse a same-sex couple's request for a website celebrating their wedding but accept an opposite-sex couple's identical request for a website celebrating their wedding. Considering this scenario, Appellants' injury becomes clear. Although Appellants might comply with CADA in other circumstances, at least *some* of Appellants' intended course of conduct arguably would "deny to an individual . . . because of . . . sexual orientation . . . the full and equal enjoyment of [goods and services]." Colo. Rev. Stat. § 24-34-601(2)(a).

A couple's request for a wedding website is, at least arguably, "inextricably bound up with" the couple's sexual orientation. *Bostock v. Clayton Cnty., Ga.,* 140 S. Ct. 1731, 1742 (2020). As the Supreme Court explained in *Bostock,* "[an] employer's ultimate goal might be to discriminate on the basis of sexual orientation. But to achieve that purpose the employer must, along the way, intentionally treat an

employee worse based in part on that individual's sex." *Id.* So too here—although Appellants' "ultimate goal" might be to only discriminate against same-sex marriage, to do so Appellants might also discriminate against same-sex couples. As a result, Appellants' refusal may be "because of" the customers' sexual orientation, and thereby expose them to liability under CADA. *See also Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (anti-sodomy law does not target "conduct," but "is instead directed toward gay persons as a class"). We do not decide whether Appellants' (or any other businesses') conscience- or message-based objections are a defense against CADA; we only hold that such objections are at least "arguably . . . proscribed by [the] statute." *SBA List*, 573 U.S. at 162 (quoting *Babbitt*, 442 U.S. at 298) (alterations in original).

Colorado asserts that, even if Appellants have shown an intent to violate CADA, Appellants have not shown a credible threat of prosecution. Specifically, Colorado questions whether Appellants will "actually den[y] services based on a person's sexual orientation" and whether such a person will "file[] a charge of discrimination." Colorado's Br. at 27; *see also id.* at 33–35. According to Colorado, Appellants' fear of prosecution is not credible because it requires the court to speculate about the actions of Appellants' would-be customers.

We disagree. Appellants have a credible fear of prosecution because Appellants' liability under CADA and Colorado's enforcement of CADA are both "sufficiently imminent." *SBA List,* 573 U.S. at 159. Appellants' potential liability is inherent in the manner they intend to operate—excluding customers who celebrate

15

same-sex marriages.  Thus, Appellants are rightfully wary of offering wedding-related services and may challenge CADA as chilling their speech.  *See id.* at 163 ("Nothing in this Court's decisions require a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."); *also Walker*, 450 F.3d at 1089 (pre-enforcement plaintiff need not show "a present intention to engage in [proscribed] speech at a specific time in the future").

Contrary to Colorado's assertion, Appellants' fears do not "rest[] on guesswork" or "a highly attenuated chain of possibilities."  Colorado's Br. at 29.  If anything, it is Colorado that invites this court to speculate.  Assuming Appellants offer wedding-related services to the public as they say they will, there is no reason to then conclude that Appellants will fail to attract customers.  Nor is there reason to conclude that only customers celebrating opposite-sex marriages will request Appellants' services.  In short, we find nothing "imaginary or speculative" about Appellants' apprehensions that they may violate CADA if they offer wedding-based services in the manner that they intend.  *SBA List*, 573 U.S. at 165.

If Appellants violate CADA, it is also "sufficiently imminent" that Colorado will enforce that statute against Appellants.  In *SBA List*, the Supreme Court described at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed "past enforcement against the same conduct"; (2) whether authority to initiate charges was "not limited to a prosecutor or an agency" and, instead, "any person" could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement.  *Id.* at 164–65.

16

All three factors indicate Appellants have a credible fear of prosecution.  First, Colorado has a history of past enforcement against nearly identical conduct—i.e., *Masterpiece Cakeshop*, which, at the time Appellants filed their complaint, had been litigated through various state administrative and court proceedings for over two years.  Aplts.' App. at 2-317 (¶ 25).  Although Appellants create websites—not cakes—this distinction does not diminish Appellants' fear of prosecution; there is no indication that Colorado will enforce CADA differently against graphic designers than bakeries.  Second, any (would be) customer who requests a website for a same-sex wedding and is refused may file a complaint and initiate a potentially burdensome administrative hearing against Appellants.  Aplts.' App. at 2-314 (¶ 4). Thus, Appellants must fear not only charges brought by Colorado, but charges brought by any person who might request a website celebrating same-sex marriage. And third, Colorado declines to disavow future enforcement against Appellants. Colorado's Br. at 29.

Colorado asks us to conclude that there is no "active enforcement by the state," because, aside from *Masterpiece Cakeshop,* Appellants only identify three similar cases, each of which ended with a "no probable cause" finding.  Colorado's Br. at 33–34.  Yet, those cases involved businesses that *supported* same-sex marriage.  Considering all four cases collectively, Appellants have a credible fear that CADA will be enforced against businesses that object to same-sex marriage. Indeed, the Supreme Court has found that Colorado's non-enforcement against businesses that support same-sex marriage evinced a Free Exercise violation.  *See*

17

*Masterpiece Cakeshop*, 138 S. Ct. at 1730 ("Another indication of hostility is the difference in treatment between [Jack] Phillips' case [in *Masterpiece Cakeshop*] and the cases of other bakers who objected to a requested cake on the basis of conscience and prevailed before the Commission.").

Colorado also asserts that it "need not 'refute and eliminate all possible risk that the statute might be enforced' to demonstrate a lack of a case or controversy." Colorado's Br. at 29 (quoting *Mink v. Suthers,* 482 F.3d 1244, 1255 (10th Cir. 2007)).  Although not dispositive, non-disavowal of future enforcement remains a relevant factor for courts to consider in determining standing.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (considering government's non-disavowal of future enforcement).  Further, in the case upon which Colorado relies, the attorney general publicly disavowed enforcement against the plaintiff. *Mink,* 482 F.3d at 1255 n.8.  Here, Attorney General Weiser has made no similar promise to Appellants.  Indeed, Colorado's strenuous assertion that it has a compelling interest in enforcing CADA indicates that enforcement is anything but speculative.  *See* Colorado's Br. at 67 ("That other website designers are willing to serve the LGBT community is of no moment").[2]

---

[2] For similar reasons, Colorado's reliance on the Supreme Court's recent decision in *California v. Texas* is misplaced.  141 S. Ct. 2104 (2021).  In that case, the Supreme Court found that plaintiffs lacked standing to challenge an Affordable Care Act provision that carried a penalty of $0, and thus had "no means of enforcement." *Id.* at 2114.  By contrast, CADA imposes a minimum penalty of $50. Colo. Rev. Stat. § 24-34-602(1)(a).  Colorado provides no indication that those statutory penalties are unenforceable.  Colorado's repeated refutations of both actual and threatened enforcement are puzzling, to say the least.

In short, on the summary-judgment record presented, we conclude that Appellants show an injury in fact because they intend to discriminate in a manner that is arguably proscribed by CADA, and they show a credible fear that Colorado will enforce CADA against them.

## 2. Causation and Redressability

Colorado also challenges causation and redressability as to Director Elenis and Attorney General Weiser. Specifically, Colorado asserts that those defendants, unlike the Commission, lack "enforcement authority" under CADA, and thus do not cause and cannot redress Appellants' injuries. Colorado's Br. at 30.

"[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). Causation does not require a plaintiff to limit a suit to only the most culpable defendants; rather, causation merely requires that the plaintiff's injury is "fairly traceable" to those defendants. *Id*. at 1109. Redressability requires "that a favorable judgment would meaningfully redress the alleged injury." *Walker*, 450 F.3d at 1098.

Here, Appellants' injury is not merely the risk of complaints filed by private customers—it also includes the burden of administrative proceedings before the Director and the prospect of litigation brought by the Attorney General. Those injuries are "fairly traceable" to Director Elenis and Attorney General Weiser. Colorado concedes that, under CADA, Director Elenis may "investigate[] charges of discrimination, issue[] subpoenas to compel information, issue[] a determination of

probable cause or no probable cause, and conduct[] mandatory mediation if cause is found, or dismiss[] if no cause is found." Colorado's Br. at 30. Colorado also concedes that, under CADA, Attorney General Weiser has "limited" enforcement authority. *Id.* at 31. Thus, the traceability issues in this case differ from those in *Bronson*. There, the defendant was a county clerk who refused to issue a marriage license, but who had no authority to enforce the criminal statute at issue. 500 F.3d at 1111. Here, both Director Elenis and Attorney General Weiser have authority to enforce CADA.

Just as Appellants' injury is traceable to Director Elenis and Attorney General Weiser, enjoining Director Elenis and Attorney General Weiser from enforcing CADA would redress Appellants' fears that they may be subject to investigation, or face charges brought by the Attorney General. Accordingly, we conclude that Appellants have established Article III standing.[3]

### 3. Ripeness

For the same reasons Appellants have established standing, we are satisfied that this case is ripe. *See SBA List*, 573 U.S. at 157 n.5 (acknowledging that, in pre-enforcement challenges, standing and ripeness often "boil down to the same question") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)). Certainly, the record would be better developed, and the legal issues would

---

[3] Because we conclude that Appellants have standing, we decline to address whether the district court could assume the constitutionality of the Accommodation Clause after first finding Appellants lacked standing to challenge that Clause.

be clearer, if Appellants had denied services to a customer, that customer filed a complaint, and that complaint was adjudicated through the appropriate administrative and judicial channels. Yet, as discussed above, Article III does not require a pre-enforcement plaintiff to risk arrest or actual prosecution before bringing claim in federal court. Any prudential considerations presented in this case do not prevent us from exercising our "virtually unflagging" obligation to hear cases within our jurisdiction. *SBA List*, 573 U.S. at 167 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

## C. Free Speech

It is a "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 61 (2006) (recognizing the principle "that freedom of speech prohibits the government from telling people what they must say").

### 1. The Accommodation Clause

#### a. Compelled Speech

Appellants' creation of wedding websites is pure speech. The websites Appellants intend to offer "celebrate and promote the couple's wedding and unique love story" by combining custom text, graphics, and other media. Aplts.' App. at 2-325 (¶¶ 81, 84). The websites consequently express approval and celebration of the couple's marriage, which is itself often a particularly expressive event. *See*

*Obergefell v. Hodges*, 576 U.S. 644, 657 (2015) (recognizing "untold references to the beauty of marriage in religious and philosophical texts spanning time, cultures, and faiths, as well as in art and literature in all their forms").  Appellants' custom websites are similar to wedding videos and invitations, both of which have also been found to be speech.  *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751–52 (8th Cir. 2019) (wedding videographers engaged in speech); *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 908 (Ariz. 2019) (custom wedding invitations are pure speech).

Our analysis relies on the custom and unique nature of Appellants' services, rather than their chosen medium.  As Colorado asserts, the mere fact that Appellants' trade is "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed" is not sufficient to show a speech interest.  Colorado's Br. at 44 (quoting *FAIR*, 547 U.S. at 62).  In *FAIR,* the Supreme Court rejected arguments that the Solomon Amendment compelled speech by requiring law schools to accommodate military recruiters, including sending students emails on behalf of military recruiters or providing military recruiters with access to law school facilities. The Court noted that "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions. . . . [A] law school's decision to allow recruiters on campus is not inherently expressive."  547 U.S. at 64.  In contrast, here, creating a website (whether through words, pictures, or other media) implicates Appellants' unique creative talents, and is thus inherently expressive.

22

Appellants' own speech is implicated even where their services are requested by a third-party. In *Hurley*, the Supreme Court recognized a parade organizer's Free Speech interests, despite the fact that the organizer lacked a "particularized message" or that the speech would be initially generated by the participants, and not the organizer. *Hurley*, 515 U.S. at 569–70. The speech element is even clearer here than in *Hurley* because Appellants actively create each website, rather than merely hosting customer-generated content on Appellants' online platform. *Compare Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 258 (1974) ("A newspaper is more than a passive receptacle or conduit for news, comment, and advertising."), *with FAIR,* 547 U.S. at 64 ("In this case, accommodating the military's message does not affect the law school's speech, because the schools are not speaking when they host interviews and recruiting receptions."), *and PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 85 (1980) (shopping center may be forced to "use his property as a forum for the speech of others").

Nor does a profit motive transform Appellants' speech into "commercial conduct." *See* Colorado's Br. at 37. The First Amendment's protections against compelled speech are "enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers." *Hurley,* 515 U.S. at 574. Thus, as the Supreme Court has recognized, for-profit businesses may bring compelled speech claims. *See, e.g.*, *Tornillo,* 418 U.S. at 254 (for-profit newspaper cannot be compelled to accommodate political candidates' "right of reply"); *Pac. Gas and Elec. Co. v. Public Utilities Comm'n of Cal.,* 475

23

U.S. 1, 9 (1986) (utility company cannot be compelled to include critic's speech in utility company's billing envelopes).

The Accommodation Clause also "compels" Appellants to create speech that celebrates same-sex marriages. Colorado asserts that the Accommodation Clause only regulates Appellants' conduct in picking customers and does not regulate Appellants' speech. *See* Colorado's Br. at 40. Yet, this argument is foreclosed by *Hurley*. As with the Massachusetts public accommodations law in *Hurley,* CADA has the effect "of declaring the sponsors' speech itself to be the public accommodation." *Hurley,* 515 U.S. at 573. By compelling Appellants to serve customers they would otherwise refuse, Appellants are forced to create websites— and thus, speech—that they would otherwise refuse.

Colorado also asserts that the Accommodation Clause does not require a specific message or statement unrelated to regulating conduct. *See* Colorado's Br. at 46 (citing *Wooley v. Maynard*, 430 U.S. 705 (1977) and *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)). Yet, again, neither was a specific message or statement required in *Hurley*. Further, as the Supreme Court explained in *FAIR,* "compelled-speech cases are not limited to the situation in which an individual must personally speak the government's message." *FAIR*, 547 U.S. at 63. Relying on *Hurley*, the Court explained in *FAIR* that compelled speech may be found where "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Id.* So here, the result of the Accommodation Clause is that Appellants are forced to create custom websites they otherwise would not.

24

Because the Accommodation Clause compels speech in this case, it also works as a content-based restriction. *See Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("By requiring petitioners to inform women how they can obtain state-subsidized abortions . . . the licensed notice plainly 'alters the content' of petitioners' speech.") (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.,* 487 U.S. 781, 795 (1988)). Appellants cannot create websites celebrating opposite-sex marriages, unless they also agree to serve customers who request websites celebrating same-sex marriages. CADA's purpose and history also demonstrate how the statute is a content-based restriction. As Colorado makes clear, CADA is intended to remedy a long and invidious history of discrimination based on sexual orientation. *See* Colorado's Br. at 65–66. Thus, there is more than a "substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Eliminating such ideas is CADA's very purpose. For similar reasons, the Supreme Court in *Hurley* concluded that eliminating discriminatory bias was a "decidedly fatal objective" in light of a Free Speech challenge. *Hurley*, 515 U.S. at 579; *see also TMG*, 936 F.3d at 753 (Minnesota public accommodations law operates as a content-based restriction "by requiring the Larsens to convey 'positive' messages about same-sex weddings"); *B&N,* 448 P.3d at 914 (Arizona public accommodations law is facially neutral, but operates as a content-based restriction).

### b. Strict Scrutiny

Whether viewed as compelling speech or as a content-based restriction, the Accommodation Clause must satisfy strict scrutiny—i.e., Colorado must show a compelling interest, and the Accommodation Clause must be narrowly tailored to satisfy that interest. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 164 (2015).

Here, Colorado has a compelling interest in protecting both the dignity interests of members of marginalized groups and their material interests in accessing the commercial marketplace. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (Minnesota public accommodation law's goals of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order"). Colorado's interest in preventing both dignitary and material harms to LGBT people is well documented. Colorado has a unique interest in remedying its own discrimination against LGBT people. *See* Colorado's Br. at 65 (discussing *Romer v. Evans*, 517 U.S. 620, 630, 634 (1996) (holding that Colorado state constitutional amendment preventing protected status for LGBT people violated the Equal Protection Clause)). Even setting Colorado's history aside, Colorado, like many other states, has an interest in preventing ongoing discrimination against LGBT people. *See* Br. of Lambda Legal Defense and Education Fund as *amicus curiae*, at 15 (describing ongoing discrimination against LGBT people in Colorado); Br. of Mass., et al. as *amicus curiae* at 7–8 (describing laws in other states that address discrimination based on sexual orientation).

26

Nor do we construe Appellants' arguments as challenging Colorado's interest in combating discrimination generally. Rather, Appellants assert Colorado fails to establish a compelling interest because "[Appellants] do[] not discriminate against anyone," and because "Colorado can curb discriminatory conduct without compelling or silencing [Appellants]." Aplts.' Br. at 54; *see also* Aplts.' Reply at 26. Appellants do not appear to deny that, at least in other contexts, LGBT people may suffer discrimination, and Colorado may have an interest in remedying that harm. Thus, Appellants' arguments more appropriately address whether CADA is narrowly tailored—not whether CADA furthers a compelling interest.

The Accommodation Clause is not narrowly tailored to preventing dignitary harms. As the Supreme Court has repeatedly made clear, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579; *see also Boy Scouts of Am. v. Dale,* 530 U.S. 640, 659 (2000) ("The state interests embodied in New Jersey's public accommodations law [prohibiting expulsion of a LGBT scoutmaster] do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association."). So too here. As compelling as Colorado's interest in protecting the dignitary rights of LGBT people may be, Colorado may not enforce that interest by limiting offensive speech. Indeed, the First Amendment protects a wide range of arguably greater offenses to the dignitary interests of LGBT people. *See Snyder v.*

27

*Phelps*, 562 U.S. 443 (2011) (extending First Amendment protections to funeral picketers).

The Accommodation Clause is, however, narrowly tailored to Colorado's interest in ensuring "equal access to publicly available goods and services." *U.S. Jaycees*, 468 U.S. at 624.  When regulating commercial entities, like Appellants, public accommodations laws help ensure a free and open economy.  Thus, although the commercial nature of Appellants' business does not diminish their speech interest, it does provide Colorado with a state interest absent when regulating non-commercial activity.  *Compare id.*, 468 U.S. at 626 (recognizing "the changing nature of the American economy and of the importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups"), *with Dale,* 530 U.S. at 657 ("As the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased.").

The Supreme Court's decision in *Heart of Atlanta Motel v. United States* illustrates the commercial consequences of public accommodation laws.  379 U.S. 241 (1964).  In that case, the Court upheld Title II of the Civil Rights Act of 1964 under Congress's Commerce Clause powers.  In doing so, the Court recognized the "overwhelming evidence of the disruptive effect that racial discrimination has had on

commercial intercourse." *Id.* at 257.  The Court recited evidence of racial discrimination by hotels and motels, which was so pervasive that some travelers relied on a special guidebook listing non-discriminatory businesses. *Id.* at 253. Thus, the cumulative result of those discriminatory practices discouraged interstate commerce.

We do not define Colorado's interest as "ensuring access to a *particular* person's unique, artistic product [i.e., Appellants']."  Dissent at 27 (emphasis in original); *see also id.* at 27 n.8.  We recognize access to Appellants' services may be the *consequence* of enforcing CADA, but that is not to say it is CADA's purpose or Colorado's primary interest.  For example, CADA does not apply only to public accommodations of a certain level of quality or artistic merit.  In fact, CADA is silent as to these attributes, leaving their appraisal to consumers.  Nor does CADA conscript Appellants' services for some collective or redistributive end.  CADA only applies here because Appellants intend to sell their unique services to the public.  The question then becomes whether Colorado's interest in ensuring access to the marketplace *generally* still applies with the same force to Appellants' case *specifically*—i.e., "whether [Colorado] has such an interest in denying an exception to [Appellants]." *Fulton*, 141 S. Ct. at 1881.

Excepting Appellants from the Accommodation Clause would necessarily relegate LGBT consumers to an inferior market because Appellants' *unique* services are, by definition, unavailable elsewhere.  As discussed above, our analysis emphasizes the custom and unique nature of Appellants' services.  For the same

29

reason that Appellants' custom and unique services are speech, those services are also inherently not fungible. To be sure, LGBT consumers may be able to obtain wedding-website design services from other businesses; yet, LGBT consumers will never be able to obtain wedding-related services of the same quality and nature as those that Appellants offer. Thus, there are no less intrusive means of providing equal access to those types of services.[4]

Amici dispute whether subjecting businesses to the Accommodation Clause ultimately chills commerce by discouraging businesses from entering the market, due to fears that they will be compelled to create objectionable products. *Compare* Br. of Law and Economics Scholars as *amicus curiae* at 4 (enforcing the Accommodation Clause will "either force unwilling associations or force the exit of a class of market participants"), *with* Br. of Scholars of Behavioral Science and Economics as *amicus curiae* at 9 (asserting "markets cannot always be counted on to 'self-correct' and produce a welfare-maximizing outcome"). With respect to amici, we find the dispute beside the point. This case does not present a competitive market. Rather, due to the unique nature of Appellants' services, this case is more similar to a monopoly. The product at issue is not merely "custom-made wedding websites," but rather

---

[4] The cumulative effect of discrimination also explains why other statutory exemptions, such as sex-based discrimination motivated by a "bona fide relationship," are permissible. *See* Aplts.' Reply at 26–27. Such exemptions promote open commerce as a whole and are consistent with Colorado's interest in ensuring access to the commercial marketplace. We do not decide whether the "bona fide relationship" exemption should apply to Appellants. *See infra*, III.D.1.b. We only hold that the existence of that exemption does not require us to craft new ones.

"custom-made wedding websites of the same quality and nature as those made by Appellants." In that market, only Appellants exist. And, as amici apparently agree, monopolies present unique anti-discrimination concerns. *See* Br. of Law and Economics Scholars at 9 ("The only exception to this principle is a monopoly situation, in which consumers are faced with a sole supplier who could decide for all sorts of reasons, including invidious motives, to refuse to deal with a group of potential consumers.").

We are also unpersuaded by the Supreme Court of Arizona's analysis in *Brush & Nib.* There, the Supreme Court of Arizona concluded that custom wedding invitations are speech because they are not fungible products, unlike a hamburger or pair of shoes. *B&N,* 448 P.3d at 910. With that much we agree—custom products often implicate speech. Yet, the Supreme Court of Arizona then held that exempting custom invitations from a public accommodation law would not undermine the law's purpose. *Id.* at 916. Thus, ostensibly, the *B&N* Court reasoned that any market harm was limited. We are unconvinced. It is not difficult to imagine the problems created where a wide range of custom-made services are available to a favored group of people, and a disfavored group is relegated to a narrower selection of generic services. Thus, unique goods and services are where public accommodation laws are most necessary to ensuring equal access.[5]

---

[5] Elsewhere, the Dissent endorses our view that Appellants' services are unique. *See* Dissent at 15 ("It is obvious to even the most casual viewer that Ms. Smith is creating a customized art product—which incorporates unique, expressive

To be clear, we, like the Dissent, do not question Appellants' "sincere religious beliefs" or "good faith." Dissent at 1. Yet, we fail to see how Appellants' sincerity or good faith should excuse them from CADA. Appellants' intent has no bearing on whether, as a consequence, same-sex couples have limited access to goods or services. For this reason, it is unclear to us why the Dissent places such repeated emphasis on Appellants' "good faith." *See, e.g.*, Dissent at 21 ("Nor is Ms. Smith's statement intended to be derogatory or malicious."); *id.* at 52 ("We must presume [Ms. Smith] has reached her beliefs 'based on decent and honorable religious or philosophical premises.'") (quoting *Obergefell*, 576 U.S. at 672). Further, as the Supreme Court has recently reaffirmed, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (citing *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). To us, whether an exception limits market access depends upon the uniqueness of the public accommodation's goods and services—not the sincerity of the public accommodation's beliefs.

---

speech—for her customers."). In doing so, we think the Dissent commits the same error as the *B&N* court. The Dissent never explains how Appellants' services are unique when considering Appellants' speech interests, but fungible when considering Colorado's interest in preventing material harms to consumers. To us, Appellants' services must either be unique for both analyses, or fungible for both. Such consistency does not "cheapen" the artistic value of Appellants' services. Dissent at 29. It is precisely because Appellants' unique services *are* valuable that exclusion is harmful. It is the Dissent that cheapens Appellants' artistry by implying Appellants' services are no better than those available elsewhere.

We also recognize that "compelled speech is deeply suspect in our jurisprudence—and rightly so, given the unique harms it presents." Dissent at 10. Yet, at the same time, "[t]he axiom that places of public accommodation are open to everyone is deeply rooted in the American legal system." *TMG*, 936 F.3d at 763 (Kelly, J., concurring in part and dissenting in part). Indeed, the Supreme Court has repeatedly emphasized public accommodation laws' vital importance—even against Constitutional challenges. *See, e.g.*, *Masterpiece Cakeshop*, 138 S. Ct. at 1728 ("It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public."); *Hurley*, 515 U.S. at 572 ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments."); *Heart of Atlanta Motel*, 379 U.S. at 260 ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty."). We resolve the tension between these two lines of jurisprudence by holding that enforcing CADA as to Appellants' unique services is narrowly tailored to Colorado's interest in ensuring equal access to the commercial marketplace.[6]

---

[6] The Dissent implies that our holding applies to "*all* artists." Dissent at 30 (emphasis in original). As should be clear, our holding does not address how CADA might apply to non-commercial activity (such as commissioning a mural for some charitable purpose).

### 2.  The Communication Clause

Appellants also assert that the Communication Clause unconstitutionally abridges their Free Speech rights.  Specifically, Appellants intend to publish a Proposed Statement on 303 Creative's website, stating Appellants "will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman."  Aplts.' App. at 2-364.  Colorado responds that the Communication Clause merely prohibits a public accommodation from advertising what is already unlawful under the Accommodation Clause.  Specifically, the Communication Clause makes it unlawful for a public accommodation to publish a statement indicating that service will be refused because of sexual orientation.  Colo. Rev. Stat. § 24-34-601(2)(a).

The Communication Clause does not violate the Appellants' Free Speech rights.  As the district court correctly held, Colorado may prohibit speech that promotes unlawful activity, including unlawful discrimination.  Aplts.' App. at 3-577–78.  In *Pittsburgh Press Company v. Pittsburgh Commission on Human Relations,* the Supreme Court held that publishing employment advertisements in "sex-designated columns" was not protected by the First Amendment.  413 U.S. 376, 378 (1973).  The Court reasoned that, because the underlying employment practice was illegal sex discrimination, there was no protected First Amendment interest.  *Id.* at 389.  In contrast, in *Bigelow v. Virginia,* 421 U.S. 809 (1975), the Supreme Court held that publishing advertisements for abortion services was protected by the First Amendment, so long as the underlying services were themselves legal.  In that case,

34

the Court held that, although the abortion services were illegal if offered in Virginia, Virginia had no interest in regulating advertisements for services offered in New York, where the services were legal. *Id.* at 828. Appellants appear to acknowledge that their Accommodation Clause and Communication Clause challenges go hand in hand, at least to the extent the merits of those challenges are "intertwined." Aplts.' Reply at 6; *see also* Aplts.' Br. at 53–57 (addressing both clauses simultaneously as to strict scrutiny).

Having concluded that the First Amendment does not protect Appellants' proposed denial of services, we also conclude that the First Amendment does not protect the Proposed Statement. Parts of the Proposed Statement might not violate the Accommodation Clause, such as those parts expressing Appellants' commitment to their clients or Ms. Smith's religious convictions. Yet, the Proposed Statement also expresses an intent to deny service based on sexual orientation—an activity that the Accommodation Clause forbids and that the First Amendment does not protect. Thus, the Proposed Statement itself is also not protected and Appellants' challenge to the Communication Clause fails. *See Pittsburgh Press*, 413 U.S. at 389 (commercial advertising is not protected where "the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity").[7]

---

[7] We presume the Dissent agrees that, under *Pittsburgh Press* and *Bigelow*, Appellants' Free Speech challenge to the Communication Clause must rise or fall with their challenge to the Accommodation Clause. We recognize the Dissent's disagreement with our analysis of the Accommodation Clause, and thus its implicit disagreement with our conclusion as to the Communication Clause.

## D. Free Exercise

### 1. CADA is a Neutral Law of General Applicability

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876 (citing *Employment Div., Dep't of Hum. Resources of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").

#### a. CADA is a Neutral Law

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices *because of their religious nature*." *Fulton*, 141 S. Ct. at 1877 (emphasis added); *see also Lukumi*, 508 U.S. at 533 ("[I]f the object of a law is to infringe upon or restrict practices *because of their religious motivation*, the law is not neutral[.]") (emphasis added). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540).

In *Masterpiece Cakeshop*, the Court held that Colorado had enforced CADA against a baker (Jack Phillips) without "the religious neutrality that the Constitution requires." 138 S. Ct. at 1724. The Court relied, in part, on a Commissioner's statement describing the baker's religious objection as "one of the most despicable pieces of rhetoric that people can use." *Id.* at 1729. The Court explained that this statement impermissibly disparaged Phillips' religion by "describing it as despicable, and also by characterizing it as something merely rhetorical." *Id.* The Court instructed the Commission that it "was obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of Phillips' religious beliefs." *Id.* at 1731.

Appellants provide no evidence that Colorado will ignore the Court's instruction in *Masterpiece Cakeshop*, and thus provide no evidence that Colorado will enforce CADA in a non-neutral fashion. Appellants rely on a comment from a public meeting held a few days after the Court's ruling in *Masterpiece Cakeshop*. At the public meeting, a different Commissioner voiced his "support" for the Commissioner whose comments that were at issue in *Masterpiece Cakeshop*, opining that the Commissioner discussed in *Masterpiece Cakeshop* did not say "anything wrong." Aplts.' App. at 3-609. The single Commissioner's statement at the public meeting, however, does not indicate Colorado will deviate from the Court's instruction in *Masterpiece Cakeshop*. In contrast to the single Commissioner's opinion, several others at the public meeting voiced their agreement with the Court's ruling, or their commitment to follow that ruling. *Id.* at 3-606 (Director Elenis: "So

37

in these cases going forward, Commissioners and ALJs and others, including the Staff at the Division, have to be careful how these issues are framed so that it's clear that full consideration was given to sincerely—what is termed as sincerely-held religious objections."); *id.* 3-608 (Commissioner Carol Fabrizio: "[*Masterpiece Cakeshop*] was correctly decided from the outside, but I also hope that anything that is taken out of here or listened to or—that we're open to being respectful of everybody's views."). In short, Appellants' pre-enforcement challenge is dissimilar to the post-enforcement challenge in *Masterpiece Cakeshop*.

### b. CADA is Generally Applicable

A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

A law is also not generally applicable "if it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for

individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884) (alteration omitted). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* (quoting *Smith*, 494 U.S. at 884). In *Smith*, the Court explained that a "good cause" exemption from requirements for unemployment compensation benefits "created a mechanism for individualized exemptions." *Smith*, 494 U.S. at 884 (citing *Bowen v. Roy*, 476 U.S. 693, 707 (1986)); *see also Sherbert v. Verner*, 374 U.S. 398, 401 n.4 (1963). And more recently, in *Fulton*, the Court explained that exemptions from contractual obligations made available at the "sole discretion" of a city commissioner trigger strict scrutiny. 141 S. Ct. at 1878.

Appellants assert that CADA is not generally applicable because Colorado enforces a "religious-speakers policy," under which religiously-motivated objections are viewed with greater scrutiny than secularly-motivated objections. *See* Aplts.' Br. at 48. For example, although Colorado admits that a business is not required to design a website proclaiming "God is Dead" if it would decline such a design for any customer, *see* Colorado's Br. at 42, Appellants must design a website celebrating same-sex marriage, even though it would decline such a design for any customer.

In support of their claim of a religious-speakers policy, Appellants also rely on the record in *Masterpiece Cakeshop*. In that case, Phillips asserted a disparity in treatment between his case and three other cases related to a customer named William Jack. In the Jack cases, bakers refused Jack's requests for cakes that "conveyed disapproval of same-sex marriage, along with religious text."

*Masterpiece Cakeshop*, 138 S. Ct. 1719 at 1730.  The Colorado Court of Appeals held that the three bakers lawfully refused Jack service "because of the offensive nature of the requested message."  *Id.* at 1731 (quoting *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272, 282 n.8 (Colo. App. 2015)).

The Supreme Court held that this difference in treatment was "[a]nother indication of hostility" toward Phillips' religious motivations.  *Id.* at 1729.  Contrary to the Colorado Court of Appeals, the Supreme Court held that the difference in treatment between the Phillips and Jack cases could not be based on "the government's own assessment of offensiveness."  *Id.* at 1731.  According to the Court, such reasoning "elevates one view of what is offensive over another and itself sends a signal of official disapproval of Phillips' religious beliefs."  *Id.*  The Supreme Court declined to address, however, "whether the cases should ultimately be distinguished."  *Id.* at 1730.  Rather, the Court's holding in *Masterpiece Cakeshop* was narrowly limited to the discriminatory enforcement in that particular case, and left open CADA's future enforcement against other objectors.  *Id.* at 1732; *see also Fulton*, 141 S. Ct. at 1930 (Gorsuch, J., concurring) ("[A]ll that victory [in *Masterpiece Cakeshop*] assured Mr. Phillips was a new round of litigation—with officials now presumably more careful about admitting their motives.").

In concurring opinions, Justices Kagan and Gorsuch disagreed as to whether Colorado could apply CADA in the Phillips case, but not in the Jack cases.  According to Justice Kagan, the bakers in the Jack cases did not discriminate against Jack's religion because the bakers would have refused *any* customer's request for

40

cakes denigrating gay people and same-sex marriage. *Masterpiece Cakeshop*, 138 S.
Ct. at 1733 (Kagan, J., concurring).  In Justice Kagan's view, "[t]he different
outcomes in the Jack cases and the Phillips case could thus have been justified by a
plain reading and neutral application of Colorado law—untainted by any bias against
a religious belief." *Id.* (Kagan, J., concurring).  According to Justice Gorsuch,
however, the Jack cases and the Phillips case "share[d] all legally salient features."
*Id.* at 1735 (Gorsuch, J., concurring).  In Justice Gorsuch's view, Colorado could
apply CADA in both cases, or in neither case, but "the one thing it can't do is apply a
more generous legal test to secular objections than religious ones." *Id.* at 1737
(Gorsuch, J., concurring); *see also id.* at 1739 (Gorsuch, J., concurring) ("Only by
adjusting the dials *just right*—fine-tuning the level of generality up or down for each
case based solely on the identity of the parties and the substance of their views—can
you engineer the Commission's outcome, handing a win to Mr. Jack's backers but
delivering a loss to Mr. Phillips.") (emphasis in original).

Although a gerrymander similar to the one identified by Justice Gorsuch may
still exist, Appellants have only shown a gerrymander favoring LGBT consumers, as
opposed to a gerrymander disfavoring religious-speakers.  Indeed, a "pro-LGBT"
gerrymander is likely inevitable given CADA's purpose and its content-based
restrictions on speech. *See supra*, III.C.1.a.  Appellants provide no evidence that
Colorado permits secularly-motivated objections to serving LGBT consumers.
Similarly, Appellants provide no evidence that Colorado enforces CADA against
religiously-motivated objections that do not injure the dignitary or material interests

of LGBT consumers.  In short, Appellants fail to show that Colorado "permit[s] secular conduct that undermines the government's asserted interests *in a similar way*." *Fulton*, 141 S. Ct. at 1877 (emphasis added).

The Supreme Court's recent cases addressing Free Exercise challenges to COVID-19 restrictions are instructive.  In *Tandon v. Newsom*, the Court explained "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather."  141 S. Ct. at 1296 (per curiam).  Accordingly, the Court held that California could not restrict at-home religious exercise while permitting secular activities that posed similar risks of COVID-19 transmission.  *Id.* at 1297.  The Court reached a similar conclusion in *Roman Catholic Diocese of Brooklyn v. Cuomo*, holding that New York could not restrict access to houses of worship while permitting access to secular facilities with similar safety records regarding the spread of COVID-19.  141 S. Ct. 63, 66–67 (2020) (per curiam).  Here, however, Appellants rely on comparators that injure LGBT consumers.  For example, in the Jack cases, non-enforcement was consistent with Colorado's pro-LGBT gerrymander.  Because Appellants provide no examples where Colorado permitted "secular-speakers" to discriminate against LGBT consumers, Appellants fail to show that Colorado disfavors similarly-situated "religious-speakers."[8]

---

[8] The Dissent is correct that Colorado "has the burden to establish that the challenged law satisfies strict scrutiny."  Dissent at 40 n.15 (quoting *Tandon*, 141 S. Ct. at 1296 (per curiam)).  But that burden is irrelevant here because strict scrutiny does not apply to Appellants' Free Exercise claims.  And it is Appellants' burden to show, at the very least, a triable issue of material fact that CADA is not neutral or

Colorado's recognition of message-based refusals also does not give rise to a system of "individualized exemptions." *See* Aplts.' Br. at 49. Message-based refusals are not an "exemption" from CADA's requirements; they are a defense. A public accommodation only violates CADA when it discriminates "because of" a consumer's membership in a protected class. Colo. Rev. Stat. § 24-34-601(2)(a). Ostensibly, message-based refusals are unrelated to class-status and fail to satisfy CADA's causation standard. Because message-based refusals do not violate CADA as an initial matter, there is nothing to "exempt" from the statute. *See* Exempt, Black's Law Dictionary (11th ed. 2019) ("Free or released from a duty or liability to which others are held.").

Message-based refusals are also not "individualized." "[A] system of individualized exemptions is one that gives rise to the application of a subjective test." *Axson-Flynn*, 356 F.3d at 1297 (internal quotation omitted). Conversely, an exemption is not "individualized" simply because it "contain[s] express exceptions for objectively defined categories of persons." *Id.* at 1298. As we explained in *Axson-Flynn*, "[w]hile of course it takes some degree of individualized inquiry to

---

generally-applicable. *Compare Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004) ("Because Axson-Flynn has raised a genuine issue of material fact as to whether Defendants maintained a discretionary system of case-by-case exemptions from curricular requirements, we hold that summary judgment on her free exercise 'individualized exemption' claim was improper."), *with Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 655 (10th Cir. 2006) ("[I]nconsistent with the requirements of *Axson-Flynn*, Grace United has not pointed to any evidence to support its conclusory allegation that the City specifically targeted religious groups or the Methodist denomination in its enforcement of the ordinance in this case.").

determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court in its discussion of *Sherbert* and related cases." *Id.*

We are satisfied that message-based refusals may be objectively defined and are not the type of subjective test that triggers the individualized exemption exception. We need not decide how CADA's causation standard should apply to Appellants' message-based refusal. *See supra*, III.B.1. We also reiterate that, on a more developed record, Appellants might show that Colorado enforces that standard in a way that discriminates against religion, violating the Free Exercise Clause. Yet, whatever issues may be presented in a future case, it is clear to us that CADA's causation standard itself is qualitatively different from the broad, discretionary analyses presented in other individualized exemption cases. *See, e.g., Fulton*, 141 S. Ct. at 1878 (exemptions granted in city official's "sole discretion"); *Sherbert*, 374 U.S. at 401 n.4 (exemptions granted for "good cause"); *Axson-Flynn*, 356 F.3d at 1299 (exemptions granted through "pattern of ad hoc discretionary decisions").

The Dissent's discussion of the individualized exemption exception conflates an "individualized exemption" with "individualized adjudication." For example, the Dissent concludes that the individualized exemption exception should apply because "the entire CADA enforcement mechanism is structured to make case-by-case determinations." Dissent at 36; *see also id.* at 43 ("By demonstrating that CADA sets up a case-by-case system for determining exceptions, Ms. Smith has shown CADA's

application here must be reviewed with strict scrutiny with regard to the free exercise claims.").  Accordingly, CADA does not grant "individualized exemptions" simply because causation is determined by the specific facts of each case.  Were we to conclude otherwise, a wide range of criminal statutes would also become subject to Free Exercise challenges because courts adjudicate a defendant's guilt through "case-by-case determinations."

Although we hold that the "religious-speakers policy" identified by Appellants is not an "exemption," CADA provides for two exemptions that warrant closer attention.  First, CADA exempts places that are "principally used for religious purposes" from its definition of public accommodations.  Colo. Rev. Stat. 24-34-601(1).  This exemption does not trigger strict scrutiny.  To the extent a "religious-purpose" exemption is individualized, the exemption expressly *favors* religious exercise over places used for secular purposes.[9]

Second, CADA exempts sex-based discrimination "if such restriction has a bona fide relationship to the goods, services, facilities, privileges, advantages, or accommodations of such place of public accommodation."  Colo. Rev. Stat. § 24-34-601(3).  On the pre-enforcement record before us, Appellants have not shown the

---

[9] Indeed, an exemption for places "principally used for religious purposes" may, in at least some instances, be required by the First Amendment.  *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 190 (2012) (recognizing a "ministerial exception" to generally applicable employment laws).  As Justice Alito noted in *Fulton*, the ministerial exemption is in "tension" with the *Smith* standard.  *Fulton*, 141 S. Ct. 1916 n.77 (Alito, J., concurring).  We need not resolve that tension here.  We only note that, under the Supreme Court's precedent, CADA remains generally applicable despite exempting some religious exercise.

"bona fide relationship" exemption should trigger strict scrutiny. Like CADA's causation standard, a fact-finder may objectively determine whether a public accommodation's discriminatory practice is "related" to the public accommodation's goods or services. Whether such a relationship is "bona fide" seems closer to the type of discretionary standard subject to the individualized exemption exception. The statute is silent as to when a relationship is "bona fide," and the parties do not define that term in their briefing. Despite that ambiguity, however, the term is facially unlike the "entirely discretionary" exemption addressed in *Fulton*. 141 S. Ct. at 1878. Thus, we conclude that the mere existence of a "bona fide relationship" exemption does not, on its own, trigger strict scrutiny.

We pause because Colorado's *application* of the "bona fide relationship" exemption may trigger strict scrutiny on a post-enforcement record. For example, strict scrutiny would apply if Colorado "refuse[d] to accept religious reasons for [a bona fide relationship] on equal footing with secular reasons for [a bona fide relationship]." *Axson-Flynn*, 356 F.3d at 1298. And, if it did so, Colorado must offer a "compelling reason why it has a *particular interest* in denying an exception to [Appellants] while making [it] available to others." *Fulton*, 141 S. Ct. at 1882 (emphasis added). Thus, a future case may present the closer questions of whether the "bona fide relationship" exemption should apply here, or, assuming Colorado denies such an exemption, whether such denial violates the Free Exercise Clause. On this pre-enforcement record, however, Appellants have not shown the exemption will be applied in an impermissible manner.

### 2.  Appellants Cannot Assert a Hybrid Rights Claim

We apply heightened scrutiny to a hybrid-rights claim where a plaintiff brings a "colorable" companion claim, i.e., one with a "fair probability or likelihood, but not a certitude, of success on the merits." *Axson-Flynn*, 356 F.3d at 1297.  Because Appellants' other constitutional claims either fail or were not raised on appeal, Appellants have no companion claim.  Thus, there is no reason to apply heightened scrutiny under a hybrid-rights theory.  In any event, CADA would satisfy heightened scrutiny for the same reasons that it satisfies strict scrutiny, as explained above.

## E.  Overbreadth and Vagueness

The Communication Clause not only prohibits statements indicating that goods or services "will be refused, withheld from, or denied an individual," but also prohibits statements indicating "that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of [protected status]."  Colo. Rev. Stat. § 24-34-601(2)(a).  Appellants challenge this latter restriction, which they term the "Unwelcome Provision," as unconstitutionally overbroad and vague.  *See* Aplts.' Br. at 57.

### 1.  The Communication Clause Is Not Unconstitutionally Overbroad

The Unwelcome Provision does not render the Communication Clause unconstitutionally overbroad, because the Communication Clause's "application to protected speech [is not] substantial . . . relative to the scope of the law's plainly legitimate applications."  *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)).  Even assuming the

Unwelcome Provision, when read alone, unconstitutionally restricts speech, the Communication Clause, when read as a whole, is primarily focused on access to goods and services. Thus, in a case like the one here, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615–16. We need not apply the Unwelcome Provision in this case because Appellants' Proposed Statement violates the Communication Clause's prohibition on statements indicating refusal of services. *See* Aplts.' App. at 2-364 (Proposed Statement that Appellants "will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman").

The Dissent concludes that the Unwelcome Provision is overbroad because it would punish numerous forms of protected speech. In support, the Dissent identifies several examples where a public accommodation might violate the Unwelcome Provision without violating the Communication Clause's separate prohibition on statements indicating refusal of services. *See* Dissent at 48–49.[10] We are unconvinced that the Dissent's examples are "substantial . . . relative to the scope of the law's plainly legitimate applications." *Hicks*, 539 U.S. at 119–20. Aside from

---

[10] As a preliminary matter, we question the Dissent's conclusion that those examples would, in fact, be "covered by . . . the Unwelcome Provision." Dissent at 50. Taking one of the Dissent's examples, it is unclear to us whether a store owner's sign stating "We honor God and His commandments here" necessarily "indicates" that an atheist customer is unwelcome. *See id.* at 48. Such a sign may cause the customer to subjectively *feel* unwelcome, even if the business does not intend any offensiveness. "Indicates" may have, under CADA, a narrower definition than the Dissent implies.

this case and *Masterpiece Cakeshop*, amici document numerous other cases where public accommodations communicated, either directly or indirectly, that a consumer's presence was unwelcome and that they would be refused access. *See, e.g.*, Br. of Law Professors from the States of Colo., et al., as *amicus curiae* at 22–24 (describing examples of discrimination against LGBT people in Colorado); Br. of Religious and Civil Rights Organizations as *amicus curiae* at 24–26 (describing examples of discrimination against religious minorities). To be clear, we express no opinion as to whether the Unwelcome Provision might violate the First Amendment in other contexts. We merely conclude that those violations are better addressed on their own facts, and do not warrant the "strong medicine" of the overbreadth doctrine. *Broadrick*, 413 U.S. at 613.

### 2. The Communication Clause Is Not Unconstitutionally Vague

Appellants' vagueness challenge also fails because their Proposed Statement indicates a refusal of services. Appellants rely on *Johnson v. United States*, 576 U.S. 591 (2015), where the Supreme Court struck the Residual Clause of the Armed Career Criminals Act as void for vagueness. The Supreme Court held that the Residual Clause was unconstitutionally vague, even if "some conduct" might clearly be proscribed. *Id.* at 602. In doing so, the Court described the standard for determining whether a statute is, as a matter of law, unconstitutionally vague—not the standard for determining when a party may bring a vagueness challenge. Accordingly, the district court in this case correctly relied on *Expressions Hair Design v. Schneiderman*, a case decided after *Johnson*, in which the Supreme Court

49

reaffirmed that "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim."  137 S. Ct. 1144, 1151–52 (2017) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)); *see also Humanitarian Law Project*, 561 U.S. at 21 ("Of course, the scope of the material-support statute may not be clear in every application.  But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail.").  Because the Proposed Statement is clearly proscribed by the Communication Clause's prohibition on statements indicating refusal of services, Appellants cannot separately challenge the Unwelcome Provision as unconstitutionally vague.[11]

## IV.    Conclusion

We agree with the Dissent that "the protection of minority viewpoints is not only essential to protecting speech and self-governance but also a good in and of itself."  Dissent at 12.  Yet, we must also consider the grave harms caused when public accommodations discriminate on the basis of race, religion, sex, or sexual orientation.  Combatting such discrimination is, like individual autonomy, "essential" to our democratic ideals.  And we agree with the Dissent that a diversity of faiths and

---

[11] The Dissent's vagueness analysis suffers the same defects as its overbreadth analysis.  What makes a consumer "feel" unwelcome may be unduly vague.  Yet, CADA only proscribes communications that "indicate" a consumer is unwelcome.  Whether a communication indicates as such may entail a more objective standard than the Dissent implies.  And, in any event, the Dissent never explains why Appellants may bring a vagueness claim when their Proposed Statement clearly indicates a refusal of services.

religious exercise, including Appellants', "enriches" our society.  Dissent at 44.  Yet, a faith that enriches society in one way might also damage society in other ways, particularly when that faith would exclude others from unique goods or services.  In short, Appellants' Free Speech and Free Exercise rights are, of course, compelling.  But so too is Colorado's interest in protecting its citizens from the harms of discrimination.  And Colorado cannot defend that interest while also excepting Appellants from CADA.

For these reasons, we AFFIRM the district court's grant of summary judgment in favor of Colorado.

**19-1413,** *303 Creative v. Elenis*, **Tymkovich, Chief Judge**, dissenting.

> *If liberty means anything at all, it means the right to*
> *tell people what they do not want to hear.*
>
> – George Orwell

No one denies Lorie Smith's sincere religious beliefs, good faith, and her willingness to serve clients regardless of race, creed, ethnicity, or sexual orientation. But what she will not do is compromise her beliefs and produce a message at odds with them. The Constitution neither forces Ms. Smith to compromise her beliefs nor condones the government doing so. In fact, this case illustrates exactly why we have a First Amendment. Properly applied, the Constitution protects Ms. Smith from the government telling her what to say or do.

But the majority takes the remarkable—and novel—stance that the government may force Ms. Smith to produce messages that violate her conscience. In doing so, the majority concludes not only that Colorado has a compelling interest in forcing Ms. Smith to speak a government-approved message against her religious beliefs, but also that its public-accommodation law is the least restrictive means of accomplishing this goal. No case has ever gone so far. Though I am loathe to reference Orwell, the majority's opinion endorses substantial government interference in matters of speech, religion, and conscience. Indeed, this case represents another chapter in the growing disconnect between the Constitution's endorsement of pluralism of belief on the one hand and anti-discrimination laws' restrictions of religious-based speech in the marketplace on the

other. It seems we have moved from "live and let live" to "you can't say that." While everyone supports robust and vigorously enforced anti-discrimination laws, those laws need not and should not force a citizen to make a Hobson's choice over matters of conscience. Colorado is rightfully interested in protecting certain classes of persons from arbitrary and discriminatory treatment. But what Colorado cannot do is turn the tables on Ms. Smith and single out her speech and religious beliefs for discriminatory treatment under the aegis of anti-discrimination laws.

The Constitution is a shield against CADA's discriminatory treatment of Ms. Smith's sincerely held religious beliefs. The First Amendment prohibits states from "abridging the freedom of speech" or the "free exercise" of religion. U.S. Const. amend. I. And the freedom to speak necessarily guarantees the right to remain silent. So the majority ushers forth a brave new world when it acknowledges that CADA compels both speech and silence—yet finds this intrusion constitutionally permissible. CADA forces Ms. Smith to violate her faith on pain of sanction both by prohibiting religious-based business practices and by penalizing her if she does speak out on these matters in ways Colorado finds "unwelcome" or "undesirable."[1]

---

[1] The Colorado Anti-Discrimination Act provides that, for places of public accommodation:

> It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status,

(continued...)

I agree with the majority that Ms. Smith has standing to bring her claims and that the case is ripe. But because I cannot agree that Colorado may force Ms. Smith to create messages or stay silent contrary to her beliefs, I respectfully dissent.

## I. Free Speech

It is important to understand from the outset that Ms. Smith and Colorado *agree* that she will serve anyone, regardless of protected class status. In the district court, both she and Colorado stipulated that: (1) Ms. Smith is "willing to work with all people regardless of classifications such as race, creed, sexual orientation and gender"; and (2) Ms. Smith does "not object to and will gladly create custom graphics and websites for gay, lesbian, or bisexual clients or for organizations run by gay, lesbian, or bisexual

---

[1](...continued)

> national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601, *as amended by* H.B. 21-1108 (enacted May 20, 2021). CADA was amended in May 2021 to add "gender identity" and "gender expression" as protected class characteristics.

persons so long as the custom graphics and websites do not violate [her] religious beliefs, as is true for all customers."  Aplt. App. 2-322.  Ms. Smith and Colorado also agree that she "will decline any request to design, create, or promote content that: contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports the destruction of unborn children; incites violence; or promotes any conception of marriage other than marriage between one man and one woman."  *Id.* at 2-323.  And counsel for Ms. Smith confirmed at oral argument that she would represent clients regardless of sexual orientation in creating websites that celebrate opposite-sex weddings.

In short, Colorado appears to agree that Ms. Smith does not distinguish between customers based on protected-class status and thus advances the aims of CADA.

But when *any* customer asks Ms. Smith to create expressive content that violates her sincerely held beliefs, she will decline the request.[2]  Colorado claims to endorse this type of message-based refusal, asserting that "the Commission does not interpret [CADA] to require any business owner, regardless of religious beliefs, to produce a message it would decline to produce for any customer."  Appellee Br. at 62.  Yet Colorado and the majority argue that Ms. Smith must do exactly this:  create expressive content celebrating

---

[2]  At oral argument, the following hypothetical was posed of Ms. Smith's counsel: imagine a heterosexual wedding planner approached Ms. Smith, asking her to design five mock-up wedding websites for the wedding planner to attract potential customers—four for opposite-sex weddings and one for a same-sex wedding. Ms. Smith's counsel confirmed that she would not make a same-sex wedding website for a heterosexual client.

-4-

same-sex weddings as long as she will create expressive content celebrating opposite-sex weddings.  This is paradigmatic compelled speech.

### A. Compelled Speech Provisions Are Subject to Strict Scrutiny

Government-compelled speech is antithetical to the First Amendment.  Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable . . . . 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.'" *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).  Thus, the government cannot—for example—coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation.  *See Barnette*, 319 U.S. at 633–34; *Wooley*, 430 U.S. at 714; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The compelled speech doctrine was first articulated in 1943 in Justice Jackson's opinion in *Barnette*.  In that case, Jehovah's Witness parents and schoolchildren sought to enjoin the enforcement of compulsory flag-salute laws, as the required salute and accompanying pledge of allegiance violated their religious beliefs.  Justice Jackson concluded that the First Amendment protected the schoolchildren's right to free speech, noting that  "[t]o sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public

authorities to compel him to utter what is not in his mind." *Barnette*, 319 U.S. at 634. Written against the backdrop of World War II, the opinion cautioned against the "[c]ompulsory unification of opinion" of the like sought by the "fast failing efforts of our present totalitarian enemies." *Id.* at 641. "[T]he First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings"—namely, by preventing the government from coercing speech in the first instance. *Id.*

Over three decades later, the Court again confirmed that the government cannot compel an unwilling individual to speak or even passively display the government's ideological message, no matter its popularity. In 1977, the *Wooley* Court struck down New Hampshire regulations requiring the display of the state's "Live Free or Die" motto on license plates. *Wooley*, 430 U.S. at 714. The motto's wide acceptance was irrelevant because the "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." *Id.* at 717. *Wooley* also expanded *Barnette*'s logic: just as the government cannot coerce affirmations of belief, it also cannot require an individual to be a "courier for [the State's] message," even when that message does not otherwise interfere with the individual's own speech. *Id.*

Nor can the government require a speaker to be a courier for another citizen's message. In *Hurley*, the Court unanimously held as unconstitutional the application of the Massachusetts public-accommodations statute to the organizers of Boston's St. Patrick's

Day Parade. *Hurley*, 515 U.S. at 572–73. Forcing the organizers of the parade—which itself is protected expression—to allow the participation of the Irish-American Gay, Lesbian & Bisexual Group "had the effect of declaring the sponsors' speech itself to be the public accommodation." *Id.* at 573. "[T]his use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* Organizing the parade and selecting participants was expressive, so applying the public-accommodations law to force the organizers to include unwanted speech was an impermissible intrusion on the freedom to create that expression. *See id.* at 576 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised."). Indeed, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

And the autonomy to speak *necessarily* includes the freedom to remain silent. Because "'*all* speech inherently involves choices of what to say and what to leave unsaid,' . . . one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Id.* at 573 (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 11, 19 (1986)) (emphasis in

-7-

original).  The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018) (internal quotation marks omitted).  As the *Hurley* Court held, "the choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control." *Hurley*, 515 U.S. at 575.  The rule that a "speaker has the right to tailor . . . speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* at 573; *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Gorsuch, J., concurring) ("Because the government cannot compel speech, it also cannot 'require speakers to affirm in one breath that which they deny in the next.'" (quoting *Pac. Gas & Elec. Co.*, 475 U.S. at 16)).

Key to the *Hurley* decision was the expressive nature of a parade.  This crucial point distinguishes it from the Court's decision compelling college campuses to allow military recruiters in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).  The Solomon Amendment, challenged in that case, required law schools to afford military recruiters access to campus facilities for interviews and promotional events, including access to school scheduling emails and announcements.  *Id.* at 60.  But the law schools were already providing these services to other speakers, and the notification emails and posted notices were not considered the law schools' *expressive*

speech. *Id.* at 61–63.  The law schools' actions in sending out such notices were not "affected by the speech it was forced to accommodate" because the emails did not constitute expressive conduct.  *Id.* at 63–64; *see also id.* at 64 ("Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive.").  This is why, in *Hurley*, the Massachusetts public-accommodation law had "been applied in a peculiar way":  it had made *expressive* speech the public accommodation and thereby changed its message.  *Hurley*, 515 U.S. at 572.  Nothing about the access afforded by the Solomon Amendment, in contrast, compromised the law schools' expressive beliefs.

In more recent cases, the Supreme Court has confirmed the First Amendment's antipathy toward government-compelled speech.  The government may no more "prohibit the dissemination of ideas that it disfavors" than it can "compel the endorsement of ideas that it approves."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012).  A state cannot compel pregnancy crisis centers—many of which are pro-life—to inform patients about the availability of abortions because it "alter[s] the content of their speech." *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2371 (2018) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)) (alterations incorporated); *see also NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring) ("This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and

expression."). Nor can a state force individuals to pay dues to subsidize a private

organization's speech. *Janus*, 138 S. Ct. at 2464. And—until now—our own precedent

has similarly taken a deeply skeptical approach to compelled speech. *See Axson-Flynn v.*

*Johnson*, 356 F.3d 1277, 1283 (10th Cir. 2004) (finding a genuine dispute of material fact

as to whether university's compulsion of theater student's speech was pretextual);

*Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (discussing the long

prohibition on compelled speech); *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trustees*,

235 F.3d 1243, 1247 (10th Cir. 2000) (noting that, in government-speech contexts, the

"crucial question is whether, in speaking, the government is compelling others to espouse

or to suppress certain ideas and beliefs"); *Semple v. Griswold*, 934 F.3d 1134, 1143 (10th

Cir. 2019) (concluding that a Colorado state amendment raising standards for citizen

ballot initiatives did not compel speech by requiring interactions with voters in all state

senate districts).

Accordingly, compelled speech is deeply suspect in our jurisprudence—and rightly

so, given the unique harms it presents. For one, the ability to choose what to say or not to

say is central to a free and self-governing polity. As Justice Alito wrote in *Janus*:

> When speech is compelled, . . . additional damage is done. In
> that situation, individuals are coerced into betraying their
> convictions. Forcing free and independent individuals to
> endorse ideas they find objectionable is always demeaning, and
> for this reason, . . . a law commanding "involuntary affirmation"
> of objected-to beliefs would require "even more immediate and
> urgent grounds" than a law demanding silence.

-10-

*Id.* (quoting *Barnette*, 319 U.S. at 634).  The "[c]ompulsory unification of opinion" cautioned by Justice Jackson in *Barnette* is not only a social harm but a personal one.  319 U.S. at 641.  The *choice* of what to say has value, regardless of what is said or not said; narrowing the field of permissible expression diminishes autonomy and free will.

Moreover, the government's ability to compel speech and silence would make hollow the promise of other First Amendment freedoms.  Freedom of association means little without the ability to express the bonds of connection, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655–56 (2000), and the freedom to petition for redress of grievances is valueless unless one is protected from retribution for that speech.  The freedom of the press is essentially coextensive with—and reliant on—the freedom of speech.  *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972).  And the freedom to exercise one's religion necessitates the ability to speak, engage in expressive conduct, *and* conscientiously refuse to speak, in order to have meaningful protection at all.  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2379 ("Freedom of speech secures freedom of thought and belief.") (Kennedy, J., concurring).

It is axiomatic that freedom of speech properly keeps the power of the government in check and preserves democratic self-government.  *See, e.g.*, *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940) ("The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government.").  This

-11-

is why, of course, electoral speech is essential to a free and functioning republic. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people."). Stifling minority speech is the prototypical "slippery slope" toward authoritarianism, recognized in the first of the compelled speech cases: "As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever-increasing severity." *Barnette*, 319 U.S. at 640. To paraphrase Orwell, liberty must mean the right to tell others—especially the government—what it does not want to hear.

Furthermore, the protection of minority viewpoints is not only essential to protecting speech and self-governance but also a good in and of itself. *See, e.g.*, *Wooley*, 430 U.S. at 715 ("The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Indeed, the "point of all speech protection, . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574. The lack of minority viewpoints would impoverish the richness of conversation and impede the search for truth contemplated by the First

-12-

Amendment.  *See, e.g.*, *Thornhill*, 310 U.S. at 95 ("Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth.").

Because of its existential threat to the most sacred freedoms, we are tasked with reviewing instances of compelled expressive speech with the utmost skepticism.  The majority's endorsement of compelled speech directed at Ms. Smith turns away from these foundational principles.

### B.  CADA Compels Expressive Speech

The Supreme Court's repeated, emphatic disapprobation of compelled expressive speech leaves little room for other conclusions.  So it is all the more troubling when, in a case where the parties have stipulated that Ms. Smith's work is expressive speech— "*[the] custom wedding websites will be expressive in nature*"—the majority decides that its compulsion is constitutional.[3]

Creating custom wedding websites is not merely conduct, or even expressive conduct.  Ms. Smith's wedding websites as a whole—and the "text, graphics, and . . . videos" that comprise them—are pure speech.  *See Kaplan v. California*, 413 U.S. 115,

---

[3]  Ms. Smith and Colorado stipulated that her "custom wedding websites will be expressive in nature, using text, graphics, and in some cases videos to celebrate and promote the couple's wedding and unique love story."  Aplt. App. at 2-325.  The parties also agree that "[a]ll of these expressive elements will be customized and tailored to the individual couple and their unique love story."  *Id.*  And the parties stipulate that "[v]iewers of the wedding websites will know that the websites are Plaintiffs' original artwork because all of the wedding websites will say 'Designed by 303Creative.com.'"  *Id.*

119–20 (1973) (pure speech includes the printed word, oral utterances, pictures, films, paintings, drawings, and engravings); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (holding that books, plays, movies, and video games all communicate ideas, which "suffices to confer First Amendment protection"); *Cressman*, 798 F.3d at 953 (noting that "an artist's sale of his own original work is pure speech").  This is because the websites are greater than the sum of their parts:  each custom website conveys Ms. Smith's message or interpretation of celebration of the couple's union.  *See Cressman*, 798 F.3d at 952–53 (emphasizing that the "animating principle behind pure-speech protection" is "safeguarding self-expression").  The parties agree on this point, stipulating that "[b]y creating wedding websites, Ms. Smith and 303 Creative will collaborate with prospective brides and grooms in order to use their unique stories as source material to express Ms. Smith's and 303 Creative's message celebrating and promoting God's design for marriage as the lifelong union of one man and one woman."  Aplt. App. at 2-325.

The fact that Ms. Smith sells her custom website designs does not reduce their value as speech.  "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley*, 487 U.S. at 801.  The creative confluence of the text and graphics in these original, individualized websites produce *expression*—which deserves the highest protection under the First Amendment.[4]

_____

[4]  Ms. Smith's custom websites are not commercial speech— or even *expressive*
(continued...)

-14-

If anything, this is an easier case than those involving wedding cakes, *see Masterpiece*, 138 S. Ct. at 1723, wedding photographs, *see Chelsey Nelson Photography LLC v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:19-CV-851-JRW, 2020 WL 4745771, at *10 (W.D. Ky. Aug. 14, 2020), *Updegrove v. Herring*, No. 1:20-CV-1141, 2021 WL 1206805, at *1 (E.D. Va. Mar. 30, 2021), and *Elane Photography, LLC v. Willock*, 309 P.3d 53, 59 (N.M. 2013), wedding videos, *see Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019), wedding floral arrangements, *see State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1225 (Wash. 2019), *cert. denied*, (U.S. July 2, 2021) (No. 19-333), or even custom wedding invitations, *see Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 908 (Ariz. 2019).  It is obvious to even the most casual viewer that Ms. Smith is creating a customized art product—which incorporates unique, expressive speech—for her customers.

---

(...continued)

commercial speech.  The Supreme Court has recognized that while advertising, for example, is purely commercial speech, *see Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985), expressive art—including art created in exchange for money—is afforded First Amendment protection.  *See, e.g.*, *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975) (theater production); *Hurley*, 515 U.S. at 569 (paintings, music, poetry, expressive parades); *Kaplan*, 413 U.S. at 119–20 (pure speech includes the printed word, oral utterances, pictures, films, paintings, drawings, and engravings).  Jackson Pollock sold his paintings, Leonard Bernstein profited from his compositions, and Lewis Carroll published his works to sell—but their creations are "unquestionably shielded."  *Hurley*, 515 U.S. at 569.  Indeed, to hold that pure speech for sale is not deserving of First Amendment protection would be the exception that swallows the rule.  Nearly all art and expressive speech has a commercial aspect in its creation because artists' and speakers' livelihoods often depend on its sale. But a paid speaker is still a speaker.  *See Riley*, 487 U.S. at 801.



*Fig. 1 – A prototype of a wedding website page design by Ms. Smith.*

Yet the majority does not afford Ms. Smith's pure speech any protection, endorsing CADA's compulsion of both speech and silence.  If Ms. Smith creates wedding websites for opposite-sex couples, CADA compels her to create wedding websites for same-sex couples.  She does not, for example, pre-design t-shirts and set a stack of them on a shelf, available to be picked up by any customer who walks in the store.  (If that were the case, CADA's application would be uncontroversial:  Ms. Smith would be required to serve *every* customer wanting to buy the pre-designed t-shirt, regardless of protected class status.)  Instead, Ms. Smith's wedding websites will be custom-made,

-16-

conveying both the couple's message about their wedding *and* Ms. Smith's own beliefs about and interpretation of marriage. So the majority recognizes that CADA forces artists to create individualized, expressive artwork that conveys a message betraying their beliefs—yet finds this constitutionally permissible.[5]

This departs from the explanation of a case substantially similar to this one, *Telescope Media*. *See* 936 F.3d at 750. There, the Eighth Circuit recognized that wedding videographers made videos that, "[b]y design, . . . serve as a medium for the communication of ideas about marriage" and are thus "a form of speech that is entitled to First Amendment protection." *Id.* at 750–51 (internal quotation marks omitted). Indeed, the Eighth Circuit acknowledged, "once conduct crosses over to speech or other expression, the government's ability to regulate it is limited." *Id.* at 755. Because the public-accommodation law thus required the videographers "to speak favorably about same-sex marriage if they choose to speak favorably about opposite-sex marriage," it impermissibly compelled speech. *Id.* at 752. And the Arizona Supreme Court came to a

---

[5] As long as a public-accommodation law is applied neutrally and not to expression, it is a commendable—and constitutional—effort by a state to eliminate discriminatory treatment of protected classes. *See Hurley*, 515 U.S. at 572 ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments."); *Masterpiece*, 138 S. Ct. at 1728 ("It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public. And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment.").

similar conclusion about custom wedding invitations.  *See Brush & Nib Studio*, 448 P.3d at 914–15 (holding that Arizona's public-accommodations law had compelled the pure speech of the custom wedding invitation designers).  Another federal court agreed with regard to wedding photography.  *See Chelsey Nelson Photography*, 2020 WL 4745771, at *10; *but see Elane Photography*, 309 P.3d at 59 (holding New Mexico's public-accommodations law did not compel speech when enforced against wedding photographer who refused to photograph same-sex weddings).

The majority instead concludes that Ms. Smith must either agree to propound messages accepting and celebrating same-sex marriage contrary to her deeply held principles or face financial penalties and remedial training under CADA.[6]  This is not a meaningful choice—nor is it one Colorado can or should force her to make.  *See Hurley*, 515 U.S. at 573 (recognizing the rule that the government "may not compel affirmation of a belief with which the speaker disagrees").

This is the central lesson of *Hurley*.  A state may not regulate speech itself as a public accommodation under anti-discrimination laws.  But CADA does so here, making Ms. Smith's artistic talents the vehicle for a message anathema to her beliefs.  The expansive view Colorado takes of CADA's reach would not stop with Ms. Smith's

---

[6]  These penalties include fines between $50 and $500 for each violation, compulsory mediation, orders to comply with CADA, and requirements that the charged party take other remedial actions, including required training, reports, and posting notices "setting forth the substantive rights of the public."  Colo. Rev. Stat. §§ 24-34-602(1)(a), 24-34-306, 24-34-605.  But I doubt any amount of training or struggle session would make Ms. Smith amenable to violating her conscience.

-18-

wedding websites. Indeed, the State could wield CADA as a sword, forcing an unwilling Muslim movie director to make a film with a Zionist message or requiring an atheist muralist to accept a commission celebrating Evangelical zeal. After all, the Muslim director would make films and the atheist muralist would paint murals for the general public with other messages. And that, Colorado contends, is all that is required to force them to accommodate a customer's request if it relates to the customer's protected class status:

> [CADA] requires commercial actors to offer specific goods and services to customers regardless of protected class status only 'if, and to the extent[,]' the merchant willingly provides those goods and services to the general public. . . . *That those goods and services may involve the vendor's creative or expressive skill does not change this analysis.*

Appellee Br. at 46 (emphasis added). The majority agrees, declaring that "unique goods and services are where public accommodation laws are most necessary to ensuring equal access." Maj. Op. at 31. It appears that the path to "coercive elimination of dissent" is steep—and short. *Barnette*, 319 U.S. at 641.

Moreover, CADA compels silence. Ms. Smith would like to post on her website an honest, straightforward message about why she will only make wedding websites for weddings involving one man and one woman.[7] Endorsing same-sex marriage is a

---

[7] Ms. Smith's intended statement reads in full:

I love weddings.

(continued...)

-19-

message Ms. Smith will not create for any client.  But CADA prevents her from

informing clients of this.  The State of Colorado can—and will, given its arguments

throughout this litigation and given its past actions—penalize her.  *See, e.g.*, *Masterpiece*,

138 S. Ct. 1719, 1726 (2018) (discussing the penalties imposed on Masterpiece Cakeshop

by the Commission);  *Masterpiece Cakeshop Inc. v. Elenis* (*Masterpiece II*), No.

---

(...continued)

> Each wedding is a story in itself, the story of a couple and their special love for each other.
>
> I have the privilege of telling the story of your love and commitment by designing a stunning website that promotes your special day and communicates a unique story about your wedding – from the tale of the engagement, to the excitement of the wedding day, to the beautiful life you are building together.
>
> I firmly believe that God is calling me to this work. Why? I am personally convicted that He wants me – during these uncertain times for those who believe in biblical marriage – to shine His light and not stay silent. He is calling me to stand up for my faith, to explain His true story about marriage, and to use the talents and business He gave me to publicly proclaim and celebrate His design for marriage as a life-long union between one man and one woman.
>
> These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs. So I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman. Doing that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage – the very story He is calling me to promote.

Aplt. App. at 1-110.

-20-

1:18-cv-02074-WYD-STV (D. Colo. Jan. 4, 2019), ECF No. 94 (order on suit regarding Colorado's second enforcement action brought against Masterpiece Cakeshop for refusing to make a birthday cake celebrating a sex-change). This reality forces Ms. Smith to stay silent about her convictions.



*Fig. 2 – The statement Ms. Smith wishes to publish on her business's website.*

Nor is Ms. Smith's statement intended to be derogatory or malicious. She forthrightly states her firm conviction—grounded in her Christian faith—that conscience requires her to create wedding websites only for marriages between one man and one woman. Doing otherwise, she states, would "compromise [her] Christian witness." Aplt. App. at 2-326.

Ms. Smith, like some other businesses that espouse religious sentiments, is simply informing the public that she operates her business in accordance with her faith. And as an artist, she will not create commissioned messages contrary to her beliefs. Her business

is firmly nondiscriminatory.  Her policy applies to *all* clients:  as Ms. Smith's counsel explained at oral argument, she would not create a same-sex wedding website—even a prototype for a non-existent couple—for anyone, regardless of sexual orientation.  Her statement simply informs potential clientele of the constraints of her faith, and the First Amendment protects Ms. Smith's right to do so.

### C. *Content- and Viewpoint-Based Restriction*

Like laws that compel speech, laws that restrict speech based on content or viewpoint are also highly suspect.  As applied to Ms. Smith, CADA does both.

A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992). This "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Reed*, 576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)); *see also Aptive Env't., LLC v. Town of Castle Rock, Colo.*, 959 F.3d 961, 981–83 (10th Cir. 2020) (treating an ordinance that facially distinguished between commercial solicitation and other types of solicitation as content-based).  Of course, "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose."  *Id.*  But "[b]oth are distinctions

-22-

drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163–64. Also subject to strict scrutiny are laws that are facially content-neutral but that "cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message the speech conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alterations incorporated). All of these types of content-based regulations—which "target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Furthermore, a law that discriminates based on viewpoint is an even more "blatant" violation of the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Because the government is regulating "speech based on 'the specific motivating ideology or the opinion or perspective of the speaker,'" it is a more "egregious form of content discrimination." *Reed*, 576 U.S. at 168 (quoting *Rosenberger*, 515 U.S. at 829). Consequently, the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The First Amendment thus "forbid[s] the State to exercise viewpoint discrimination," and such a regulation must undergo the strictest scrutiny. *Id.*

As the majority recognizes, CADA is indisputably a content- and viewpoint-based regulation. The "crucial first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face." *Reed*, 576 U.S. at 165. Take, for example, the provision that requires an arbiter to—at the very least—read a challenged "communication, . . . notice, or advertisement" to determine whether it "indicates that the full and equal enjoyment" of the public accommodation "will be refused, withheld from, or denied an individual." Colo. Rev. Stat. § 24-34-601(2)(a). The permissibility of the communication depends on *what* it says—or, stated simply, its content.

Similarly, determining whether a person has been denied accommodation *because of* a protected class status requires, of course, an inquiry into the motivation behind the denial. (This is, in large part, why the Commission exists.) Because the *content* of the message determines the applicability of the statute and the *viewpoint* of the speaker determines the legality of the message, CADA is both content- and viewpoint-based. But both point to the same conclusion: "A law that is content-based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed*, 576 U.S. at 165 (internal quotation marks omitted).

\*    \*    \*

Whether CADA compels speech or regulates speech based on its content or discriminates against speech based on its viewpoint—or all three—one thing is clear, as

-24-

the majority concedes:  CADA must undergo strict scrutiny.  Under a proper application

of strict scrutiny, CADA fails to pass constitutional muster.

### D.  CADA Fails Strict Scrutiny

Although the majority properly finds CADA compels expressive speech, *see* Maj.

Op. at 24, it resists the firm teaching of precedent that the resulting compulsion violates

the Constitution.  And even though the majority also agrees that CADA is a content-based

restriction on speech, *see* Maj. Op. at 25, its permissive application of strict scrutiny is

troubling.  The majority tells us not to worry because Colorado has good reasons to

violate Ms. Smith's conscience for the greater good.  After all, she is only one person out

of many.  But this is misguided.  *See Barnette*, 319 U.S. at 638 ("The very purpose of a

Bill of Rights was to withdraw certain subjects from the vicissitudes of political

controversy, to place them beyond the reach of majorities and officials and to establish

them as legal principles to be applied by the courts.  One's right to life, liberty, and

property, to free speech, a free press, freedom of worship and assembly, and other

fundamental rights may not be submitted to vote; they depend on the outcome of no

elections.").

To be sure, the Supreme Court has warned that it "wish[es] to dispel the notion

that strict scrutiny is strict in theory, but fatal in fact."  *Adarand Constructors, Inc. v.

Pena*, 515 U.S. 200, 237 (1995) (internal quotation marks omitted).  But "it is the rare

case in which a State demonstrates" that a provision passes strict scrutiny.

-25-

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (internal quotation marks omitted).

In the context of expressive speech, the stakes are high—so a rigorous application of

strict scrutiny is vital.

As the majority acknowledges, strict scrutiny requires the government to

demonstrate that the provision "is justified by a compelling government interest and is

narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799; *see also Pac. Gas &*

*Elec. Co.*, 475 U.S. 1, 19 (1986) (holding that a law that compels speech is only valid if it

is a "narrowly tailored means of serving a compelling state interest"). When determining

whether a law is narrowly tailored, "the court should ask whether the challenged

regulation is the least restrictive means among available, effective alternatives." *Ashcroft*

*v. ACLU*, 542 U.S. 656, 666 (2004). And in the free-speech context, "narrow" means the

law must "avoid unnecessarily abridging speech." *See Williams-Yulee*, 575 U.S. at 444.

It also means a law cannot be overinclusive, *see Brown*, 564 U.S. at 804, or

underinclusive, *see Reed*, 576 U.S. at 171–72. The existence of administrable, reasonable

alternatives indicate the law is not sufficiently narrow to survive the rigors of strict

scrutiny. *See Ashcroft*, 542 U.S. at 666. Ultimately, the court's task is to ensure that

"speech is restricted no further than necessary to achieve the [government's] goal[.]" *Id.*

CADA is not narrowly tailored so as to survive its encroachment on First

Amendment liberties. Eliminating discrimination in places of public accommodation is

undeniably a compelling state interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628

(1984) ("[A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent[.]").  And as a general proposition, "ensuring 'equal access to publicly available goods and services'" is also a compelling government interest.  Maj. Op. at 28 (quoting *U.S. Jaycees*, 468 U.S. at 624).  But ensuring access to a *particular* person's unique, artistic product—as the majority holds, *see* Maj. Op. at 33—is *not* a compelling state interest.[8]  Nor does the majority cite any case law to support this unconventional characterization of a compelling interest.

And in advancing its aims, Colorado has failed to narrowly tailor CADA so as to preserve vital speech protections.  For one, CADA is overinclusive, intruding into

---

[8]  In concluding that CADA is narrowly tailored, the majority appears to conflate the compelling-interest analysis with the narrow-tailoring analysis.  The majority states that CADA is "narrowly tailored to Colorado's interest in ensuring access to the commercial marketplace."  Maj. Op. at 33.  Although the majority acknowledges that "the commercial nature of [Ms. Smith's] business does not diminish [her] speech interest," *id.* at 28, the opinion then states that this same commercial nature allows Colorado to regulate it.

But this statement—and the ensuing discussion—is not aimed at how narrowly CADA is or is not tailored; rather, it confuses the *means* (how a State accomplishes its compelling interest) with the *ends* (the State's compelling interest it seeks to further).  Put differently, the majority appears to endorse the proposition that if the government's *compelling interest* is drawn narrowly enough, the government may use any means to further it.  Other than pointing out how CADA is aimed at regulating commercial behavior, the majority says nothing about how CADA uses the least restrictive means to accomplish its goal and "avoid[s] unnecessarily abridging speech."  *See Williams-Yulee*, 575 U.S. at 444.  The majority's discussion on this point merely reiterates Colorado's purportedly compelling interest in providing market access to Ms. Smith's website designs in particular.

-27-

protected speech both by compelling it and by suppressing it, as discussed above.  For another, there are reasonable, practicable alternatives Colorado could implement to ensure market access while better protecting speech.  Colorado could simply take seriously (and codify) its own statement that CADA allows for message-based exceptions.  *See* Appellee Br. at 62 ("[T]he Commission does not interpret [CADA] to require any business owner, regardless of religious beliefs, to produce a message it would decline to produce for any customer.").  This practicable alternative protects artists' speech interests while not harming the state's interest in ensuring market access.  After all, the Commission claims to interpret CADA in this way already.

Alternatively, Colorado could allow artists—those who are engaged in making expressive, custom art—to select the messages they wish to create, free from fear of retribution.  Or Colorado could exempt from CADA artists who create expressive speech about or for weddings, as Mississippi does.  *See* Miss. Code Ann. § 11-62-5(5).  Colorado could also modify its definition of "place of public accommodation" by placing expressive businesses beyond its reach.  *See* Colo. Rev. Stat. § 24-34-601(1).  Indeed, CADA already excludes one type of expressive establishment: "places principally used for religious purposes."  *Id.*

In any event, the majority overlooks these simple answers that would keep Colorado properly within the bounds of the Constitution.  Instead, the majority allows the government to dictate what shall and shall not be said, impinging on the most vital First

Amendment liberties.  Rather than embracing the idea that creative, expressive works are even worthier of First Amendment protection by virtue of their originality and intrinsic worth, the majority comes to the *opposite* conclusion.  It holds that "unique goods and services are where public accommodation laws are most necessary to ensuring equal access."  Maj. Op. at 32.  It premises this argument on the idea (novel to the First Amendment) of a "monopoly of one," characterizing the "product at issue [as] not merely 'custom-made wedding websites,' but rather 'custom-made wedding websites of the same quality and nature as those *made by [Ms. Smith]*.'"  *Id.* at 30–31 (emphasis added).  The majority then concludes that "monopolies present unique anti-discrimination concerns," justifying regulation of a market in which "only [Ms. Smith] exist[s]."  *Id.* at 30.

But this reductive reasoning leads to absurd results.  By describing custom artists as creating a monopoly of one, the majority uses the very quality that gives the art value—its expressive and singular nature—to cheapen it.  In essence, the majority holds that the *more* unique a product, the more aggressively the government may regulate access to it—and thus the *less* First Amendment protection it has.[9]  This is, in a word, unprecedented.  And this interpretation subverts our core understandings of the First Amendment.  After all, if speech can be regulated by the government solely by reason of

---

[9]  This was not the conclusion reached by the *Hurley* Court.  Consider what was at issue in that case:  participation in the Boston St. Patrick's Day–Evacuation Day Parade. What could possibly be more unique and non-fungible than marching in this famous, storied parade?  *See Hurley*, 515 U.S. at 560–61 (discussing the long history of the parade).

-29-

its novelty, nothing unique would be worth saying.  And because essentially all artwork is inherently "not fungible," *id.* at 28, the scope of the majority's opinion is staggering.  Taken to its logical end, the government could regulate the messages communicated by *all* artists, forcing them to promote messages approved by the government in the name of "ensuring access to the commercial marketplace."[10]  *Id.* at 27.

In sum, I am persuaded by what Justice Jackson wrote nearly 80 years ago:  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642.  These words are as true now as they were then.

## II.  Free Exercise

The majority then turns to Ms. Smith's right to freely exercise her religious beliefs. State actions that infringe on this right enshrined in the First Amendment can range from extreme (and unconstitutional) to permissible.  A short review of the legal framework demonstrates where CADA's application to Ms. Smith falls on this spectrum.

---

[10]  The majority points out that its holding "does not address how CADA might apply to non-commercial activity (such as commissioning a mural for some charitable purpose)."  Maj. Op. at 33 n.6.  But this is surely cold comfort for the vast majority of artists, who make a living by selling their work.  Artists should not have to choose to either disavow their beliefs or charitably create in order to have control over their own messages.

At one end of the spectrum are neutral laws that are generally applicable, which treat religious and secular entities the same. *See Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).[11]  These laws are subject to rational basis review.  A "law that is both

---

[11]  On June 17, 2021, the Supreme Court issued its opinion in *Fulton v. Philadelphia*, a case in which Philadelphia had ended its relationship with Catholic Social Services for approving foster parents because CSS's religious beliefs on marriage prevented it from approving same-sex couples. 141 S. Ct. at 1874.  Although one of the issues presented was whether *Employment Division v. Smith* should be overturned, the Court held that "[t]his case falls outside *Smith*" because Philadelphia's policies were not "generally applicable."  *Id.* at 1878.

Nevertheless, since *Smith*, several Supreme Court justices have written or joined in expressing doubt about *Smith*'s free exercise jurisprudence.  *See, e.g.*, *Fulton*, 141 S. Ct. at 1882 (Barrett, J., concurring) ("In my view, the textual and structural arguments against *Smith* are more compelling.  As a matter of text and structure, it is difficult to see why the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination."); *Id.* at 1883 (Alito, J., concurring) (writing that "[*Smith*'s] severe holding is ripe for reexamination" and "correct[ion]"); *Id.* at 1926 (Gorsuch, J., concurring) ("*Smith* failed to respect this Court's precedents, was mistaken as a matter of the Constitution's original public meaning, and has proven unworkable in practice."); *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019), *denial of cert.* (Alito, J., concurring, joined by Thomas, Gorsuch, and Kavanaugh, JJ.) (writing that *Smith* "drastically cut back on the protection provided by the Free Exercise Clause"); *City of Boerne v. Flores*, 521 U.S. 507, 548 (1997) (O'Connor, J., dissenting) (stating that "*Smith* is gravely at odds with our earlier free exercise precedents."); *id.* at 565 (Souter, J., dissenting) ("I have serious doubts about the precedential value of the *Smith* rule and its entitlement to adherence."); *id.* at 566 (Breyer, J., dissenting); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 559 (1993) (Souter, J., concurring in part and concurring in the judgment).  And recent COVID-restriction-related opinions have cast doubt on *Smith*'s precedential value for cases in which a state's facially neutral regulations result in disparate treatment between secular and religious entities.  *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam).

(continued...)

neutral and generally applicable need only be rationally related to a legitimate

governmental interest to survive a constitutional challenge." *Grace United Methodist*

*Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006); *see also Smith*, 494 U.S.

at 878–79.  Furthermore, "a law that is neutral and of general applicability need not be

justified by a compelling governmental interest even if the law has the incidental effect of

burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City*

*of Hialeah*, 508 U.S. 520, 531 (1993) (emphasis added).  "[A]n individual's religious

beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting

conduct that the State is free to regulate." *Smith*, 494 U.S. at 878–79.

But a state's discriminatory treatment—hidden in the guise of facial neutrality—

may be less apparent.  *See Lukumi Babalu Aye*, 508 U.S. at 534 ("Facial neutrality is not

determinative. The Free Exercise Clause . . . extends beyond facial discrimination.").  A

law may place certain secular activities in a favored category at the same time it places

religious activities in a less favorable category—perhaps by denying them exemptions or

excluding them from benefits or beneficial treatment.  *See id.* at 537–38.  But "[t]he Free

Exercise Clause bars even 'subtle departures from neutrality' on matters of religion."

*Masterpiece*, 138 S. Ct. at 1731.  As a result, "government regulations are not neutral and

generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause,

---

(...continued)
But because this case presents the "individualized exemptions" exception to *Smith*,
we need not predict whether *Smith* has continued viability.

whenever they treat *any* comparable secular activity more favorably than religious

exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (emphasis in

original); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)

(per curiam) (stating that because COVID-related capacity restrictions resulted in

disparate treatment between houses of worship and some businesses, the restrictions were

not neutral and generally applicable and thus subject to strict scrutiny).

　　　The Supreme Court has identified at least two ways in which a law can lack

general applicability, thereby triggering strict scrutiny review.  One of these is "if [a law]

prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  Such a law

might be underinclusive, targeting only certain harms purportedly caused by religious

conduct while permitting similar harms by others.  *See Lukumi Babalu Aye*, 508 U.S. at

545–46.

　　　The other manner in which a law may not be generally applicable is the

individualized exemption exception.  "A law is not generally applicable if it 'invites' the

government to consider the particular reasons for a person's conduct by providing 'a

mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*,

494 U. S., at 884) (alterations incorporated); *see also Grace United Methodist Church*,

451 F.3d at 650.  "[T]he individualized exemption exception inquiry can be summarized

as follows:  as long as a law remains exemptionless, it is considered generally applicable

and religious groups cannot claim a right to exemption; however, when a law has secular

exemptions, a challenge by a religious group becomes possible." *Grace United Methodist*

*Church*, 451 F.3d at 650. Accordingly, this exception "is limited . . . to systems that are

designed to make case-by-case determinations." *Axson-Flynn*, 356 F.3d at 1298 (finding

that a university's treatment of an LDS student's right to free exercise of her religion was

part of a system of individualized exemptions because it had granted an exception to a

Jewish student). This is because such a system "permit[s] the government to grant

exemptions based on the circumstances underlying each application" of the law. *Fulton*,

141 S. Ct. at 1877. Accordingly, "[t]o ensure that individuals do not suffer unfair

treatment on the basis of religious animus, subjective assessment systems that invite

consideration of the particular circumstances behind an applicant's actions . . . trigger

strict scrutiny." *Grace United Methodist Church*, 451 F.3d at 651 (internal quotation

marks omitted).

At the far end of the spectrum, a state violates the right to free exercise when it

expressly discriminates against—or demonstrates animus toward—religion. This type of

action is subject to the "strictest scrutiny." *Trinity Lutheran Church of Columbia, Inc. v.*

*Comer*, 137 S. Ct. 2012, 2019 (2017) ("The Free Exercise Clause 'protect[s] religious

observers against unequal treatment' and subjects to the strictest scrutiny laws that target

the religious for 'special disabilities' based on their 'religious status.'" (quoting *Lukumi*

*Babalu Aye*, 508 U.S. at 533)). As Justice Kennedy wrote in another case involving

-34-

CADA, "[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece*, 138 S. Ct. at 1731. In other words, a statute that discriminates against religious beliefs or prohibits conduct *because* they are religious must pass strict scrutiny review. *Lukumi Babalu Aye*, 508 U.S. at 531–33, 546. This type of law is invalid unless it is narrowly tailored to accomplish the government's compelling interest. *See Grace United Methodist Church*, 451 F.3d at 649 ("[I]f a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest.").

Given this legal framework, CADA clearly violates Ms. Smith's Free Exercise rights.

Colorado asserts that CADA is a neutral, generally applicable law because it purports to regulate only commercial conduct, or the "terms and conditions under which a business chooses to offer goods or services for sale to the public." Appellee Br. at 38. All that CADA requires of Ms. Smith, therefore, is that she "make that product or service available to all customers regardless of protected class status." Appellee Br. at 38. If

CADA were enforced exactly in this even-handed manner, perhaps it would be neutral and generally applicable, and perhaps it would pass the resulting rational basis scrutiny.[12]

But this is not how CADA works. Colorado *has* allowed exceptions. In fact, the entire CADA enforcement mechanism is structured to make case-by-case determinations. *See* Maj. Op. at 6–7 (discussing investigative and adjudicative processes dictated by CADA). CADA deputizes *anyone* to file a complaint challenging a business practice, and the Commission is required to investigate and rule on each complaint individually. *Id.* There is no meaningful difference between the Commission's role in enforcing CADA here and the Commissioner's role in *Fulton* in parceling out exceptions for foster care contracts. In that case, Philadelphia's provision "incorporate[d] a system of individual exemptions, made available . . . at the sole discretion of the Commissioner." *Fulton*, 141 S. Ct. at 1878 (internal quotation marks omitted). And, as here, Philadelphia "made clear that the Commissioner 'ha[d] no intention of granting an exception'" to the Catholic charity. *Id.* (quoting the petition for certiorari). But in cases where this causes "religious hardship," held the Court, this "exception system" triggers strict scrutiny. *Id.* (quoting *Smith*, 494 U.S. at 884).

The Colorado Civil Rights Commission operates under exactly the same ad-hoc system as in *Fulton*. The Commission is the sole arbiter for handling complaints

---

[12] As discussed above, 303 Creative does not deny website services based on sexual orientation.

submitted to it—decreeing when a religious objection is valid[13] and when it is not, doling out punishment and reprieve based on its own standards.  As the Supreme Court has made clear, "in circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of religious hardship without compelling reason.'"  *Lukumi Babalu Aye*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884); *see also Fulton*, 141 S. Ct. at 1878; *Tandon*, 141 S. Ct. at 1296.[14]

---

[13]  Or, for that matter, whether a sex-related "restriction has a bona fide relationship to the goods, services, facilities, privileges, advantages, or accommodations of such place of public accommodation."  Colo. Rev. Stat. § 24-34-601(3).

[14]  The majority declines to apply heightened scrutiny under a hybrid-rights theory because it concludes that Ms. Smith's free speech claim fails.  *See* Maj. Op. at 47.  But because CADA employs case-by-case individualized exemptions, it triggers strict scrutiny, *see Lukumi Babalu Aye*, 508 U.S. at 537, not the "heightened scrutiny" required in the hybrid-rights context, *see Axson-Flynn*, 356 F.3d at 1295.

Moreover, jurists and scholars have expressed doubts as to the practical validity of *Smith*'s hybrid-rights doctrine, characterizing it as dicta, difficult to define, illogical, and untenable.  *See, e.g.*, *Lukumi Babalu Aye*, 508 U.S. at 567 (Souter, J., concurring) ("And the distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith*."); *Axson-Flynn*, 356 F.3d at 1301 ("We agree with the district court that the law regarding this controversial 'hybrid-rights' exception is not clearly established, and even this Court has recognized that '[i]t is difficult to delineate the exact contours of the hybrid-rights theory discussed in *Smith*.'" (quoting Swanson, 135 F.3d at 699)); *Kissinger v. Bd. of Trustees of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993) (criticizing the hybrid-rights doctrine as illogical and declining to apply it); Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109, 1122 (1990) ("[A] legal realist would tell us . . . that the *Smith* Court's notion of 'hybrid' claims was not intended to be taken seriously.").  And courts are "divided on the strength of the independent constitutional right claim that is required to assert a cognizable hybrid rights claim, with a number of

(continued...)

Because CADA's enforcement requires the Commission to make individualized assessments of complaints—which is *necessarily* structured to allow individualized exemptions for some and not for others—it must undergo strict scrutiny.

The arbitrary way in which Colorado has handed out exceptions to CADA is best demonstrated by a familiar case: *Masterpiece.  See* 138 S. Ct. at 1730.  There, the Court delivered a stinging rebuke to the Commission, declaring that its "treatment of [the baker's] case ha[d] some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated his objection." *Id.* at 1729.  Besides this remarkable reprimand, though, *Masterpiece* has additional relevance here with respect to the differential treatment of religious individuals.  *Masterpiece*'s applicability is not, as the majority would have it, related to any animus (or lack thereof) of the Commission. Rather, it indicates how the CADA-created system of individualized exceptions is designed for—and *has already resulted in*—disparate treatment, particularly for religious speakers.  For example, during the pendency of the *Masterpiece* litigation, a professing

---

(...continued)
courts, including this circuit, expressing the view that a litigant is required to assert at least a 'colorable' claim to an independent constitutional right to survive summary judgment." *Grace United Methodist Church*, 451 F.3d at 656.

Regardless, in a similar case on wedding videography, the Eighth Circuit acknowledged that the hybrid-rights doctrine supported a free speech claim that was intertwined with a free exercise claim.  *See Telescope Media*, 936 F.3d at 758.  But it may simply be a distinction without a difference, for as the *Telescope Media* panel stated, "it is not at all clear that the hybrid-rights doctrine will make any real difference in the end. After all, the [appellants'] free-speech claim already requires the application of strict scrutiny." *Id.* at 760.  The same is true here.

Christian man, William Jack, filed CADA complaints against three bakeries for refusing to make cakes that expressed opposition to same-sex marriage.  Aplt. App. at 1-027–28; *see also Masterpiece Cakeshop*, 138 S. Ct. at 1728.  But the Commission found that there was "no probable cause" to Mr. Jack's "creed" discrimination complaints because the bakeries would not have made cakes with those messages for any customer, regardless of creed.  But around the same time, the Commission concluded that Masterpiece Cakeshop had violated CADA by refusing to make a cake because of the customer's status—that is, sexual orientation.  In other words, the Commission contended, the Jack cases were acceptable message-based refusals, while the Masterpiece case was an unacceptable status-based refusal.

But this evinces a failure to act neutrally toward religious belief.  *Masterpiece*, 138 S. Ct. at 1730 ("Another indication of hostility is the difference in treatment between Phillips' case and the cases of other bakers who objected to a requested cake on the basis of conscience and prevailed before the Commission.").  As Justice Gorsuch pointed out, the Commission "slid[] up and down the *mens rea* scale, picking a mental state standard to suit its tastes depending on its sympathies" in coming to these inconsistent conclusions. *Id.* at 1737 (Gorsuch, J., concurring).  Such "gerrymander[ing]" leads to unacceptable "results-driven reasoning" by civil authorities.[15]  *Id.* at 1739.  Stated more simply, the

---

[15]  The majority disagrees, holding that Colorado may engage in "a gerrymander favoring LGBT customers, as opposed to a gerrymander disfavoring religious-speakers." Maj. Op. at 41.  But in doing so, the majority places the burden on the wrong party.  In a

(continued...)

Commission cannot use different standards for religious individuals and non-religious individuals. *See id.* at 1737 ("But the one thing [the Commission] can't do is apply a more generous legal test to secular objections than religious ones."). This type of differential treatment is the most intolerable of the "individualized exemption" exception to *Smith*, as recognized in *Lukumi Babalu Aye.*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884).

And contrary to the majority's assertion, Colorado may not "gerrymander" CADA, *see* Maj. Op. at 39, to benefit a certain group when its practical effect is to violate the rights of another. *See Lukumi Babalu Aye*, 508 U.S. at 524 (invalidating ordinances where "the principle of general applicability was violated because the secular ends asserted in defense of the laws were pursued only with respect to conduct motivated by religious beliefs"); *id.* at 535 (determining the validity of the law by looking to the "ordinances' *operation*" (emphasis added)).

Despite all this, Colorado continues to profess that CADA allows for message-based refusals, stating: "[T]he Commission does not interpret [CADA] to require any

---

[15](...continued)
system of case-by-case adjudication *exactly like this one*—where the Commission would determine whether a person's objection to same-sex marriage is religiously motivated—strict scrutiny must apply. *See also Fulton*, 141 S. Ct. at 1878. As the Supreme Court has made clear, "the government has the burden to establish that the challenged law satisfies strict scrutiny." *Tandon*, 141 S. Ct. at 1296. The majority disregards this, stating that Ms. Smith "provide[s] no evidence that Colorado permits secularly-motivated objections to serving LGBT consumers." Maj. Op. at 41 (internal citations to *Lukumi Babalu Aye* omitted). Of course, it is the government's job to prove CADA passes muster—not Ms. Smith's.

business owner, regardless of religious beliefs, to produce a message it would decline to produce for any customer."[16]  Appellee Br. at 62.  As Ms. Smith's counsel affirmed at oral argument, Ms. Smith would refuse to make any message celebrating same-sex marriage for *any* client, regardless of sexual orientation.  This is exactly the type of refusal Colorado claims Ms. Smith can make:  a message-based refusal not rooted in the identity or status of the client.  But again, Colorado slides up and down the *mens rea*

---

[16]  The majority states that "[m]essage-based refusals are not an 'exemption' from CADA's requirements; they are a defense."  Maj. Op. at 43.  This contradicts Colorado's own position that the Commission "interpret[s] [CADA]" to allow message-based refusals; if Colorado says it interprets the law this way, it provides guidance to business owners *before* a complaint is filed, not after.  Such an interpretation gives notice to business owners that they may make message-based refusals without fear that they will be dragged before the Commission to present this argument as a defense.  And such an interpretation should prevent the Commission from seriously investigating any complaint based on a message-based refusal in the first instance—thus "free[ing] or releas[ing]" message-based refusals from liability under CADA.  *See* Exempt, Black's Law Dictionary (11th ed. 2019).

But even assuming that the majority's characterization is correct, a defense available only to some and not others *based on protected class status* triggers strict scrutiny.  The majority claims that "[o]stensibly, message-based refusals are unrelated to class-status," Maj. Op. at 43, but in CADA's enforcement history, they can and have been related to protected class status.  It is precisely why the differential treatment between the secular bakeries' refusals and Jack Phillips's refusal in *Masterpiece* has enduring relevance here:  because both were making a message-based refusal, Colorado demonstrated religious animus in crediting one and not the other.  *Masterpiece*, 138 S. Ct. at 1731.  Or imagine a Muslim muralist, contacted by a Jewish restaurant owner requesting a depiction of the Israeli flag with a Zionist message.  The Muslim muralist might refuse to paint such a message—but the message is undeniably intertwined with the Jewish restaurant owner's protected religious class status.  Even though "message-based refusals may be objectively defined," Maj. Op. at 44, Colorado can and does enforce its purported message-based-refusal rule in a subjective manner based on protected class status.  This requires strict scrutiny review.

scale, presuming that Ms. Smith has discriminatory intent in her faith-based refusal while allowing other artists to refuse to convey messages contrary to their non-faith-based beliefs.  Just because Ms. Smith's beliefs may seem to be a minority viewpoint to Colorado does not give it the right to presume ill-intent.[17]  On the contrary, it is precisely *because* Ms. Smith's views may be in the minority that they must be afforded the greatest protection.  *See Masterpiece*, 138 S. Ct. 1737 (Gorsuch, J., concurring) ("Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a refuge for religious freedom."); *Fulton*, 141 S. Ct. at 1925 (Alito, J., concurring) ("Suppressing speech—or religious practice—simply because it expresses an idea that some find hurtful is a zero-sum game.").  This is the promise of the Free Exercise Clause, and it is why Colorado's treatment of Ms. Smith's religious beliefs must be rejected.

---

[17]  As the Supreme Court made clear in *Obergefell*, individuals with religious convictions about marriage

> may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Obergefell v. Hodges*, 576 U.S. 644, 679–80 (2015).

-42-

Indeed, we need only look at our own precedent.  In *Axson-Flynn*, the University of Utah refused to exempt an LDS student from speaking profanity in her acting program—which she refused to do because of her religious beliefs—but *did* grant an exemption for a Jewish student who refused to perform on Yom Kippur.  *Axson-Flynn*, 356 F.3d at 1298.  Because this meant the University had a system of individualized exemptions, the panel concluded the LDS student had raised a genuine issue of material fact as to whether her case fell in the "individualized exemption" exception.  In other words, the University "maintained a discretionary system of making individualized case-by-case determinations regarding who should receive exemptions from curricular requirements," indicating it was not demonstrating the requisite neutrality to the student's religious beliefs.  *Id*. at 1299.  Furthermore, the "'system of individualized exemptions' need not be a written policy, but rather the plaintiff may show a pattern of ad hoc discretionary decisions amounting to a 'system.'"  *Id.*

By demonstrating that CADA sets up a case-by-case system for determining exceptions, Ms. Smith has shown CADA's application here must be reviewed with strict scrutiny with regard to the free exercise claims.  *See Fulton*, 141 S. Ct. at 1878; *id.* at 1881 ("A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests."  (quoting *Lukumi*, 508 U. S. at 546)).  "So long as [Colorado] can achieve its interests in a manner that does not burden religion, it must do so."  *Id*. at 1881.

-43-

But for the same reasons CADA fails strict scrutiny with regard to Ms. Smith's free speech claims, it fails with regard to the free exercise claims. *See Grace United Methodist Church*, 451 F.3d at 649 ("[I]f a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest."). With regard to the compelling interest analysis, Colorado bears the burden of proving not that it "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Ms. Smith. *Fulton*, Slip Op. at 14. Colorado has not done so here. And with respect to the narrow tailoring analysis, Colorado must show CADA is not "the least restrictive means among available, effective alternatives." *Ashcroft*, 542 U.S. at 666. But, as discussed above, effective alternatives *do* exist. Colorado says it allows message-based refusals for religious beliefs. Given its infamous history in not administering these exceptions in a neutral way, *see Masterpiece*, 138 S. Ct. at 1729, perhaps Colorado can write this provision into CADA. Or perhaps it could exempt religious speakers when their refusal to provide a service or product is rooted in a sincerely held religious belief. Or again, Colorado could exempt faith-based artists who speak about weddings from the requirements of CADA.

When all is said and done, allowing business owners like Ms. Smith to operate in accordance with the tenets of their faiths does not damage society but enriches it. Indeed,

-44-

"we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Barnette*, 319 U.S. at 641. Religious liberty is among the purest forms of self-determination because it allows believers to retain sovereignty of the soul. Because of this, the "Free Exercise Clause commits government itself to religious tolerance." *Lukumi Babalu Aye*, 508 U.S. at 547. Even though Colorado has not committed itself to respect this diversity, our First Amendment protects Ms. Smith.

## III. Facial Challenge for Overbreadth and Vagueness

Finally, the majority fails to protect Ms. Smith from CADA's Orwellian diktat that regulates businesses based on the subjective experience of customers. CADA contains a breathtakingly broad and vague provision prohibiting "directly or indirectly" speaking in such a way that makes a customer feel "unwelcome, objectionable, unacceptable, or undesirable" because of a protected characteristic.[18] Colo. Rev. Stat. § 24-34-601(2)(a). Facially and as applied to Ms. Smith, this "Unwelcome Provision"

---

[18] It states:

> It is a discriminatory practice and unlawful for a person, . . . directly or indirectly, to [communicate] *that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable* because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601(2)(a).

easily flunks the requirement that fair notice be given to citizens about what can or cannot be said in exercising First Amendment rights. Like *Nineteen Eighty-Four*'s Winston Smith, CADA wants Lorie Smith to not only accept government approved speech but also to endorse it.

In the First Amendment context, a plaintiff may bring a facial challenge "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010); *see also Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (holding that a "law's application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications . . . before applying the 'strong medicine' of overbreadth invalidation" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). In *Stevens*, the Supreme Court held as constitutionally overbroad an animal cruelty ban that applied to any depiction in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." *Id.* at 474 (quoting the statute at issue). The Court picked through each of these words, one by one, determining whether any of these words made the statute's reach too broad. The words "wounded" and "killed" encompassed too much legal, protected conduct. *Id.* at 475–76. Even the statute's inclusion of the additional element of "accompanying acts of cruelty" did not work to contain the too-broad meaning of "wounded" and "killed." *Id.* at 474.

Nor may a statute be so impermissibly vague as to deprive a potential lawbreaker

of due process.  As the Supreme Court has explained:

> Vague laws offend several important values.  First, because we
> assume that man is free to steer between lawful and unlawful
> conduct, we insist that laws give the person of ordinary
> intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly.  Vague laws may trap
> the innocent by not providing fair warning.  Second, if arbitrary
> and discriminatory enforcement is to be prevented, laws must
> provide explicit standards for those who apply them.  A vague
> law impermissibly delegates basic policy matters to policemen,
> judges, and juries for resolution on an ad hoc and subjective
> basis, with the attendant dangers of arbitrary and discriminatory
> application.  Third, but related, where a vague statute abuts upon
> sensitive areas of basic First Amendment freedoms, it operates
> to inhibit the exercise of those freedoms.  Uncertain meanings
> inevitably lead citizen[s] to steer far wider of the unlawful zone
> than if the boundaries of the forbidden areas were clearly
> marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (internal quotation marks

omitted; alterations incorporated); *see also U.S. Jaycees*, 468 U.S. at 629 ("The

void-for-vagueness doctrine reflects the principle that a statute which either forbids or

requires the doing of an act in terms so vague that persons of common intelligence must

necessarily guess at its meaning and differ as to its application, violates the first essential

of due process of law.") (internal quotation marks omitted; alterations incorporated).

The void-for-vagueness doctrine also prevents arbitrary enforcement by

government officials and properly maintains separation of powers.  *See Sessions v.

Dimaya*, 138 S. Ct. 1204, 1225 (2018) (Gorsuch, J., concurring) ("Vague laws invite

-47-

arbitrary power"); *id.* at 1205 ("Nor is the worry only that vague laws risk allowing judges to assume legislative power.  Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions.").  And when a law abridges First Amendment civil rights, it must be subjected to an especially "stringent vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

CADA's "do-not-offend provision" is both overbroad and vague.  Begin with the provision's overbreadth.  Analyzing any of the operative words—"unwelcome, objectionable, unacceptable, or undesirable"—is instructive.  Take, for instance, "unwelcome."  Merriam-Webster defines unwelcome as "not wanted."  It surely implies a subjective element on behalf of the person who feels unwelcome.  For example, an atheist who walked into a hardware store owned by a Christian might feel unwelcome if he saw a sign inside that said, "We honor God and His commandments here."  This sign says nothing about the atheist's protected class status, and it certainly does not directly "indicate" that he is unwelcome.  And the store's purveyors might not have hung the sign with that intent whatsoever—but the statute includes *indirect* as well as *direct* speech or conduct.  This otherwise completely innocent and lawful sign—indeed, a sign protected by the First Amendment—would fall within the provision's purview.

Or suppose a restaurant owner hung a Confederate flag outside his establishment.  Given its controversial status, such a symbol might make potential patrons feel

unwelcome in that restaurant, or perhaps make them feel as though the owner finds their business undesirable.  But government regulation of displaying a flag as part of expressive or symbolic speech is surely subject to strict scrutiny under the First Amendment.  *See Spence v. State of Washington*, 418 U.S. 405, 415 (1974) (holding the display of an United States flag upside down and with a peace sign taped on it was protected expression); *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (concluding that a man's "burning of the [United States] flag was conduct 'sufficiently imbued with elements of communication' to implicate the First Amendment" (quoting *Spence*, 418 U.S. at 409)).

Or take "objectionable."  Perhaps a Muslim shop owner hangs a sign that reads, "There is no God but Allah and Muhammad is His Prophet."  A Christian who walked into the store may feel that the shopkeeper *objects* to his beliefs about Jesus Christ as his savior—which would make the sign an indirect statement that the Christian's views about Jesus Christ (or about Muhammad, for that matter) are *objectionable*.  But the sign is, of course, protected speech.  It takes little imagination to multiply these examples by dozens. The provision unyieldingly sweeps in substantial swaths of protected conduct and speech.

The majority's position that the Unwelcome Provision cannot be overbroad because it is couched within the Communication Clause's "primar[y] focus[] on access to goods and services," Maj. Op. at 48, is unpersuasive.  For one, all of the examples above relate to access to goods and services within places of public accommodation and would

-49-

be covered by both the Communication Clause and the Unwelcome Provision—yet the speech in each example is undoubtedly protected. For another, the Unwelcome Provision does not solely target *access* to goods and services: indeed, communication that an individual's mere *presence* at a place of public accommodation is unwelcome is swept into the law as well. Colo. Rev. Stat. § 24-34-601(2)(a) (prohibiting communication "that an individual's *patronage or presence* at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable" because of a protected class status (emphasis added)). Moreover, by its own terms, the Unwelcome Provision applies not only to direct but indirect communication. The majority fails to explain how its market-access theory will permissibly apply to *indirect* communication—communication that, in other words, may not even be aimed at an individual's access to a product or place of public accommodation. Is the monopolist-of-one artist required to silence herself?

As for vagueness, the examples discussed above make clear that the terms "unwelcome, objectionable, unacceptable, [and] undesirable" are too flexible in meaning to give proper notice to any reasonable person as to the provision's reach. Indeed, given the terms' subjective valence, their definitions could be nearly limitless. The Unwelcome Provision abuts directly against "sensitive areas of basic First Amendment freedoms," thus "operat[ing] to inhibit the exercise of those freedoms." *Grayned*, 408 U.S. at 109. In verging on, or even overlapping with, protected speech, the provision has confusing and uncertain meanings that "inevitably lead citizen[s] to steer far wider of the unlawful

zone than if the boundaries of the forbidden areas were clearly marked." *Id.* And given this wide latitude, Colorado state officials and courts can arbitrarily interpret the provision, parceling out punishment and mercy at whim.

Colorado says no harm, no foul. But its own statements in this litigation belie Colorado's willingness to distribute punishment inequitably. Colorado explained at oral argument that interpreting the provision would require case-by-case analysis—and that outcomes would "depend on the context." Oral Arg. at 31:50. Hanging a Confederate flag, for example, might be acceptable in "some circumstances" and not in others. *Id.* at 32:10. But Colorado offers no cognizable standard by which business owners, the Commission, or judges can determine which are which. And the provision itself does not give any clues for interpretation. Rather, the Unwelcome Provision

> leaves the people to guess about what the law demands—and leaves judges to make it up. You cannot discern answers to any of the questions this law begets by resorting to the traditional canons of statutory interpretation. No amount of staring at the statute's text, structure, or history will yield a clue. Nor does the statute call for the application of some preexisting body of law familiar to the judicial power.

*Sessions v. Dimaya*, 138 S. Ct. at 1225 (Gorsuch, J., concurring). Without hints about how to apply these traditional methods of interpretation, the provision invites exactly the type of capricious enforcement prohibited by due process.

Because it cannot give proper and clear notice of what is lawful and what is not, this provision of CADA is unconstitutionally vague and overbroad.

-51-

## IV.  Conclusion

Lest it go unsaid in this case:  We must presume Ms. Smith wants to live and speak by her faith, not discriminate against any particular group or person.  We must presume she has reached her beliefs "based on decent and honorable religious or philosophical premises."  *Obergefell*, 576 U.S. at 672.  And we must presume that her beliefs are anything but trivial.  So it is in protecting the right to hold these beliefs that we understand the true resilience of the First Amendment.  The "freedom to differ is not limited to things that do not matter much.  That would be a mere shadow of freedom.  The test of its substance is the right to differ as to things that touch the heart of the existing order."  *Barnette*, 319 U.S. at 642.

For these reasons, I dissent.