19-1413

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

| | |
|---|---|
| 303 CREATIVE LLC, a limited liability company, et al., | |
| Plaintiffs - Appellants, | |
| v. | |
| AUBREY ELENIS, Director of the Colorado Civil Rights Division, in her official capacity, et al., | |
| Defendants - Appellees. | |

On Appeal from the United States District Court
For the District of Colorado

The Honorable Chief District Judge Marcia S. Krieger
D.C. No. 16-cv-02372-MSK

## APPELLEES' ANSWER BRIEF

PHILIP J. WEISER
Colorado Attorney General

Eric R. Olson*
Solicitor General

Billy Lee Seiber*
First Assistant Attorney General

Vincent E. Morscher*
Skippere S. Spear*

Attorneys for Defendants-Appellees.

Jack D. Patten, III*
Senior Assistant Attorney General

Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000

*Counsel of Record

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF RELATED CASES ........................................................ 2

INTRODUCTION .................................................................................... 2

ISSUES PRESENTED FOR REVIEW ..................................................... 6

JURISDICTION ....................................................................................... 7

STATEMENT OF THE CASE .................................................................. 7

SUMMARY OF THE ARGUMENT ......................................................... 19

ARGUMENT ............................................................................................ 22

  I. This case does not satisfy Article III because the Company lacks
     standing and the dispute is not ripe .................................................. 22

    A. Standing must be decided before, and independently of, the
       merits ............................................................................................ 23

       1. Standard of review ................................................................. 24

       2. Injury in fact .......................................................................... 25

       3. Causation ............................................................................... 29

       4. Redressability ........................................................................ 32

    B. This dispute is not ripe .............................................................. 35

  II. As a content-neutral regulation of commercial conduct, the
      Anti-Discrimination Act is subject to—and satisfies—rational-
      basis scrutiny ................................................................................... 37

  III. The Anti-Discrimination Act's Business Discrimination Clause
       does not violate the Free Speech Clause ........................................... 40

# TABLE OF CONTENTS

**PAGE**

A. The Anti-Discrimination Act's Business Discrimination Clause does not restrict protected speech .......................................... 40

B. The Anti-Discrimination Act's Business Discrimination Clause does not compel protected speech ......................................... 42

C. The Company's arguments, if accepted, would bar the application of anti-discrimination law in a wide range of cases ..... 49

IV. The Anti-Discrimination Act's Discriminatory Advertising Clause does not violate the Free Speech Clause .................................. 50

A. The First Amendment poses no bar to the government's regulation of commercial speech incidental to illegal discrimination ........................................................................ 51

B. The Anti-Discrimination Act's Discriminatory Advertising Clause is neither unconstitutionally vague nor overbroad ............. 57

V. The anti-discrimination act does not violate the Free Exercise Clause ...................................................................................... 59

VI. The Anti-Discrimination Act also satisfies heightened scrutiny ...... 64

A. The Act serves a compelling state interest ..................................... 65

B. The Act is narrowly tailored ............................................................ 68

CONCLUSION ................................................................................. 73

STATEMENT REGARDING ORAL ARGUMENT ..................................... 76

CERTIFICATE OF COMPLIANCE ........................................................... 77

CERTIFICATE OF DIGITAL SUBMISSION  AND PRIVACY REDACTIONS ................................................................................ 78

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF SERVICE ...................................................................... 79

## TABLE OF AUTHORITIES

**PAGE**

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)................................. 36

*AT & T Techs. Inc. v. Royston*, 772 P.2d 1182 (Colo. App. 1989)................ 31

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ........................... 63

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ........... 26

*Bd. of Dirs. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ................................................................................ 17

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007).................................. 30

*Brown v. Buhman*, 822 F.3d 1151 (10th Cir. 2016) .............................. 24, 28

*Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890 (Ariz. 2019) ...................................................................... 34, 49, 68, 69

*Bushco v. Shurtleff*, 729 F.3d 1294 (10th Cir. 2013)................................. 64

*Califano v. Sanders*, 430 U.S. 99 (1977)....................................................... 36

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) .......................................................................... 53, 54

*Cervelli v. Aloha Bed & Breakfast*, 415 P.3d 919 (Haw. App. 2018) .......... 61

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...................................................................................... 61

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ....................... 58

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................... 26

*Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016) . 23, 26

# TABLE OF AUTHORITIES

**PAGE**

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) ......... 32

*Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015) ........ 43

*Demetry v. Colo. Civil Rights Comm'n*, 752 P.2d 1070 (Colo. App. 1988) ...................................................................................................... 30

*Elane Photography, LLC. v. Willock*, 309 P.3d 53 (N.M. 2013) ...... 48, 61, 71

*Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ...... 59

*Fort Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776 (S.D. Iowa 2016) ........................................................................................ 61

*Fulton v. City of Phila.*, 922 F.3d 140 (3d Cir. 2019) ............................. 61, 65

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ......................... 44

*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006) .................................................................................... 63

*Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1964) .................... 39, 67

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ......................................... 48

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644 (6th Cir. 1991) ................................................................ 55

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557 (1995) ................................................................. 47, 48, 66

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ......................................................................................... 23, 24, 25

*Klein v. Or. Bureau of Labor and Indus.*, 410 P.3d 1051 (Or. Ct. App. 2017) ........................................................................................... 70, 73

## TABLE OF AUTHORITIES

PAGE

*Kolender v. Lawson*, 461 U.S. 352 (1983) .................................................... 58

*Lawrence v. Texas*, 539 U.S. 558 (2003) ...................................................... 65

*Lexington-Fayette Urban Cty. Human Rights Comm'n v. Hands On Originals*, 2019 WL 5677638 (Ky. 2019).................................................. 61

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) ................................................................................ *passim*

*Mink v. Suthers*, 482 F.3d 1244 (10th Cir. 2007) .................................. 26, 29

*Morgan v. McCotter*, 365 F.3d 882 (10th Cir. 2004)............................. 35, 37

*Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878 (10th Cir. 1997) ............................................................................................. 57

*New Hope Family Svcs., Inc. v. Poole*, 387 F. Supp. 3d 194 (N.D.N.Y. 2019) ............................................................................................ 61

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995) ...................................................................................... 36

*Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968)....................... 48

*Nicopure Labs, LLC v. Food & Drug Admin.*, 944 F.3d 267 (D.C. Cir. 2019) ............................................................................................ 54

*North Coast Women's Care Med. Grp. v. Superior Court*, 189 P.3d 959 (Cal. 2008)................................................................................... 61

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) ............... 28, 32

*Osborne v. Ohio*, 495 U.S. 103 (1990)........................................................ 58

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) ................................................................................ *passim*

## TABLE OF AUTHORITIES

**PAGE**

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ............................ 45

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................... 17, 18

*Raines v. Byrd*, 521 U.S. 811 (1997) ............................................................ 23

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ........................................ 64

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .................................. 39, 48, 66

*Romer v. Evans*, 517 U.S. 620 (1996) .......................................................... 65

*Rumsfeld v. Forum for Acad. & Inst. Rights*, Inc. 547 U.S. 47
    (2006) ................................................................................................ *passim*

*Sorrell v. IMS Health*, Inc., 564 U.S. 552 (2011) ........................................ 51

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...................................... 23, 25

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) ............... *passim*

*Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070 (10th Cir.
    2007) .................................................................................................... 22

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......... 19, 24, 25, 26

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ........ *passim*

*U.S. v. O'Brien*, 391 U.S. 367 (1968) .......................................................... 64

*U.S. v. Playboy Entm't Grp.*, Inc., 529 U.S. 803 (2000) .............................. 66

*U.S. v. Sandoval*, 29 F.3d 537 (10th Cir. 1994) .......................................... 22

*U.S. v. Supreme Ct. of N.M.*, 839 F.3d 888 (10th Cir. 2016) ...................... 24

*U.S. v. Windsor*, 570 U.S. 744 (2013) ........................................................ 66

## TABLE OF AUTHORITIES

**PAGE**

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) ............................................................................... 57

*Virginia v. Hicks*, 539 U.S. 113 (2003) ................................. 57

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................... 45, 46

*Weller v. Carpenter*, 695 F.2d 1348 (10th Cir. 1982)................................. 54

*West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937)................................ 38

*Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006) .................................... 29

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ................................. 38

*Wooley v. Maynard*, 430 U.S. 705 (1977)................................. 46, 47

## CONSTITUTIONS

U.S. CONST. amend. I................................................................. 57

U.S. CONST. art. III................................................................. 24

## STATUTES

29 U.S.C. § 623(e).................................................................. 54

42 U.S.C. § 2000e-3(b).............................................................. 55

42 U.S.C. § 3604(c)................................................................. 55

Colo. Rev. Stat. § 24-4-105......................................................... 30

Colo. Rev. Stat. § 24-34-306(1) .................................................... 30

Colo. Rev. Stat. § 24-34-306(1)(b) ................................................. 31

Colo. Rev. Stat. § 24-34-306(2) .................................................... 30

# TABLE OF AUTHORITIES

**PAGE**

Colo. Rev. Stat. § 24-34-306(2)(a) ...................................................... 12

Colo. Rev. Stat. § 24-34-306(2)(b) ...................................................... 12

Colo. Rev. Stat. § 24-34-306(2)(b)(I) ................................................... 13

Colo. Rev. Stat. § 24-34-306(2)(b)(II) .................................................. 13

Colo. Rev. Stat. § 24-34-306(4) ........................................................... 13

Colo. Rev. Stat. § 24-34-306(8) ........................................................... 13

Colo. Rev. Stat. § 24-34-306(9) ...................................................... 30, 33

Colo. Rev. Stat. § 24-34-307 ................................................................. 13

Colo. Rev. Stat. § 24-34-601(1) ....................................................... 8, 69

Colo. Rev. Stat. § 24-34-601(2)(a) ............................................. 8, 51, 69

Colo. Rev. Stat. § 24-34-602(1)(a) ...................................................... 33

Colo. Rev. Stat. § 24-34-602(3) .......................................................... 33

## OTHER AUTHORITIES

2014 Colo. Legis. Serv. 974 (West) ....................................................... 3

Resolution, Colo. Civil Rights Comm'n (Feb. 28, 2020) ............................. 62

ix

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| 303 CREATIVE LLC, a limited liability company, et al., | |
| Plaintiffs - Appellants, | No. 19-1413 |
| v. | |
| AUBREY ELENIS, Director of the Colorado Civil Rights Division, in her official capacity, et al., | |
| Defendants - Appellees. | |

On Appeal from the United States District Court
for the District of Colorado
D.C. No. 16-cv-02372-MSK-CBS

## APPELLEES' ANSWER BRIEF

Appellees Aubrey Elenis, Charles Garcia, Kendra Anderson,
Sergio Cordova, Miguel Rene Elias, Ajay Menon, Richard Lewis, Jessica
Pocock, and Phil Weiser (collectively "Colorado"), respectfully submit
this Brief for the Court's consideration.

## STATEMENT OF RELATED CASES

This court previously denied an interlocutory appeal filed by 303

Creative and Lorie Smith in this matter. *303 Creative v. Elenis*, No.

17-1344 (10th Cir. Dec. 18, 2017).

## INTRODUCTION

> It is unexceptional that Colorado law can protect
> gay persons, just as it can protect other classes of
> individuals, in acquiring whatever products and
> services they choose on the same terms and
> conditions as are offered to other members of the
> public.

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct.

1719, 1728 (2018). Under *Masterpiece Cakeshop*, Colorado can protect

all of its residents from discrimination when engaging in everyday

commerce. Colorado provides these protections through the Colorado

Anti-Discrimination Act, which safeguards the right of Coloradans to

receive the same goods and services offered to other persons, regardless

of their race, sex, religion, or sexual orientation.

303 Creative LLC and its owner (together, the Company)

challenge two provisions of the Anti-Discrimination Act. The "Business

2

Discrimination Clause" prohibits businesses from denying service based on a person's protected class, and the "Discriminatory Advertising Clause" prevents businesses from advertising that they will deny service based on a person's specific protected class. Colo. Rev. Stat. § 24-34-601(2)(a) (2020).[1] The Company claims that it intends to both deny services to customers based on their sexual orientation—by refusing to provide wedding website services to same-sex couples—and to advertise its intention to deny services to customers based on their sexual orientation. The Company argues that these intentions are based on the religious beliefs of its owner and that the Anti-Discrimination Act hampers the Company's ability to act on these intentions.

But these claims are speculative. The Company has never offered wedding-related services to any customer, never denied service to a person based on their sexual orientation, and never advertised its wish to do so. No person has ever filed a charge of discrimination with the

---

[1] The Anti-Discrimination Act was last changed in 2014. 2014 Colo. Legis. Serv. 974 (West).

Colorado Civil Rights Division asserting discrimination by the Company; as a result, no case has been opened at the Division, no investigation conducted, no decision issued by the Division Director, and no action has been taken by the Colorado Civil Rights Commission. Because this case does not contain any facts showing that either the Division or the Commission has taken an action involving the Company which might implicate the Anti-Discrimination Act, the Company lacks standing and this dispute is not ripe.

The Anti-Discrimination Act's Business Discrimination Clause does not violate the Free Speech Clause because it regulates what commercial actors do (and not what they say), which is offer goods and services for sale to the public. The statute is triggered by a commercial actor's failure to provide some customers, based on protected class status, services that the commercial actor provides to other customers. Nor does the Discriminatory Advertising Clause violate the Free Speech Clause because it regulates unprotected speech incidental to illegal conduct.

4

While the Company owner's "religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop,* 138 S. Ct. at 1727. The Free Exercise Clause does not require exemptions from neutral laws of general applicability. The State respectfully recognizes the Company owner's sincerely held religious beliefs. However, Supreme Court "precedents make clear that the . . . owner of a business serving the public[ ] might have his right to the free exercise of religion limited by generally applicable laws." *Masterpiece Cakeshop,* 138 S. Ct. at 1723-24. The Anti-Discrimination Act is such a law.

## ISSUES PRESENTED FOR REVIEW

Colorado disagrees with Appellants' statement of the issues presented for review, and submits the following alternative statement:

1.  Is this dispute nonjusticiable because the Company lacks standing to challenge the Business Discrimination and Discriminatory Advertising Clauses of the Colorado Anti-Discrimination Act and because the dispute is not ripe?

2.  Is the Colorado Anti-Discrimination Act subject to rational-basis or a heightened level of review and does it satisfy that level of review?

3.  Does the Business Discrimination Clause or the Discriminatory Advertising Clause of the Colorado Anti-Discrimination Act violate the Company's First Amendment right to free speech?

4.  Does the Discriminatory Advertising Clause of the Colorado Anti-Discrimination Act violate the Fourteenth Amendment as overbroad, vague, or allowing unbridled discretion?

5.  Does the Business Discrimination Clause of the Colorado Anti-Discrimination Act violate the Company's First Amendment right to religious exercise?

6

## JURISDICTION

Colorado agrees that this Court has appellate jurisdiction. This Court, however, does not have Article III subject matter jurisdiction because the Company lacks standing and the dispute is not ripe.

## STATEMENT OF THE CASE

In *Obergefell v. Hodges*, the Supreme Court recognized that the fundamental right to marry applied regardless of the sex of a person's spouse under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. 135 S. Ct. 2584, 2602 (2015). And the Court more recently reiterated that "gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018).

Colorado has enacted such a law to protect same-sex couples, along with other individuals, in the exercise of their civil rights. The Colorado Anti-Discrimination Act prohibits discrimination in places of "public accommodation," and broadly defines that term to include "any

7

place of business engaged in any sales to the public and any place

offering services . . . to the public." Colo. Rev. Stat. § 24-34-601(1).

There are two provisions of the Anti-Discrimination Act at issue

here. The first provision, the "Business Discrimination Clause,"

provides:

> It is a discriminatory practice and unlawful for a
> person, directly or indirectly, to refuse, withhold
> from, or deny to an individual or a group, because
> of disability, race, creed, color, sex, sexual
> orientation, marital status, national origin, or
> ancestry, the full and equal enjoyment of the
> goods, services, facilities, privileges, advantages,
> or accommodations of a place of public
> accommodation[.]

§ 24-34-601(2)(a). The second provision, the "Discriminatory Advertising

Clause," provides

> It is a discriminatory practice and unlawful for a
> person . . . directly or indirectly, to publish,
> circulate, issue, display, post, or mail any written,
> electronic, or printed communication, notice, or
> advertisement that indicates that the full and
> equal enjoyment of the goods, services, facilities,
> privileges, advantages, or accommodations of a
> place of public accommodation will be refused,
> withheld from or denied an individual or that an
> individual's patronage or presence at a place of
> public accommodation is unwelcome,

> objectionable, unacceptable, or undesirable
> because of disability, race, creed, color, sex,
> sexual orientation, marital status, national
> origin, or ancestry.

*Id.*

No one has alleged that the Company has violated either clause of the Anti-Discrimination Act. Rather, the Company claims that because unknown future customers may hire, or seek to hire, it to perform commercial services that it does not yet offer, it needs federal court advice on whether the Constitution prevents a potential future finding that its future conduct violates the Anti-Discrimination Act.

The Company is a commercial entity and, under Colorado law, a place of public accommodation engaged in the fields of graphic design, website design, social media management and consultation, marketing, branding strategy, and website management training. Lorie Smith owns the Company and provides services to the Company. Aplt. App. 3-563-64. All statements and conduct at issue in this case, as set forth in the complaint, are statements and conduct that would be made during the Company's operation. Aplt. App. 1-19, 39-40, 46-47, 55, 58,

9

62, 69. The district court relied on this fact in denying the Company's motion for summary judgment. Aplt. App. 3-582 ("Because Ms. Smith's posting of the Statement occurs in the context of advertising or promoting the business of 303 (and not, say, in Ms. Smith's own private website or social media page), . . . Ms. Smith's free speech challenge to the Communication Clause fails.").

Although the Company does not currently design websites for couples planning weddings, it claims that it intends to expand its business to do so. *Id.* at 3-512 and 564. However, the Company claims that it will decline any request to design a website for a same-sex couple. *Id.* at 3-564. In addition, the Company asserts that it intends to post the following statement on its website:

> I love weddings.
>
> Each wedding is a story in itself, the story of a couple and their special love for each other.
>
> I have the privilege of telling the story of your love and commitment by designing a stunning website that promotes your special day and communicates a unique story about your wedding – from the tale of the engagement, to the excitement of the wedding day, to the beautiful life you are building together.

10

I firmly believe that God is calling me to this work. Why? I am personally convicted that He wants me – during these uncertain times for those who believe in biblical marriage – to shine His light and not stay silent. He is calling me to stand up for my faith, to explain His true story about marriage, and to use the talents and business He gave me to publicly proclaim and celebrate His design for marriage as a life-long union between one man and one woman.

These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs. So I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman. Doing that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage – the very story He is calling me to promote.

*Id.* at 3-564-65.

According to the Company, the only reason why it has not begun offering to build wedding websites and has not posted the quoted statement is that it believes doing so would violate the Business Discrimination and Discriminatory Advertising Clauses of the Anti-Discrimination Act. *Id.* at 3-513. But this claim ignores the limited enforcement nature of the Anti-Discrimination Act.

11

Only if the Company began to offer the proposed wedding website services to the public, *and* a same-sex couple requested those services, *and* the Company refused to provide those services, *and* the couple sought redress by filing a private civil action in court or by filing a charge of discrimination with the Division, would the Company face potential consequences under the Act. Colo. Rev. Stat. §§ 24-34-306 (1)(a), 24-34-602, 24-34-603. Because "a place of public accommodation" under the Act is limited to "any place of business . . . offering services," any action could only be taken against the Company, and not its owner. § 24-34-601(1). Similarly, only if the Company posted the text on its website, *and* someone read it, *and* that person filed a private civil action or charge of discrimination, would the Company face potential consequences under the Act. *Id.*

If someone filed a charge against the Company, the Colorado Civil Rights Division would be required to make a prompt investigation. § 24-34-306(2)(a). After investigating, the Director of the Division, or her designee, would determine whether probable cause exists for crediting the charge. § 24-34-306(2)(b). If probable cause were not

12

found, the charge would have to be dismissed and the complaining party could appeal that decision to the Colorado Civil Rights Commission. § 24-34-306(2)(b)(I).

If probable cause were found, the Director would notify the charging party and the Company and commence compulsory mediation. § 24-34-306(2)(b)(II). If mediation failed, the Commission would then decide whether to notice the case for hearing before the Commission, a single Commissioner, or an Administrative Law Judge. § 24-34-306(4). If the case were noticed for hearing, an evidentiary trial would be held, a decision would be issued, and either party could appeal the decision to the Commission, § 24-34-306(8), and could later seek review of the final agency decision at the Colorado Court of Appeals. § 24-34-307.

But the Company has not offered the proposed wedding website services, a same-sex couple has not requested those services, and the Company has not refused to provide those services. Similarly, the Company has not posted the proposed statement on its website. Aplt.

13

App. 3-517-18. No one has filed a charge against the Company. There

has been no investigation or determination of probable cause.

Although no action, whatsoever, has been taken or threatened, the

Company filed a lawsuit requesting a declaration that the

Anti-Discrimination Act is unconstitutional and a permanent

injunction precluding the Act's enforcement. *Id.* at 1-17-78. Colorado

moved to dismiss the complaint for lack of standing, among other

grounds. Sup. App. at 17-41.

The district court granted in part and denied in part Colorado's

motion to dismiss. Aplt. App. 3-509-22; also found at 2017 WL 4331065.

The district court agreed that the Company has not suffered an injury

in fact that establishes standing to challenge to the Business

Discrimination Clause, stating:

> For the Plaintiffs to violate the Accommodation
> Statute there are many conditions precedent to
> be satisfied. The Plaintiffs must offer to build
> wedding websites, a same-sex couple must
> request Plaintiffs' services, the Plaintiffs must
> decline, and then a complaint must be filed. This
> scenario is . . . attenuated and . . . speculative. If
> the Court assumes that the Plaintiffs would offer
> to build wedding websites, decline a request by a

> same-sex couple, and the unhappy customer filed
> a complaint, there remains the question of
> whether a same-sex couple would request
> Plaintiffs' services.

*Id.* at 3-517.

But the district court found that the Company had standing to challenge the Discriminatory Advertising Clause because it could be enforced as soon as the Company posted the statement and a complaint was filed. *Id.* However, the district court stayed the matter until the Supreme Court decided *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*—another case challenging the constitutionality of the Anti-Discrimination Act.

In *Masterpiece Cakeshop*, the Supreme Court found that if "persons who provide goods and services for marriages and weddings" are permitted to "refuse to do so for gay persons," it would result "in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Masterpiece Cakeshop,* 138 S. Ct. at 1727. While a party's "religious and philosophical objections are protected, it is a

15

general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.*; *see also id.* at 1733 (Kagan, J., concurring, stating "As this Court has long held, and reaffirms today, a vendor cannot escape a public accommodations law because his religion disapproves selling a product to a group of customers, whether defined by sexual orientation, race, sex, or other protected trait.").

After *Masterpiece Cakeshop*, the district court issued two orders granting summary judgment for Colorado with regard to the Discriminatory Advertising Clause. Aplt. App. at 3-563-89 (385 F. Supp. 3d 1147) and 3-752-59 (405 F. Supp. 3d 907).

The district court ruled that the Company failed to demonstrate a free exercise violation under the First Amendment. First, the court recognized that the Anti-Discrimination Act is a neutral law because it was not "specifically enacted in response to and with the purpose of frustrating anyone's religious exercise," and because the legislative history suggested "that the legislature's goal was <u>not</u> to suppress

16

religious exercise." *Id.* at 3-585 (emphasis in original). Second, the court

found that the Discriminatory Advertising Clause has general

applicability because it regulates "statements that discriminate against

same-sex couples regardless of whether such statements are based on

religious or other beliefs." *Id.*

Finding that the Discriminatory Advertising Clause is a neutral

law of general applicability, the court ruled that it need only be

rationally related to a legitimate governmental interest to survive the

Company's First Amendment challenge. *Id.* at 3-586. The court found

that the Clause easily passed this hurdle because "states have a

paramount interest in protecting historically disfavored groups from

discrimination in the provision of public services." *Id.* (*citing R.A.V. v.

City of St. Paul*, 505 U.S. 377, 395 (1992) *and Bd. Of Dirs. Of Rotary

Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987)).

The district court ruled that the Company also failed to establish

a free speech violation under the First Amendment. In this regard, the

district court first assumed that the Discriminatory Advertising Clause

presents a content-based restriction and is therefore presumptively

17

unconstitutional. *Id.* at 3-576. The court then recognized, however, that "the government may engage in a content-based restriction to prohibit speech that proposes an illegal act or transaction." *Id.* at 3-577 (*citing Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973)). As stated by the district court, "the government may prohibit speech that would violate duly enacted anti-discrimination laws, even if it does so by reference to the speech's content, because the government's target is not the speech's 'expressive content' but rather its tendency to cause the prohibited discrimination." *Id.* at 3-578-79 (*citing R.A.V.*, 505 U.S. at 389-90). The district court concluded that "[c]ases like *Pittsburgh Press* make clear that the government's interest in eradicating unlawful discrimination trumps the free speech rights of a person who wishes to advertise their willingness to unlawfully discriminate." *Id.* at 3-580.

Finally, the district court held that the Company failed to establish that the Discriminatory Advertising Clause was vague or overly broad in violation of the First or Fourteenth Amendments. The court found that it did not need to address the challenged language—

18

"unwelcome, objectionable, unacceptable, or undesirable"—because the Clause clearly proscribes the specific language that the Company wished to publish—that the Company would refuse services to same-sex couples. *Id.* at 3-573. The court also found that the Company failed to present a "colorable overbreadth challenge," *id.* at 3-580, because the "Clause simply prohibits Ms. Smith from stating that she will not provide 303's wedding website service to same-sex couples." *Id.* at 3-579.

## SUMMARY OF THE ARGUMENT

This dispute is not justiciable because the Company cannot establish standing and the dispute is not ripe.

The Company cannot establish standing to bring its lawsuit because it has not made the required showing that "threatened enforcement [is] sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). It has not entered the market for wedding websites and has failed to demonstrate the likelihood that Colorado would enforce the Anti-Discrimination Act against it if it does

so. And regardless, an injunction against the Commission would not prevent a resident from filing a private lawsuit

Nor is the dispute ripe. Because the Company has not offered wedding website services, much less refused to perform any such services, and because the Commission has taken no action whatsoever, the Company's claim is not fit for judicial resolution

Regardless, the Anti-Discrimination Act satisfies the required rational-basis scrutiny for the regulation of commercial conduct. The Act is a content-neutral regulation that just requires businesses to make the services that they choose to provide to some customers available to all customers irrespective of protected class status.

The Business Discrimination Clause does not violate the Free Speech Clause by restricting protected speech. Businesses retain the ability to choose what products and services they will provide to the general public; they just may not refuse to provide those products and services to some customers based on protected class status. Nor does it compel speech, because it does not require businesses to endorse any

20

particular message. Rather, it just requires merchants to offer goods and services to all customers regardless of protected class status.

Similarly, the Discriminatory Advertising Clause is consistent with the Free Speech Clause. The First Amendment does not protect speech that enables illegal discrimination. The Anti-Discrimination Act, like many longstanding federal statutes, prohibits advertising illegal conduct. The overbreadth doctrine does not apply to restrictions on commercial speech and, regardless, the Act clearly sets forth what type of conduct and advertisements violate the law.

The Free Exercise Clause does not create an exemption to neutral laws of general applicability, like the Anti-Discrimination Act. The Company has pointed to no enforcement action against it motivated by religious hostility. To the contrary, the Civil Rights Commission recently reaffirmed its commitment to "discharge its duty respectfully of all parties." Supp. App. p. 96. Nothing about the Act infringes on the Company's Free Exercise rights.

Finally, even if heightened scrutiny applies, the Act satisfies those requirements. It furthers a compelling governmental interest—

21

eradicating discrimination—and is narrowly tailored because it regulates specific conduct—the discriminatory refusal to serve customers based on protected class status. The Act already contains exemptions for places principally used for religious purposes. Expanding that exemption to cover all religiously motivated conduct would undermine the core purpose of the Act—ensuring LGBT members of our community have equal access to available goods and services.

## ARGUMENT

### I.  This case does not satisfy Article III because the Company lacks standing and the dispute is not ripe.

Below, Colorado filed a motion to dismiss the Company's lawsuit based on standing. Because this Court "may 'affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied on by the district court,'" Colorado renews its standing challenge here. *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007) (quoting *U.S. v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)). The parties' district

court briefs are submitted as Colorado's supplemental appendix. In addition, because the Company has yet to enter the market the lack of factual development means that the dispute is not fit for judicial resolution and is thus not ripe.

### A. Standing must be decided before, and independently of, the merits.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "And '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

"For standing purposes, we ask only if there was an injury in fact, caused by the challenged action and redressable in court." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc), *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (stating that "a federal court can't 'assume' a plaintiff

23

has demonstrated Article III standing in order to proceed to the merits of the underlying claim, regardless of the claim's significance").

The Company relies on an unorthodox view of standing that improperly "put[s] the merits cart before the standing horse." *Walker*, 450 F.3d at 1093. The Company claims that, in this case, the merits and standing questions are rooted in the same issue and are therefore "inextricably intertwined," requiring the court to address both. But the Company actually argues that the two merits issues are intertwined (they are), not that the standing and merits issues are intertwined. Aplt. Br. pp. 18-23.

Because the Company has not shown the required "circumstances that render the threatened enforcement sufficiently imminent," it does not have standing. *Susan B. Anthony List*, 573 U.S. at 159.

### 1.    Standard of review.

This Court reviews questions of standing de novo, *U.S. v. Supreme Ct. of N.M.*, 839 F.3d 888, 898 (10th Cir. 2016), and must "measure standing as of the time the plaintiff files suit." *Brown v. Buhman*, 822 F.3d 1151, 1164 (10th Cir. 2016). Standing consists of three elements.

24

The Company "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [Colorado], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,* 136 S. Ct. at 1547. The Company, "as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* That the Company makes constitutional claims does not change this analysis or its burden. *Walker*, 450 F.3d at 1089 ("If all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is discouraged from speaking, there would be little left of the Article III threshold in First Amendment cases.").

## 2.    Injury in fact.

To establish an injury in fact in a pre-enforcement challenge, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted). The Tenth Circuit calls this the "credible-

threat-of-prosecution test." *Colo. Outfitters*, 823 F.3d at 544-45. The Company fails this test.

The Company has not demonstrated a credible threat of prosecution. While "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *Susan B. Anthony List*, 573 U.S. at 158, a plaintiff must allege more than "the mere presence on the statute books of an unconstitutional statute." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) (holding that plaintiff did not have standing to seek prospective relief alleging Colorado law violated First Amendment). Rather, to confer standing, the threatened enforcement must be "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159. A plaintiff's fear of enforcement that is "imaginary or wholly speculative" does not confer standing. *Id.* at 160 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). In particular, the Supreme Court has recognized that "standing theories that rest on speculation about the decisions of independent actors" do not meet constitutional requirements. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

26

In this case, any threatened enforcement of the Business Discrimination and Discriminatory Advertising Clauses against the Company is not sufficiently imminent. The Complaint makes no allegations about enforcement against the Company. Rather, the Complaint describes unrelated episodes involving four bakeries that actually sold, and sometimes refused to sell, certain goods, and had complaints filed against them by residents. Aplt. App. 1-026-29.

Before Colorado could enforce the Clauses against the Company, the following events would need to occur:

1. The Company begins offering wedding website services to the public;

2. The Company advertises a refusal to serve persons based on their sexual orientation or actually denies services based on a person's sexual orientation;

3. A person files a charge of discrimination against the Company with the Colorado Civil Rights Division;

4. The Division investigates the charge and the Director or her designee finds that there is probable cause to credit the charge;

5. Mandatory mediation is attempted and fails;

6. The Commission decides to notice the case for hearing;

27

7.  The Commission holds a hearing and the fact finder rules against the Company;

8.  The Commission affirms the decision and orders the Company to remove the discriminatory advertising or cease and desist the discriminatory practice; and

9.  The Company exhausts available state appellate remedies.

While not all of these events would necessarily have to occur before enforcement would rise to the level of "sufficiently imminent," at least *some* of them would. But none of these events had occurred when the Company filed this lawsuit.[2]

Further, even if a chain of events is "possible," any threat of enforcement based on those events does not create standing unless it is "immediate." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 n.6 (10th Cir. 2005). The Company, in its Complaint, does not identify any actual customers that it may not serve because of the religious belief of its

---

[2] The Company makes much of the fact that, after it filed this lawsuit, it received an email from what the Company believes to have been a same-sex couple indicating that they might seek design of a wedding website. However, because the email did not exist at the time that the Company filed this lawsuit, it is irrelevant to the standing analysis. *Brown*, 822 F.3d at 1164.

28

owner. Nor does it identify anyone who may read the proposed statement it seeks to place on its website, let alone anyone who may read it and then file a complaint with the Division. The Company's entire case rests on guesswork as to how unknown customers and numerous decisionmakers would exercise their judgment if a highly attenuated chain of possibilities occurred sometime in the future. It has failed to demonstrate the required immediate threat of enforcement.

Instead, the Company attempts to shift its burden by arguing that Colorado has not disavowed its intent to enforce the Anti-Discrimination Act against it. But this argument does not satisfy the Company's burden. Government need not "'refute and eliminate all possible risk that the statute might be enforced' to demonstrate a lack of a case or controversy." *Mink*, 482 F.3d at 1255 (quoting *Winsness v. Yocom*, 433 F.3d 727, 733 (10th Cir. 2006). The Company must establish standing, which it has not done.

### 3.    Causation.

"It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory

provision, the causation element of standing requires the named

defendants to possess authority to enforce the complained-of provision."

*Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). Of the

named defendants in this case, only the Commission has enforcement

authority.

The Director of the Colorado Civil Rights Division investigates

charges of discrimination, issues subpoenas to compel information,

issues a determination of probable cause or no probable cause, and

conducts mandatory mediation if cause is found, or dismisses if no cause

is found. §§ 24-34-306(1), (2). The Commission is the quasi-judicial body

that reviews evidence, considers arguments, and renders a decision. §§

24-4-105, 24-34-306(9). The Director's investigation is merely

preparatory to the Commission's de novo proceeding. *Demetry v. Colo.*

*Civil Rights Comm'n*, 752 P.2d 1070, 1072 (Colo. App. 1988). The

Director's preliminary proceedings are, therefore, without legal effect

until suit is brought. *Id.* The sufficiency of the investigation or the

evidence underlying the finding of probable cause is "not binding" and

therefore cannot be challenged in the hearing before the Commission.

30

*AT & T Techs. Inc. v. Royston*, 772 P.2d 1182, 1186 (Colo. App. 1989)
(the Director's findings of probable cause or no probable cause are not
quasi-judicial rulings, only administrative determinations reached
without the benefit of an adversarial hearing, and the rulings are not
binding). The Director does not have enforcement authority and the
Company lacks standing to bring its claims against her.

The Attorney General has limited enforcement authority under
the Anti-Discrimination Act, which does not create standing in this
case. The Act provides that the Attorney General may file a charge with
the Division alleging a discriminatory or unfair practice when he
determines "the alleged discriminatory or unfair practice imposes a
significant societal or community impact." § 24-34-306(1)(b). Under the
circumstances alleged here, a small company entering a new line of
business with numerous competitors would rarely create a "significant
societal or community impact" sufficient to justify enforcement by the
Attorney General.

Because the Company has not shown that the Director and
Attorney General have enforcement authority that would likely apply to

31

it, the Company does not have standing to bring claims against either individual.

### 4.    Redressability.

"Article III does not allow a plaintiff who wishes to challenge state legislation to do so simply by naming as a defendant anyone who, under appropriate circumstances, might conceivably have an occasion to file a suit . . . under the relevant state law at some future date." *Nova Health*, 416 F.3d at 1157-58. As applicable here, "a party lacks standing to seek an injunction against a nominally public defendant who has not threatened suit and who cannot be distinguished from the countless private litigants with identical enforcement powers." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 904 (10th Cir. 2012). Under the Anti-Discrimination Act, any person denied a public accommodation may initiate their own independent civil action in state court without ever filing a charge with the Division. Colo. Rev. Stat. § 24-34-602(1)(a). If a person does so, he or she is prohibited from filing a charge of discrimination with the Commission. *See* § 24-34-602(3) ("[R]elief provided by this section is an alternative to that authorized

32

by § 24-34-306(9) and a person who seeks redress under this section is not permitted to seek relief from the commission."). An injunction against the Commission will not prevent anyone from initiating an independent civil action against the Company to enforce the Anti-Discrimination Act.

The cases relied on by the Company, *Telescope Media Group* and *Brush & Nib*, do not support standing here.

*Telescope Media* relied on allegations of a "credible threat of enforcement" because of two factors not present here. *Telescope Media Group v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). First, the court relied on "testers" hired by the state to "target noncompliant businesses" to find a credible threat of enforcement. *Id.* No allegations of such testers employed by Colorado appear in the Company's complaint. Second, *Telescope Media* relied on the state's "active enforcement" of the state law to find that it "leaves [the court] with little doubt that the [plaintiffs] will face legal consequences." *Id.* Here, unlike in *Telescope Media*, the Company does not allege any active enforcement by the state. Rather, the Company only identifies four

33

examples of enforcement where residents filed complaints with the Division, instituting the statutory process. And in three of those four complaints, the Division found no probable cause. Aplt. App. 1-026-29. The Company identifies no potential plaintiffs who have stated an intention to file complaints against it, nor could it as it had not yet entered the business of wedding websites when it filed its complaint.

And in *Brush & Nib*, the court found that the plaintiffs *did not* have standing for most of their claims even though they were actively engaged in the business of making custom wedding products. The court found that plaintiffs lacked standing to assert a "sweeping challenge" to a public accommodations law without a customer's request for those products because it "implicate[d] a multitude of possible factual scenarios too imaginary or speculative to be ripe." *Brush & Nib Studio, LC v. City of Phoenix,* 448 P.3d 890, 901 (Ariz. 2019) (quotation and citations omitted). In contrast, the *Brush & Nib* court found that plaintiff had standing to challenge the public accommodations law to the extent it was applied to specific wedding invitations "materially

similar to those in the record." *Id.* But here, the Company has not had

a single customer hire it to make any wedding websites.

Because the Company has not demonstrated a credible threat of

enforcement by an unknown customer against its future business, it

does not have standing to bring any of its claims.

### B.    This dispute is not ripe.

The Article III requirements of standing and ripeness are related

in that both seek to ensure that a dispute is fit for judicial decision

based on adequate factual development rather than speculation.

Federal courts may consider ripeness at any time—even if raised by

neither party. *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004)

("Because the question of justiciability implicates this court's

jurisdiction, even if neither party, nor the district court, raised the

issue, it is our duty to undertake an independent examination to

determine whether the dispute, as framed by the parties, presents a

justiciable controversy.").

Ensuring that a dispute is ripe requires courts "to evaluate both

the fitness of the issues for judicial decision and the hardship to the

parties of withholding judicial consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). As this Court has explained, when determining whether an issue is fit for judicial review, the central focus is on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all. To this end, courts frequently focus on whether a challenged government action is final and whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (quotations and citations omitted).

Here, the Company has yet to offer, much less refuse, any specific wedding-related service. It is thus premature to say whether any refusal, were it to occur, would violate the statute without knowing specifically what the Company offered, and refused, to provide to any customer. For example, refusing to design a website that says "Gay Pride Forever," when the Company would not design such a website for any customer would be very different for Free Speech Clause purposes

36

from refusing to design a website for a same-sex couple that says "Alex and Taylor Invite You to Share Their Joy," when it would design the same website for an opposite-sex couple. Nor has there been any complaint filed against or investigation of the Company, much less any adjudication by the Commission, and thus there are no facts upon which to base a claim of religious hostility in violation of the Free Exercise Clause.

Absent this factual development, this dispute is not yet ripe: "At best, further developments would undoubtedly sharpen the factual issues in this case; at worst, the failure of certain contingent events may render a decision completely advisory." *Morgan*, 365 F.3d at 891.

## II. As a content-neutral regulation of commercial conduct, the Anti-Discrimination Act is subject to—and satisfies—rational-basis scrutiny.

The Supreme Court has long recognized governments' constitutional power to regulate commercial conduct to achieve anti-discrimination and other objectives, subject only to rational-basis scrutiny. *See, e.g., Masterpiece Cakeshop*, 138 S. Ct. at 1728 ("It is unexceptional that Colorado law can protect gay persons, just as it can

37

protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public."); *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (identifying "federal and state anti-discrimination laws" as "an example of a permissible content-neutral regulation of conduct"); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 393 (1937) ("In dealing with the relation of employer and employed, the Legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression.").

The terms and conditions under which a business chooses to offer goods or services for sale to the public constitute commercial conduct, and the Anti-Discrimination Act regulates this commercial conduct in a content-neutral way. Once a commercial actor like the Company chooses to provide a specific product or service for sale to the public, the Act simply requires that commercial actor to make that product or service available to all customers regardless of protected class status.

As Justice Kagan explained in *Masterpiece Cakeshop,* "[a] vendor can choose the products he sells, but not the customers he serves, no matter the reason." 138 S. Ct. at 1733 (Kagan, J., concurring); *see also Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 260 (1964) (recognizing the constitutionality of public accommodation laws that prohibit business from discriminating against prospective customers based on protected-class status).

The Anti-Discrimination Act easily satisfies rational-basis review, which requires that the government's regulation be rationally related to a legitimate interest. Colorado has a legitimate, indeed compelling, interest in ensuring its residents access to goods, services, and other opportunities free from discrimination. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984). And by prohibiting the denial of goods and services to customers based on protected class status, the Anti-Discrimination Act directly advances this interest.

39

### III. The Anti-Discrimination Act's Business Discrimination Clause does not violate the Free Speech Clause.

As a content-neutral regulation of commercial conduct, the Anti-Discrimination Act neither restricts nor compels protected speech and thus does not violate the Free Speech Clause.

#### A. The Anti-Discrimination Act's Business Discrimination Clause does not restrict protected speech.

The Anti-Discrimination Act does not restrict protected speech, and instead simply requires commercial actors that willingly offer certain goods and services to the public to do so regardless of customers' protected class status. For example, the Act does not interfere with writers' or artists' decisions to write or depict whatever they choose and then to make those products available for any buyer to purchase online (or in a brick-and-mortar establishment). Nor, more specifically, does it restrict a graphic artist's decision to design T-shirts, bumper stickers, letterhead, or logos celebrating opposite-sex marriage (or opposing same-sex marriage), and to offer those designs online (or in brick and mortar stores) for purchase by all comers.

40

Nor, contrary to the Company's assertion, does the Anti-Discrimination Act interfere with its ability to "enjoy the same editorial freedom other online speakers exercise." *See* Aplt. Br. p. 36. The Company cites a range of cases that stand for the straightforward proposition that publishers and other online commercial actors have the freedom to make their own editorial choices in crafting the content of their product or service before making it available to the public for sale (at which point the public can choose to buy it, or not). But none of the decisions cited by the Company support the contention that those commercial actors may then refuse to sell that content to potential customers based on protected class status. Aplt. Br. pp. 37-38. To be sure, a publisher remains free to decide which op-eds and stories to run and which letters to the editor to print—but the Anti-Discrimination Act does not restrict protected speech when it forbids that publisher from choosing its subscribers or advertisers based on their protected class status.

41

### B.    The Anti-Discrimination Act's Business Discrimination Clause does not compel protected speech.

The Act prohibits a business from refusing to provide services (including services that involve the vendor's creative or expressive skill) to a particular customer because of that customer's religion or nonreligion, or other protected class status. It does not, however, require a business to design a website featuring the statement "God is Dead" if that business would decline to design such a website for any customer. Nor does the Act require a business to design a website featuring the rainbow flag or the statement "Gay Pride Forever" for same-sex couples if it would decline to design such a website for any customer. But if a merchant is willing to design a website featuring certain statements—like "Alex and Jordan request the honor of your presence [at a particular date, time, and place]" or "Taylor and Morgan invite you to share their joy"—for an opposite-sex couple, then the Anti-Discrimination Act simply requires that business to provide the same commercial service to a same-sex couple: to offer a service to opposite-sex couples but to deny the same service to same-sex couples is

42

to discriminate on the basis of the couples' sexual orientation. *See Masterpiece Cakeshop,* 138 S. Ct. at 1733 (Kagan, J., concurring) (reading "the Court's opinion as fully consistent with that view").

Nor does the Act compel a commercial actor to communicate any message of endorsement when it requires that business to offer the same services to all comers regardless of protected class status. Customers who purchase individualized services from a vendor do so to meet their own needs, expressive or otherwise, rather than those of the vendor. The same is true of wedding services—purchasers of such services seek to celebrate their own weddings rather than to facilitate the views of the commercial service provider; that some of those services involve creative or expressive skill simply explains why those purchasers are willing to pay a certain price for those services. In any event, the Anti-Discrimination Act leaves commercial actors free to make clear that their compliance with the Act "does not constitute an endorsement or approval of conduct." *Craig v. Masterpiece Cakeshop, Inc.,* 370 P.3d 272, 288 (Colo. App. 2015).

43

The Supreme Court's decision in *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.* 547 U.S. 47 (2006), provides the relevant analysis. There, the Court held that the First Amendment permitted Congress to regulate conduct through the Solomon Amendment by requiring federally funded universities to provide military recruiters with the same access to campus facilities as they provided other employers, even though this law also required universities to send emails or post notices on recruiters' behalf:

> As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*. . . . The compelled speech to which the law schools point is plainly incidental to the Solomon Amendment's regulation of conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

*Id.* at 60–62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

44

As the Court explained, the Solomon Amendment "neither limits what law schools may say nor requires them to say anything. . . . Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies." *Id.* at 65; *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (observing that the views expressed by private citizens at "a business establishment that is open to the public" would "not likely be identified with those of the owner," particularly where the owner remained free to "disavow any connection with the message").

The *Rumsfeld* Court thus described the Solomon Amendment as "a far cry from the compelled speech in *Barnette* and *Wooley*"—decisions upon which the Company heavily relies but that did not involve the government's regulation of speech incidental to conduct. *Rumsfeld*, 547 U.S. at 62 (discussing *Wooley v. Maynard*, 430 U.S. 705 (1977) and *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)). As the Court explained, "[t]he Solomon Amendment, unlike the laws at issue in those cases, does not dictate the content of the speech at all, which is only

45

'compelled' if, and to the extent, the school provides such speech for other recruiters." *Id.* at 62.

The same is true of the Anti-Discrimination Act: it requires commercial actors to offer specific goods and services to customers regardless of protected class status only "if, and to the extent" the merchant willingly provides those goods and services to the general public. *See id.* That those goods and services may involve the vendor's creative or expressive skill does not change this analysis.

Just as the *Rumsfeld* Court found to be the case with the Solomon Amendment, the Anti-Discrimination Act is also "a far cry" from *Barnette* and *Wooley*—both of which involved compelled expression entirely untethered to the government's regulation of conduct. *See Wooley*, 430 U.S. 705 (holding that the government violated the Free Speech Clause when it compelled an objecting motorist to display the state's motto "Live Free or Die"); *Barnette*, 319 U.S. 624 (holding that the government violated the Free Speech Clause when it compelled students to salute the flag despite their religious objections). The Act, in contrast, simply requires businesses that willingly offer particular

46

goods and services for sale to the public to make those goods and services available to all customers regardless of protected class status.

So too is *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557 (1995), inapposite to the case at hand, despite the Company's reliance on it. To be sure—unlike *Wooley* and *Barnette*—*Hurley* involved a First Amendment challenge to the application of a law that prohibited discrimination by public accommodations. *Hurley*, 515 U.S. at 564. But unlike this case, *Hurley* involved the application of that anti-discrimination law not to the commercial conduct of a vendor offering goods and services to the public, but instead to a private, noncommercial parade organizer's refusal "to admit a parade contingent expressing a message not of the private organizers' own choosing." *Id.* at 566. Indeed, in that case, the Court noted the state courts' "peculiar" application of the law when they characterized speech itself in the form of a parade—rather than conduct—as the regulated public accommodation. *Id.* at 572-73.

In short, none of the Supreme Court's decisions upon which the Company relies involve the application of an anti-discrimination law to

the commercial conduct of vendors offering goods and services to the public. Indeed, the Supreme Court has never held that the First Amendment requires the exemption of commercial actors from anti-discrimination laws. *See Hishon v. King & Spalding*, 467 U.S. 69 (1984); *Roberts*, 468 U.S. 609; *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968); *see also Hurley*, 515 U.S. at 572 (recognizing that public accommodations laws "do not, as a general matter, violate the First or Fourteenth Amendments"). And in contexts very similar to the case at hand, the New Mexico and Washington Supreme Courts, among other courts, have rightly held that the First Amendment poses no bar to the government's application of anti-discrimination laws to merchants offering wedding-related services to the public. *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1229 (Wash. 2019), *petition for cert. filed* (U.S. Sep. 11, 2019); *Elane Photography, LLC. v. Willock*, 309 P.3d 53, 76 (N.M. 2013).

Putting aside differences that led the courts to find standing, the Eighth Circuit and the Arizona Supreme Court, however, have held to the contrary. *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir.

48

2019); *Brush & Nib Studio, LC, v. City of Phoenix*, 448 P.3d 890 (Ariz. 2019). In both cases, those courts failed to recognize that a commercial vendor's refusal to offer the same wedding-related services to same-sex couples that it offers to opposite-sex couples constitutes discriminatory conduct rather than protected speech.

### C.    The Company's arguments, if accepted, would bar the application of anti-discrimination law in a wide range of cases.

Allowing an exception for commercial conduct to anti-discrimination laws would undermine the application of anti-discrimination law in contexts far afield from the case at hand. For example, the Company's Free Speech Clause arguments cannot be limited to protect only those who object to serving same-sex couples, nor only those with religious motivations for their objections: all that matters is that a vendor objects, for whatever reason, to providing certain services to certain customers based on protected class status.

Acceptance of the Company's Free Speech Clause arguments would permit a vendor to refuse to serve interracial or interfaith

couples regardless of whether its refusal were motivated by unexamined habit, stereotypes, or ignorance rather than by sincerely held religious convictions. *Arlene's Flowers*, 441 P.3d at 1228 (recognizing the "enormous hole" in "public accommodation laws under such a system").

Many artisans offer custom-tailored goods and services for sale to the public that require creative or other expressive skill. Examples include not only artists and graphic designers, but also bespoke tailors, hair stylists, florists, dress designers, architects, and gourmet chefs, among many others. The Company offers no workable rule for separating the sorts of commercial goods and services that are sufficiently expressive to warrant constitutional exemption from anti-discrimination law from those that are not.

## IV.   The Anti-Discrimination Act's Discriminatory Advertising Clause does not violate the Free Speech Clause.

In addition to prohibiting businesses from denying goods and services based on customers' protected class status, the Act prohibits any "communication, notice, or advertisement that indicates that the full and equal enjoyment" of available goods and services will be denied,

50

or that indicates that a customer's "patronage or presence" is "unwelcome, objectionable, unacceptable, or undesirable," based on customers' protected class status. Colo. Rev. Stat. § 24-34-601(2)(a). Because, as discussed above, the Business Discrimination Clause does not violate the Free Speech Clause, this Discriminatory Advertising Clause regulates speech that is unprotected because it is incidental to conduct made illegal by the anti-discrimination provision.

### A.    The First Amendment poses no bar to the government's regulation of commercial speech incidental to illegal discrimination.

Laws that forbid commercial actors from making statements that enable illegal discrimination—by communicating that certain goods, services, and other opportunities are off limits to some because of their protected class status—satisfy the First Amendment. As the Supreme Court explained in *Sorrell v. IMS Health, Inc.*:

> It is true that restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. It is also true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on

51

> speech. That is why a ban on race-based hiring
> may require employers to remove "White
> Applicants Only" signs.

564 U.S. 552, 567 (2011).

And in *Rumsfeld,* the Court again offered "White Applicants Only" as an illustration of speech that is unprotected because of its relationship to illegal conduct: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62.

*Pittsburgh Press* provides yet another illustration of this principle in action. There, the Court rejected a First Amendment challenge to a local anti-discrimination law that not only prohibited sex-based employment decisions, but also the publication of "any notice or advertisement relating to 'employment' or membership which indicates any discrimination because of . . . sex." 413 U.S. at 378. In holding that sex-segregated job advertisements constituted unprotected commercial

speech because they proposed the illegal commercial transaction of

discriminatory hiring, the Court explained:

> Discrimination in employment is not only
> commercial activity, it is illegal commercial
> activity under the Ordinance. . . . The
> advertisements, as embroidered by their
> placement, signaled that the advertisers were
> likely to show an illegal sex preference in their
> hiring decisions. Any First Amendment interest
> which might be served by advertising an ordinary
> commercial proposal and which might arguably
> outweigh the governmental interest supporting
> the regulation is altogether absent when the
> commercial activity itself is illegal and the
> restriction on advertising is incidental to a valid
> limitation on economic activity.

*Id.* at 388–89.

The Court has thus repeatedly identified anti-discrimination

provisions that prohibit commercial actors' statements of discriminatory

preference as exemplifying the government's constitutionally

permissible regulation of speech that is incidental, or related, to

commercial conduct that the government has legitimately regulated.

*See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447

U.S. 557, 563-64 (1980) ("The government may ban . . . commercial

speech related to illegal activity."); *Weller v. Carpenter*, 695 F.2d 1348,

1350 (10th Cir. 1982) (holding "the commercial speech at issue

[promoting sales of drug paraphernalia] is not protected by the first

amendment"); *Nicopure Labs, LLC v. Food & Drug Admin.*, 944 F.3d

267, 284 (D.C. Cir. 2019) (applying *Central Hudson* to require

heightened scrutiny of the government's regulation of commercial

speech only when the speech is "neither misleading nor related to

unlawful activity").

Indeed, many anti-discrimination laws incorporate similar

provisions:

- The Fair Housing Act prohibits housing providers from
  "indicat[ing] any preference, limitation, or discrimination
  based on race, color, religion, sex, handicap, familial status,
  or national origin." 42 U.S.C. § 3604(c).

- Title VII of the Civil Rights Act of 1964 makes it unlawful
  "to print or publish or cause to be printed or published any
  notice or advertisement relating to employment . . .
  indicating any preference, limitation, specification, or

discrimination, based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-3(b).

- The Age Discrimination in Employment Act prevents employers from printing or publishing "any notice or advertisement relating to employment . . . indicating any preference, limitation, specification, or discrimination, based on age." 29 U.S.C. § 623(e).

These provisions ensure the anti-discrimination laws work. *See Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 652 (6th Cir. 1991) ("Without the regulation of advertisements, realtors could deter certain classes of potential tenants from seeking housing at a particular location, effectively discriminating against these classes without running afoul of the [Fair Housing Act's] prohibition against discriminatory housing practices. Congress obviously recognized the key role housing advertisements play in potential real estate transactions and concluded that the regulation of real estate advertisements is warranted.").

55

The Company claims that because the proposed statement reflects the owner's religious views it is therefore not commercial speech. Aplt. Br. p. 58. But the Company concedes, as it must, that the only proposed speech at issue here occurs on the Company's website, which would explain the services the Company proposes to sell. *See, e.g.,* Aplt. App 1-19 (describing the "expressive platform [the owner] has in 303 Creative"). The proposed speech therefore falls well within the confines of commercial speech as it proposes a commercial transaction, only available to opposite-sex couples. See *Pittsburgh Press,* 413 U.S. at 385-89 (describing advertisements that indicated that some job opportunities were available only to men and others were available only to women as commercial speech because they proposed the terms of commercial transactions).

Here, the Act regulates the same sort of speech as the numerous federal statutes discussed above: a commercial actor's statement indicating that it will not provide certain goods or services to certain customers, or that certain customers are preferred (or not), based on

their protected class status. The First Amendment does not protect

these statements because they facilitate illegal commercial conduct.

> **B.    The Anti-Discrimination Act's Discriminatory Advertising Clause is neither unconstitutionally vague nor overbroad.**

The Company's vagueness and overbreadth challenges to this

provision also fail. First, the Supreme Court has made clear that the

overbreadth doctrine does not apply to laws regulating commercial

speech. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S.

489, 497 (1982) ("[T]he overbreadth doctrine does not apply to

commercial speech."); *accord Nat'l Council for Improved Health v.*

*Shalala*, 122 F.3d 878, 882 n.6 (10th Cir. 1997) (discussing origin of this

rule). And, as explained above, the Act's Discriminatory Advertising

Clause regulates commercial speech related to illegal commercial

transactions.

In any event, a statute is not unconstitutionally overbroad unless

it regulates substantially more speech than the Free Speech Clause

permits it to regulate. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003)

(rejecting an overbreadth challenge and noting that "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct"); *Osborne v. Ohio*, 495 U.S. 103, 113-14 (1990) (emphasizing the importance of construing statutes narrowly to avoid overbreadth problems); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984) ("[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge . . . . In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."). And a statute is not unconstitutionally vague when "ordinary people" can "understand what conduct is prohibited" and when the statute defines the prohibited conduct "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

58

The Act is neither vague nor substantially overbroad. It prohibits commercial actors' statements of discriminatory preference in connection with a regulated commercial transaction. It leaves commercial actors free to express any political, moral, religious, or other views outside of the context of proposing and offering commercial transactions through, for example, websites and social media postings, letters to the editor, testimony, lobbying, and more. *See Pittsburgh Press,* 413 U.S. at 391 ("Nothing in our holding allows government at any level to forbid Pittsburgh Press to publish and distribute advertisements commenting on the Ordinance, the enforcement practices of the Commission, or the propriety of sex preferences in employment.").

## V.    The Anti-Discrimination Act does not violate the Free Exercise Clause.

The Free Exercise Clause permits the government to regulate conduct even when that conduct is accompanied by a sincerely held religious belief. *Emp't Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 882 (1990) ("Respondents urge us to hold, quite simply, that

59

when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have never held that, and decline to do so now."). The Free Exercise Clause thus does not require exemptions from anti-discrimination laws and other neutral laws of general applicability. *See Masterpiece Cakeshop*, 138 S. Ct. at 1727 ("[I]t is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law.").

The Act exemplifies a neutral law of general applicability, as its enforcement is triggered not by a commercial actor's religious motivations, but instead by a commercial actor's refusal, based on protected class status, to provide some customers a product or service that the business willingly provides to other customers. Courts have repeatedly found that anti-discrimination laws like the Act are neutral laws of general applicability. *See, e.g., Masterpiece Cakeshop*, 138 S. Ct. at 1728-29; *Telescope Media Group*, 936 F.3d at 761; *Fort Des Moines*

60

*Church of Christ v. Jackson*, 215 F. Supp. 3d 776, 802-03 (S.D. Iowa 2016); *Arlene's Flowers*, 441 P.3d at 1229; *Elane Photography*, 309 P.3d at 76; *North Coast Women's Care Med. Grp. v. Superior Court*, 189 P.3d 959, 966 (Cal. 2008); *Cervelli v. Aloha Bed & Breakfast*, 415 P.3d 919, 934 (Haw. App. 2018); *Lexington-Fayette Urban Cty. Human Rights Comm'n v. Hands On Originals*, 2019 WL 5677638, at *6 (Ky. 2019); *cf. Fulton v. City of Phila.*, 922 F.3d 140, 156 (3d Cir. 2019), *cert. granted,* 140 S. Ct. 1104 (2020) (finding an anti-discrimination law that prohibited foster care agencies from refusing to work with same-sex couples to be neutral and generally applicable); *New Hope Family Svcs., Inc. v. Poole*, 387 F. Supp. 3d 194, 213-14 (N.D.N.Y. 2019) (same).

To be sure, the Free Exercise Clause forbids governmental enforcement motivated by religious hostility. *Masterpiece Cakeshop,* 138 S. Ct. at 1729-30; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540-41 (1993). The Court in *Masterpiece Cakeshop*, for instance, found that the Colorado Civil Rights Commission did not adjudicate the specific complaint in that case "with the religious neutrality that the Constitution requires." 138 S. Ct. at

61

1724. But in the case at hand, there has been *no* enforcement action of *any* sort, much less one reflecting religious hostility. Moreover, should any enforcement action occur, the Commission will respond consistently with its recently emphasized commitment to "discharge its duties respectfully of all parties, in a way that presumes the conduct of any respondent is neither unfair nor discriminatory unless proven otherwise, and in a matter that seeks to provide appropriate protections pursuant to Colorado's anti-discrimination laws." Resolution, Colo. Civil Rights Comm'n (Feb. 28, 2020), Supp. App. p. 96.

Contrary to the Company's contention, the Commission does not have any discriminatory "religious speakers' policy." *See* Aplt. Br. pp. 48-49. As explained above, the Commission interprets the Act to prohibit all businesses owners, regardless of their religious beliefs, from refusing to provide particular services to a particular customer based on that customers' protected class status. At the same time, the Commission does not interpret the Act to require any business owner, regardless of religious beliefs, to produce a message it would decline to produce for any customer.

62

Finally, although the Company argues that the hybrid rights doctrine triggers strict scrutiny of its Free Exercise Clause claim, the hybrid rights doctrine does not apply because the Act is a neutral law of general applicability and does not infringe another constitutionally protected right. This Court requires a Free Exercise Clause claim to be coupled with another "colorable" constitutional infringement before applying the hybrid rights doctrine. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). To be colorable, the additional constitutional claim must have a fair probability or likelihood of success on the merits. *Id.*; *see also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 656-59 (10th Cir. 2006) (concluding that the challenger had alleged no other colorable constitutional claim and thus that the hybrid rights doctrine did not apply). As explained above, the Company does not have a colorable Free Speech Clause claim because the Act is a content-neutral regulation of commercial conduct that neither restricts nor compels protected speech.

63

## VI.   The Anti-Discrimination Act also satisfies heightened scrutiny.

As explained above, the Anti-Discrimination Act is a content-neutral regulation of commercial conduct that triggers, and survives, rational-basis scrutiny. But the Act would also survive heightened scrutiny.

If the Act regulates expressive conduct, it meets constitutional requirements so long as it furthers an important governmental interest that is unrelated to limitation on expression and the limitation is no greater than necessary to further that interest. *Bushco v. Shurtleff*, 729 F.3d 1294, 1304 (10th Cir. 2013) (relying on *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968)).

Even if strict scrutiny applies, the Act meets constitutional requirements if it serves a "compelling state interest" and is "narrowly tailored" to that interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Because the Act meets this standard, it satisfies any version of heightened scrutiny.

64

### A.   The Act serves a compelling state interest.

"It is black-letter law that eradicating discrimination is a compelling interest." *Fulton v. City of Phila.*, 922 F.3d 140, 163 (3d Cir. 2019) (quotation omitted), *cert. granted*, No. 19-123 (U.S. Feb. 24, 2020). But the Company argues that this "black-letter law" does not apply because Colorado "has not proved any actual problem" and has not "identified a single Colorado public accommodation that discriminates based on sexual orientation." Aplt. Br. p. 54. This argument ignores history.

"[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral." *Lawrence v. Texas*, 539 U.S. 558, 571 (2003). In 1992, the Supreme Court found that Colorado enacted a constitutional amendment "born of animosity," to "deprive gays and lesbians even of the protection of general laws and policies that prohibit arbitrary discrimination in governmental and private settings." *Romer v. Evans*, 517 U.S. 620, 630, 634 (1996). And, in 1996, the Court found that Congress enacted the Defense of Marriage Act with "the principal

65

purpose . . . to demean those persons who are in a lawful same-sex marriage." *U.S. v. Windsor*, 570 U.S. 744, 774 (2013).[3]

Against this historical backdrop, the States enacted public accommodation laws like the Act to "eliminat[e] discrimination and assur[e] citizens equal access to publicly available goods and services." *Roberts*, 468 U.S. at 624. Because they "plainly serve[ ] compelling state interests of the highest order," *id.*, these laws have repeatedly survived constitutional challenge. *See, e.g., Hurley*, 515 U.S. at 572 ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments."); *Roberts*, 468 U.S. at 628 ("[A]cts of invidious discrimination in the distribution of publicly available goods,

---

[3] *U.S. v. Playboy Entm't Grp., Inc.*, does not hold to the contrary. In that case, the Court held that "a handful of complaints" about unwanted exposure to sexually explicit cable programming did not support a "pervasive, nationwide problem" to establish a compelling interest for content-based cable regulation. 529 U.S. 803, 823 (2000). As discussed above, the Supreme Court itself has documented the wide-spread historical discrimination against the LGBT community.

services, and other advantages cause unique evils that government has a compelling interest to prevent").

Colorado's interest is in no way related to the suppression of free expression. Rather, Colorado's interest in preventing the harms that result from invidious discrimination are "wholly apart from the point of view such conduct may transmit." *Roberts*, 468 U.S. at 628.

That other website designers are willing to serve the LGBT community is of no moment. *See Heart of Atlanta Motel*, 379 U.S. at 292 (Goldberg, J., concurring) (recognizing that "[d]iscrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public." (quotation omitted)).

When the Washington Supreme Court considered this very same argument—there in relation to florists—it "emphatically" rejected it, holding that public accommodations laws "serve a broader societal purpose: eradicating barriers to the equal treatment of all citizens in the commercial marketplace" and "that purpose would be fatally

undermined" if courts were "to carve out a patchwork of exceptions for ostensibly justified discrimination." *Arlene's Flowers, Inc.*, 441 P.3d at 1235; *see also Telescope Media Group,* 936 F.3d at 777 (Kelly, J., concurring in part and dissenting in part, emphasis in original) (stating that the "argument that victims of discrimination are free to go elsewhere carries little force" because public accommodations laws "were not passed to ensure that members of historically discriminated groups had access to *some* places of public accommodation. They were passed to guarantee equal access to *all* goods and services otherwise available to the public."); *Brush & Nib Studio,* 448 P.3d at 934 (Bales, J., dissenting) ("One would think—indeed fervently hope—that we are long past the notion that businesses operating as public accommodations have a 'right' to tell certain customers that they do not serve their kind and so they should take their patronage elsewhere.")

## B.    The Act is narrowly tailored.

The Act is narrowly tailored because it aims to erase discrimination in the public commercial market, and it only regulates conduct—the discriminatory refusal to serve customers based on

68

protected class status—rather than speech. *See* Colo. Rev. Stat. § 24-34-601(2)(a). The "least restrictive way to eliminate discrimination in places of public accommodation is to expressly prohibit such places from discriminating." *Brush & Nib Studio,* 448 P.3d at 931(Bales, J., dissenting) (quotation omitted). The Company does not dispute this. Instead, it argues that the Act is not narrowly tailored because Colorado could enact statutory exceptions that: (1) allow message-based objections; (2) exempt expressive or highly selective businesses; or (3) exempt artists who speak about weddings. Aplt. Br. pp. 55-57. But, the enactment of any one of these exceptions would eviscerate the Act.

The Act already contains an exception for any "place that is principally used for religious purposes." § 24-34-601(1). But, as noted by the Supreme Court, "if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Masterpiece Cakeshop*, 138 S. Ct. at 1727; *see also*

69

*Klein v. Or. Bureau of Labor and Indus.*, 410 P.3d 1051, 1074 (Or. Ct. App. 2017) (holding that there "is no doubt" that the purpose of public accommodations laws "would be undermined if businesses that market their goods and services to the 'public' are given a special privilege to exclude certain groups from the meaning of that word").

This alone is sufficient to reject the Company's arguments, but each proposed individual exception also fails review.

The Company does not identify what, exactly, a message-based objection is. Could a business object to serving an LGBT individual because it disagrees with that person's sexual orientation and does not wish to promote a message that such an individual can equally participate in our economy? Could the same business further object to serving an individual who belongs to a racial or religious minority because it does not wish to promote a message that members of that minority should be served equally? Under well-established law, of course not.

And why should expressive or highly selective businesses be exempt from a generally applicable public accommodations law? Under

70

the Company's theory, the Act would not apply any time a business provides services that "express" something. But who decides what is expressive and worthy of exemption? *Elane Photography*, 309 P.3d at 71 ("Courts cannot be in the business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws."). As demonstrated by the concurring and dissenting opinions in *Masterpiece Cakeshop*, even Supreme Court Justices are unable to agree as to whether a wedding cake is expressive. The exception advanced by the Company would inject such doubt as to often render the Act unenforceable with regard to all protected classes. *Elane Photography,* 309 P.3d at 72 ("Such an exemption would not be limited to religious objections or to sexual orientation discrimination; it would allow any business in a creative or expressive field to refuse service on any protected basis, including race, national origin, religion, sex, or disability."); *see also Telescope Media Group,* 936 F.3d at 780 (Kelly, J., concurring in part and dissenting in part) ("Can an inn-keeper deny a same-sex couple access to the honeymoon suite because handing over the keys would 'express' an endorsement of their marriage?").

71

Further, an exception for businesses offering individualized services "would create a two-tiered system that carves out an enormous hole from public accommodations laws: under such a system, a dime-store lunch counter would be required to serve interracial couples but an upscale bistro could turn them away." *Arlene's Flowers*, 441 P.3d at 1228 (quotations and citations omitted).

Finally, an exception based on weddings is similarly untenable, "lest all purveyors of goods and services who object to gay marriages for moral and religious reasons in effect be allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages,' something that would impose a serious stigma on gay persons." *Masterpiece Cakeshop*, 138 S. Ct. at 1728-29. The Supreme Court's fear is borne out by the number of recent legal challenges to public accommodations laws across the country based on the refusal to provide services for same-sex weddings.

And no limiting principle ensures this exception would stop with same-sex weddings. The Company's proffered exception would also apply to weddings between those of different faiths, ethnicities, or races,

regardless of whether refusals to provide wedding services to some customers were motivated by sincerely held religious beliefs or instead unexamined habit, stereotypes, or ignorance. *Klein*, 410 P.3d at 1077-78 (stating that if an exception to public accommodations laws was created based on "sincere religious opposition to same-sex marriage," then "those with sincere religious objections to marriage between people of different races, ethnicities, or faiths could just as readily demand the same exemption").

The Act's uniform enforcement is the least restrictive means of furthering Colorado's compelling interest in eliminating discrimination and ensuring residents' equal access to available goods and services.

## CONCLUSION

The Company does not make wedding websites. The Company has not identified a single potential customer who may complain about the Company's stated intent to refuse services in the future. It has not, therefore, shown the credible threat of enforcement required to establish standing. Nor is the dispute ripe.

73

On the merits, the Anti-Discrimination Act is a content-neutral regulation of commercial conduct that satisfies rational basis scrutiny because it advances Colorado's compelling interest in preventing and eliminating commercial actors' discriminatory conduct. And even examined under higher levels of scrutiny, the Act satisfies the Free Speech and Free Exercise Clauses because it is narrowly tailored to achieve that compelling interest. Colorado respectfully requests that the Court affirm.

PHILIP J. WEISER
Colorado Attorney General

*s/Eric R. Olson*
ERIC R. OLSON*
Solicitor General

BILLY LEE SEIBER*
First Assistant Attorney General

VINCENT EDWARD MORSCHER*
SKIPPERE SPEAR*
JACK D. PATTEN, III*
Senior Assistant Attorneys General

1300 Broadway, 10th floor
Denver, CO 80203
Telephone: (720) 508-6000

74

Fax: (720) 508-6037
E-Mail: eric.olson@coag.gov
billy.seiber@coag.gov
vincent.morscher@coag.gov
skip.spear@coag.gov
jack.patten@coag.gov
*Counsel of Record

## STATEMENT REGARDING ORAL ARGUMENT

Colorado believes that oral argument is necessary and will assist the court in reaching a decision. Oral argument will aid the court's consideration of standing, ripeness, and the First Amendment issues and will ensure that the court, and counsel, can discuss any developments in related cases after the completion of briefing.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,713 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook.

Dated April 22, 2020

*s/ Skip Spear*
Skippere S. Spear
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6635
skip.spear@coag.gov

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

This is to certify that all privacy redactions have been made, and with the exception of those redactions, every document submitted in digital form or scanned PDF is an exact copy of the written document filed with the Court.

The digital submission has been scanned for viruses with the most recent version of CrowdStrike; Version 5.26.10806.0, recently updated on February 19, 2020, and according to the program is free of viruses.

*s/ Skip Spear*
Skippere S. Spear
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6635
skip.spear@coag.gov

78

# CERTIFICATE OF SERVICE

This is to certify that I have duly served the within APPELLEES'

ANSWER BRIEF upon all parties herein this 22nd day of April, 2020 by

using the CM/ECF system which will send notification of such filing to

the following:

<u>303 Creative LLC and Lori Smith, Plaintiffs-Appellants</u>

Kristin K. Waggoner
Jonathan A. Scruggs
Katherine L. Anderson
Samuel David Green
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kwaggoner@ADFlegal.org
jscruggs@ADFlegal.org
kanderson@ADFlegal.org
sgreen@adflegal.org

David A. Cortman
John J. Bursch
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
dcortman@ADFlegal.org
jbursch@ADFlegal.org

<u>INTERESTED PARTIES</u>

<u>Catholicvote.Org Education Fund</u>
Scott W. Gaylord
Professor of Law
Elon Law Constitutional Appellate Clinic 201
North Greene Street
Greensboro, NC 27401
sgaylord@elon.edu

<u>Center for Religious Expression</u>
Nathan W. Kellum
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38170
nkellum@crelaw.org

<u>Tyler House Publishers, *et al*.</u>
Wesley R. Butler
Holly R. Iaccarino
BARNETT BENVENUTI & BUTLER PLLC
3801 E. Florida Ave., Ste. 830

Barry K. Arrington
ARRINGTON LAW FIRM
489 East Main Street, Suite 300 Denver,
CO 80210
barry@arringtonpc.com

Lexington, KY 40507
wes.butler@bbb-law.com;
holly.iaccarino@bbb-law.com
*Counsel for Tyndale House Publishers*

Law and Economics Scholars
Theresa Lynn Sidebotham
TELIOS LAW PLLC
19925 Monument Hill Road
Monument, CO 80132
tls@telioslaw.com

Cato Institute
Eugene Volokh
UCLA SCHOOL OF LAW
450 Hilgard Ave. Los Angeles, CA 90095
volokh@law.ucla.edu

Foundation for Moral Law
John Allen Eidsmoe
1 Dexter Ave. Montgomery, AL 36104
eidsmoeja@juno.com

The States of Arizona, *et al.*
Mark Brnovich
Attorney General
Oramel H (O.H.) Skinner
Solicitor General
Rusty D. Crandell
Deputy Solicitor General
Office of the Arizona Attorney General
2005 N. Central Ave. Phoenix, AZ 85004
Rusty.Crandell@azag.gov

*Counsel for Catholic Creatives; Christian Professional Photographers; & The Briner Institute*

Ilya Shapiro
Cato Institute 1000 Mass. Ave. N.W
Washington, DC 20001
ishapiro@cato.org

Professor Robert P. George
Scott D. Goodwin
Gene C. Schaerr
1717 K Street NW, Suite 900
Washington, DC 20006
sgoodwin@schaerr-jaffe.com
gschaerr@schaerr-duncan.com

Timothy C. Fox
Attorney General of Montana
215 North Sanders Street
Helena, MT 59601
timfox@mt.gov

Douglas J. Peterson
Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
djp1977@nebraska.gov

*s/ Elle Di Muro*

80